IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| 68TH STREET SITE WORK GROUP | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| 7-ELEVEN, INC.; A&M (2015) LLC; | ) | COMPLAINT |
| AARON'S, INC.; ABACUS CORPORATION; | ) | |
| AIRGAS, INC.; ALBAN TRACTOR CO., INC.; | ) | |
| ALLY FINANCIAL INC.; AMERICAN | ) | |
| EXPRESS COMPANY; AMERICAN | ) | |
| PREMIER UNDERWRITERS, INC.; | ) | |
| AMERICAN SUGAR REFINING, INC.; | ) | |
| AMTOTE INTERNATIONAL, INC.; APPLIED | ) | |
| INDUSTRIAL TECHNOLOGIES, INC.; | ) | |
| ARMACELL, LLC; ASARCO LLC; | ) | |
| ASCENSION ST. AGNES HOSPITAL; AVIS | ) | |
| RENT A CAR SYSTEM, LLC; BATESVILLE | ) | |
| CASKET COMPANY, INC.; BELL AND | ) | |
| HOWELL, LLC; BENJAMIN MOORE & CO.; | ) | |
| BERWIND CORPORATION; BOB BELL | ) | |
| AUTOMOTIVE GROUP, INC.; BOB | ) | |
| DAVIDSON FORD, INC.; BRAND | ) | |
| INDUSTRIAL SERVICES, INC.; BRINK'S | ) | |
| INC.; BURT RIGID BOX, INC.; C&I | ) | |
| LEASING, INC.; CAPLAN BROTHERS, INC.; | ) | |
| CARAUSTAR INDUSTRIES, INC.; GREIF, | ) | |
| INC.; CARISAM-SAMUEL MEISEL (MD), | ) | |
| INC.; CERES MARINE TERMINALS INC.; | ) | |
| CHIQUITA BRANDS LLC; CITIFINANCIAL | ) | |
| CREDIT COMPANY; CLARK EQUIPMENT | ) | |
| COMPANY; CLOVERLAND DAIRY | ) | |
| LIMITED PARTNERSHIP; COACH USA, | ) | |
| INC.; COLDWELL BANKER REAL ESTATE | ) | |
| LLC; COWAN SYSTEMS, INC.; CROWN | ) | |
| CENTRAL LLC; CRW PARTS INC.; | ) | |
| DETROIT ROYALTY, INC.; DONOHOE | ) | |
| REAL ESTATE SERVICES; DRUG CITY | ) | |
| PHARMACY, LLC; EAGLE GROUP; EBY- | ) | |
| BROWN COMPANY, LLC; ECLIPSE | ) | |
| INTERNATIONAL, INC.; ELG METALS, | ) | |
| INC.; ENTERPRISE ELECTRIC COMPANY; | ) | |

FERGUSON ENTERPRISES, INC.; FIRST          )
NATIONAL BANK OF PENNSYLVANIA;             )
F.N.B. CORPORATION; FOOT LOCKER            )
SPECIALTY, INC.; FROEHLING &               )
ROBERTSON, INC.; FUCHS LUBRICANTS          )
CO.; GENESCO INC.; GIVAUDAN FLAVORS        )
CORPORATION; UNILEVER UNITED               )
STATES, INC.; GLEN-GERY                    )
CORPORATION; GRAUL'S MARKET, INC.;         )
GRAYBAR ELECTRIC COMPANY INC.;             )
H&R BLOCK, INC.; HAMPSHIRE                 )
INDUSTRIES, INC.; HARLAND CLARKE           )
CORP.; HERITAGE CHEVROLET-BUICK,           )
INC.; HIGH'S OF BALTIMORE, LLC; NEW        )
RIDGE ASSOCIATES, INC.; HILTON             )
WORLDWIDE, INC.; HOHMANN &                 )
BARNARD, INC.; DAYTON SUPERIOR             )
CORPORATION; HOLLY POULTRY, INC.;          )
HOST HOTELS AND RESORTS, INC.; HMS         )
HOST FAMILY RESTAURANTS, INC.; HSBC        )
NORTH AMERICA HOLDINGS, INC.;              )
ILLINOIS SLEEP PRODUCTS, INC.;             )
INDUSTRIAL CONTAINER SERVICES, LLC;        )
JERRY'S CHEVROLET, INC.; KEURIG DR.        )
PEPPER, INC.; KING DAVID AT AUTUMN         )
LAKE LLC; KMART CORPORATION;               )
KOHLBERG KRAVIS ROBERTS & CO. L.P.;        )
KOROS, LLC; LAIRD PLASTICS, INC.;          )
LANE BRYANT, INC.; LEAR                    )
CORPORATION; LEBANON SEABOARD              )
CORPORATION; LEGG MASON, INC.; LEN         )
STOLER, INC.; LIFESTAR RESPONSE            )
CORPORATION; LIFETOUCH NATIONAL            )
SCHOOL STUDIOS, LLC; LIFOAM                )
INDUSTRIES, LLC; LION BROTHERS             )
COMPANY, INC.; LONG & FOSTER REAL          )
ESTATE, INC.; M. WEINMAN COMPANY,          )
INC.; MACDERMID, INC.; THE MARYLAND        )
MANAGEMENT COMPANY; MASTER-                )
HALCO, INC.; MAWSON AND MAWSON,            )
INC.; MCCORMICK & COMPANY, INC.;           )
MELIBELLE USA, INC.; MERCK SHARP &         )
DOHME CORP.; MONDELEZ                      )
INTERNATIONAL, INC.; MORGAN                )
PROPERTIES MANAGEMENT COMPANY,             )
LLC; MOUNT VERNON MILLS, INC.;             )

NATIONAL INSTITUTES OF HEALTH;          )
NATIONWIDE AUTO SALES CORP.; NCR        )
CORPORATION; NL INDUSTRIES, INC.;       )
NORRIS AUTOMOTIVE HOLDINGS LLC;         )
PABST BREWING CO.; PACTIV LLC;          )
PENSKE LOGISTICS LLC; PENSKE TRUCK      )
LEASING CO., L.P.; POLY-SEAL LLC;       )
POWERCON CORPORATION; PRINCE            )
MINERALS, LLC; JOTUN PAINTS, INC.; PQ   )
CORPORATION; PREMIER TECHNOLOGY         )
INC.; PVH CORP.; QUIKRETE HOLDINGS,     )
INC.; RAYMOND JAMES & ASSOCIATES,       )
INC.; RIDGEWAY MANOR, INC.; ROCA        )
USA INC.; ROPER CORPORATION; THE        )
RUKERT TERMINALS CORPORATION;           )
RUSSELL T. BUNDY ASSOCIATES, INC.;      )
SCHMIDT BAKING COMPANY, INC.;           )
SCHUMACHER & SEILER, INC.; SERVICE      )
AMERICA CORPORATION; SHELL OIL          )
COMPANY; SMYTH JEWELERS INC.;           )
ALBERT S. SMYTH CO., INC.; SOLO CUP     )
COMPANY; STATE FARM LIFE                )
INSURANCE COMPANY; STELLA MARIS         )
OPERATING CORP.; TEKTRONIX, INC.;       )
TRANSAMERICA PREMIER LIFE               )
INSURANCE COMPANY; TREEHOUSE            )
PRIVATE BRANDS, INC.; TRI-STAR          )
REALTY, LLP; TRUIST FINANCIAL           )
CORPORATION; BUNGE NORTH AMERICA        )
(EAST), L.L.C.; UNION CARBIDE           )
CORPORATION; UNISYS CORPORATION;        )
UNIVERSAL MUSIC GROUP, INC.; US         )
FOODS, INC.; USF REDSTAR LLC; VALLEY    )
MOTORS, INC.; VIACOMCBS, INC.; VIAD     )
CORP.; THE VICTORY RACING PLATE         )
COMPANY; VISUAL MARKING SYSTEMS,        )
INC.; VORNADO REALTY TRUST; WELLS       )
FARGO BANK, NATIONAL ASSOCIATION;       )
THE WHITING-TURNER CONTRACTING          )
COMPANY; YRC WORLDWIDE INC.; and        )
ZURICH AMERICAN INSURANCE CO.,          )
                                        )
            Defendants.                 )

## COMPLAINT

For its Complaint, Plaintiff 68th Street Site Work Group (hereinafter "Plaintiff" or "68th Street Site Work Group"), by and through counsel, alleges as follows:

### STATEMENT OF THE CASE

1.      This is a civil action pursuant to the provisions of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq. ("CERCLA"). Plaintiff asserts there has been a release and/or threat of release of hazardous substances from a facility known as the 68th Street Dump Superfund Alternative Site located in the Rosedale Area of Baltimore County and City of Baltimore, Maryland ("68th Street Site" or "Site"). These hazardous substances have allegedly contaminated the soil and groundwater at the 68th Street Site and have allegedly threatened the public health and the environment. Each Defendant is a potentially responsible party ("PRP") that generated and/or transported materials containing hazardous substances that were treated and/or disposed of at the 68th Street Site. This action seeks recovery of over $4.8 million in past response costs incurred by Plaintiff at the 68th Street Site in response to the release and threatened release of hazardous substances into the environment at and from the 68th Street Site, and a declaration of each Defendant's liability for future response costs to be incurred by Plaintiff (and its assignors) at the 68th Street Site.

### JURISDICTION AND VENUE

2.      This Court has exclusive jurisdiction over Count I pursuant to CERCLA Sections 107(a) and 113(b), 42 U.S.C. §§ 9607(a) and 9613(b), providing federal jurisdiction over controversies arising under CERCLA, and pursuant to 28 U.S.C. § 1331, providing federal jurisdiction over controversies involving questions of federal law. The Court also has jurisdiction

over the request for declaratory relief in Count II pursuant to CERCLA Section 113, 42 U.S.C. §
9613, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202.

3.     Venue is proper in this district pursuant to 42 U.S.C. §§ 9607(a) and 9613(b), and
28 U.S.C. § 1391(b), because the release or threatened release of hazardous substances that give
rise to this action occurred and/or are occurring at or from the 68th Street Site located in this
judicial district.

**ALLEGATIONS COMMON TO ALL CLAIMS**

4.     The 68th Street Site is an aggregate of seven landfills and encompasses
approximately 239 acres, nearly 118 acres of which are streams and wetlands. The 68th Street
Site is in a mixed industrial, commercial and residential area of Baltimore County, crossing the
border with Baltimore City in Rosedale, Maryland. The 68th Street Site is transected near the
western boundary in a north-south direction by Interstate Route 95, and is transected in an east-
west direction by Moores Run. Additional waterways include Herring Run and Redhouse Run.
Herring Run discharges into the Back River about 1,500 feet downstream of the 68th Street Site,
which ultimately flows into the Chesapeake Bay.

5.     The 68th Street Site has been organized into five Management Areas ("MAs")
identified as MA-A, MA-B, MA-D, MA-E and MA-F, with MA-C having been combined into
MA-F.

6.     With the exception of MA-A, waste disposal activities occurred between the
1950s and early 1970s under various landfill operating permits. The landfill activities involved
filling of low-lying and wetland areas and disposal of solid and liquid municipal, industrial and
commercial wastes. Industrial wastes have been documented to include construction debris,
paints, ash, sludges, and other materials from east Baltimore industry and municipal operations.

There is surface debris across much of the 68th Street Site, including metal, concrete, brick and masonry, rubber products and construction/demolition debris.

7.      MA-A comprises 11 acres on the eastern boundary of the 68th Street Site and was not used as a landfill. Instead it appears to have been used as a concrete plant in the early 1960s and was later used as a junkyard from 1966 to 1968, and includes a "tire pond."

8.      MA-B is also known as the Unclaimed Landfill and comprises 43 acres, including six lagoons for disposal of liquid waste starting in 1957 and ending in 1966.

9.      MA-D includes the 20 acre Horseshoe Landfill. Permitted disposal began in 1965 and continued until at least 1973.

10.     MA-E comprises 47 acres in the western portion of the 68th Street Site, including the original Robb Tyler Landfill permitted in 1953 and the East and West Colgate Pay Dumps which began disposal in 1956 after the Robb Tyler Landfill closed. Portions of the landfill wastes were excavated and re-deposited on either side of Interstate 95 during its construction from 1981 to 1984.

11.     MA-F is known as the Lowland Management Area and contains 118 acres of environmentally sensitive ecosystem, including the three main streams (Herring Run, Moores Run and Redhouse Run) and the six-acre Island Landfill and the nine-acre Redhouse Run Landfill. Dumping of debris along Redhouse Run began as early as 1942. In 1956, a refuse disposal permit was issued to Robb Tyler, and disposal of waste material continued until at least 1969, with evidence that some other entity placed fill material along the stream in 1973. Numerous vehicles, trailers and equipment still remained along the stream by 1984. The Island Landfill was operated by Robb Tyler as a permitted landfill from 1960 to 1969.

12. The emergency removal actions were performed at the 68th Street Site in the 1980s. In 1981, there was a drum removal action in MA-B. In 1984, ten (10) 55-gallon drums protruding from the hillside of the Redhouse Run Landfill were removed from the 68th Street Site. A 1985 emergency response removed at least forty (40) 55-gallon drums from the Island Landfill following a fire.

13. The United States Environmental Protection Agency ("EPA") issued multiple rounds of General Notice Letters to various PRPs from 1999 through 2013.

14. EPA proposed the 68th Street Site to the National Priorities List ("NPL") in 1999.

15. EPA re-proposed the 68th Street Site to the NPL in 2003.

16. On April 26, 2006, members of the 68th Street Site Work Group and EPA entered into an Administrative Settlement Agreement and Order for Remedial Investigation and Feasibility Study ("RI/FS AOC").

17. Plaintiff commenced the RI/FS work in June 2006.

18. During a Site-wide evaluation in 2007, twenty points of interest were identified for further evaluation.

19. Between June 26, 2008 and December 2, 2008, a Non-Time Critical Removal Action was conducted to remove surface materials and containers that had exhibited elevated chemical concentrations to reduce the risk to trespassers and on-Site workers.

20. Members of the 68th Street Site Work Group completed a Remedial Investigation Report on or aoubt May 14, 2012, and completed a Feasibility Study Report on or about March 18, 2013.

21. On September 30, 2013, EPA issued its final Record of Decision ("ROD") for remedial actions at the 68th Street Site.

22.     On November 28, 2017, the United States District Court for the District of Maryland entered a Consent Decree for Remedial Design/Remedial Action ("RD/RA Consent Decree") between EPA and the State of Maryland, on the one hand, and Settling Performing Defendants comprising the members of the 68th Street Site Work Group and Non-Performing Settling Defendants, on the other hand.

23.     Hazardous substances identified at the 68th Street Site include, but are not limited to: metals, including arsenic, barium, lead, and selenium; polychlorinated biphenyls ("PCBs"); polycyclic aromatic hydrocarbons ("PAHs") including benzo(a)pyrene, benzo(a)anthracene, benzo(b)fluoranthene, dibenz(a,h)anthracene; pesticides including dieldrin and DDx, comprising isomers of dichlorodiphenyltrichloroethane ("DDT"), dichlorodiphenyldichloroethylene ("DDE") and dichlorodiphenyldichloroethane ("DDD"); dieldrin; endrin; heptachlor epoxide; thallium; and zinc.

24.     As of the filing of this Complaint, Plaintiff has incurred over $4.8 million in response costs in connection with the activities and payments required by the RD/RA Consent Decree at the 68th Street Site.

25.     The response costs incurred to date by Plaintiff in connection with the RD/RA Consent Decree are necessary to address the release and/or threatened release at the 68th Street Site, and are required by EPA and the State of Maryland, and as such are consistent with the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and amendments thereto ("National Contingency Plan" or "NCP").

26.     Plaintiff will continue to incur response costs to conduct response actions at the 68th Street Site as required by the EPA, the State of Maryland, and/or other federal or state agencies.

## THE PARTIES

27.     The 68th Street Site Work Group is an unincorporated association currently comprised of the following members, in their own right, and as assignees of all CERCLA claims at the 68th Street Site of those entities who have settled or will settle with the 68th Street Site Work Group: AAI Corporation; Acme Markets Inc.; AK Steel Corporation; Browning-Ferris, Inc.; Black & Decker (U.S.) Inc.; Brunswick Corporation; ConAgra Grocery Products Company, LLC; Crown Cork & Seal Company, Inc.; CSX Realty Development, LLC; CSX Transportation, Inc.; Exxon Mobil Corporation; and Illinois Tool Works, Inc., on behalf of Signode and Vulcan-Hart.

28.     Each of the members of the 68th Street Site Work Group has assigned its claims in this case to the 68th Street Site Work Group as a whole.

29.     All of the members of 68th Street Site Work Group are signatories to the RD/RA Consent Decree.

30.     According to 68th Street Site records, 7-Eleven; 7 11 Stores No 3; 7 11 Stores No 4; 7 11 Stores No 5; 7 11 Store No 6; 7 11 Store No 7; 7 11 Store No 8; 7 11 Store No 10; 7 11 Store No 14; 7 11 Store No 1S; 7 11 Stores No 16; 7 11 Store No 18; 7 11 Store No 20; 7 11 Store No 22; 7 11 Store No 23; 7 11 Store No 24; 7 11 Store No 32; 7 11 Store No 37; 7 11 Stores No 38; 7 11 Stores No 39; 7 11 Stores No 41; 7 11 Stores No 43; Seven Eleven Store 44; 711 Store No 4S; 7 11 Store No 47; 7 11 Stores No 48; 7 11 Stores No 49; 7 11 Stores No 53; 7 11 Stores No 54; Seven Eleven Store 55; 7 11 Stores No 56; 7 11 Store No 60; 7 11 Stores No 61

and Delvale Dairy by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

31.     Defendant 7-Eleven, Inc. ("7-Eleven") is one and the same as and/or the successor to 7-Eleven; 7 11 Stores No 3; 7 11 Stores No 4; 7 11 Stores No 5; 7 11 Store No 6; 7 11 Store No 7; 7 11 Store No 8; 7 11 Store No 10; 7 11 Store No 14; 7 11 Store No 1S; 7 11 Stores No 16; 7 11 Store No 18; 7 11 Store No 20; 7 11 Store No 22; 7 11 Store No 23; 7 11 Storfe No 24; 7 11 Store No 32; 7 11 Store No 37; 7 11 Stores No 38; 7 11 Stores No 39; 7 11 Stores No 41; 7 11 Stores No 43; Seven Eleven Store 44; 711 Store No 4S; 7 11 Store No 47; 7 11 Stores No 48; 7 11 Stores No 49; 7 11 Stores No 53; 7 11 Stores No 54; Seven Eleven Store 55; 7 11 Stores No 56; 7 11 Store No 60; 7 11 Stores No 61 and Delvale Dairy.

32.     7-Eleven is and/or was engaged in the business of convenience store operations.

33.     7-Eleven's waste streams consisted of auto service station waste, retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, mercury, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

34.     By letter dated August 28, 2020, Plaintiff demanded that 7-Eleven reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

35.     To date, 7-Eleven has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

36.     According to 68th Street Site records, Arnold Constable & Company by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

37.     Defendant A&M (2015) LLC ("A&M") is the successor to Arnold Constable & Company.

38.     In or about the 1990's Y M Inc. acquired Arnold Constable & Company.

39.     Y M Inc.'s parent company is YM LLC USA.

40.     In or about 2015, YM LLC USA changed its name to A&M.

41.     Arnold Constable & Company is and/or was engaged in the business of clothing store operations.

42.     Arnold Constable & Company's waste streams consisted of retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

43.     By letter dated August 28, 2020, Plaintiff demanded that A&M reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

44.     To date, A&M has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

45.     According to 68th Street Site records, Aaron Rents-Furniture, Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for

transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

46.     Defendant Aaron's, Inc. ("Aaron's") is formerly known as Aaron Rents-Furniture, Inc.

47.     In or about 1967, Aaron Rents-Furniture, Inc. changed its name to Aaron's.

48.     Aaron's is and/or was engaged in the business of furniture sales and leasing.

49.     Aaron's' waste streams consisted of wholesale appliance waste, wood furniture waste, retail household appliance waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, ethyl benzene, lead, manganese, methanol, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

50.     By letter dated August 28, 2020, Plaintiff demanded that Aaron's reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

51.     To date, Aaron's has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

52.     According to 68th Street Site records, Abacus Corporation and Jefferson Bldg. (Abacus) by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

53.     Defendant Abacus Corporation ("Abacus") is one and the same as and/or also known as Abacus Corporation and Jefferson Bldg. (Abacus).

54.     Abacus is and/or was engaged in the business of janitorial services.

55.     In addition to the hazardous substances associated with janitorial services, Abacus' waste streams also consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

56.     By letter dated August 28, 2020, Plaintiff demanded that Abacus reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

57.     To date, Abacus has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

58.     According to 68th Street Site records, Arundel Sales & Service and Mr. R. B.Cooke by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

59.     Defendant Airgas, Inc. ("Airgas") is the successor to Arundel Corporation, Arundel Sales & Service and Mr. R. B.Cooke.

60.     In or about 1988, Arundel Sales & Service merged into Potomac Airgas, Inc.

61.     Potomac Airgas, Inc. is a subsidiary of Airgas, Inc.

62.     Arundel Sales & Service and Mr. R. B.Cooke are and/or were engaged in the business of gas distribution.

63.     Arundel Sales & Service and Mr. R. B.Cooke's waste streams consisted of transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead,

manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

64.     By letter dated August 28, 2020, Plaintiff demanded that Airgas reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

65.     To date, Airgas has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

66.     According to 68th Street Site records, Defendant Alban Tractor Co., Inc. ("Alban Tractor") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

67.     Alban Tractor is and/or was engaged in the business of construction equipment sales and repair.

68.     Alban Tractor's waste streams consisted of equipment maintenance waste and general office waste, which contained the following hazardous substances: acetone, arsenic, benzene, cadmium, chromium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

69.     By letter dated August 28, 2020, Plaintiff demanded that Alban Tractor reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

70.     To date, Alban Tractor has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

71.     According to 68th Street Site records, GMAC by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

72.     Defendant Ally Financial Inc. ("Ally Financial") is the successor to and/or formerly known as GMAC.

73.     In or about 2008, GMAC changed its name to Ally Financial.

74.     GMAC is and/or was engaged in the business of financial services.

75.     GMAC's waste streams consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

76.     By letter dated August 28, 2020, Plaintiff demanded that Ally Financial reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

77.     To date, Ally Financial has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

78.     According to 68th Street Site records, Defendant American Express Company ("American Express") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

79.     American Express is and/or was engaged in the business of financial services.

80.     American Express's waste streams consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene,

lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

81.     By letter dated August 28, 2020, Plaintiff demanded that American Express reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

82.     To date, American Express has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

83.     According to 68th Street Site records, New York Central Transpt and Penn Central Railroad by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

84.     Defendant American Premier Underwriters, Inc. ("American Premier") is the successor to New York Central Transpt and Penn Central Railroad.

85.     New York Central Transpt is also known as New York Central Railroad.

86.     The Penn Central Railroad Company is also known as Penn Central Transportation Company.

87.     In or about 1968, New York Central Railroad merged with the Pennsylvania Railroad Company to form Penn Central Transportation Company.

88.     In or about 1994, the Penn Central Transportation Company changed its name to American Premier Underwriters, Inc.

89.     New York Central Transpt and Penn Central Railroad are and/or were engaged in the business of transportation services.

16

90.     New York Central Transpt and Penn Central Railroad's waste streams consisted of transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

91.     By letter dated August 28, 2020, Plaintiff demanded that American Premier reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

92.     To date, American Premier has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

93.     According to 68th Street Site records, Defendant American Sugar Refining, Inc. ("American Sugar") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

94.     American Sugar is and/or was engaged in the business of food refining.

95.     American Sugar's waste streams consisted of food processing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

96.     By letter dated August 28, 2020, Plaintiff demanded that American Sugar reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

97.     To date, American Sugar has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

98.     According to 68th Street Site records, American Totalisator Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

99.     Defendant Amtote International, Inc. ("Amtote International") is formerly known as American Totalisator Co.

100.    American Totalisator Co. is and/or was engaged in the business of electronic equipment manufacturing and distribution.

101.    In addition to the hazardous substances associated with electronic equipment manufacturing and distribution, American Totalisator Co.'s waste streams also consisted of electrical component waste, fabrication waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

102.    By letter dated August 28, 2020, Plaintiff demanded that Amtote International reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

103.    To date, Amtote International has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

104.    According to 68th Street Site records, Bearings Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

105.    Defendant Applied Industrial Technologies, Inc. ("Applied Industrial") is formerly known as Bearings Inc.

106.    In or about 1997, Bearings, Inc. changed its name to Applied Industrial Technologies, Inc.

107.    Bearings Inc. is and/or was engaged in the business of bearing distribution.

108.    In addition to the hazardous substances associated with bearing distribution, Bearings Inc.'s waste streams also consisted of metal processing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

109.    By letter dated August 28, 2020, Plaintiff demanded that Applied Industrial reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

110.    To date, Applied Industrial has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

111.    According to 68th Street Site records, Monarch Rubber Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

112.    Defendant Armacell, LLC ("Armacell") is the successor to Monarch Rubber Co.

113.    In or about 2005, Armacell acquired Monarch Rubber Company.

114.    Monarch Rubber Co. is and/or was engaged in the business of rubber product manufacturing and distribution.

115.    Monarch Rubber Co.'s waste streams consisted of rubber product waste, transportation waste and general office waste, which contained the following hazardous substances: acetone, arsenic, benzene, cadmium, chromium, copper, dichloroethylene, ethyl benzene, lead, manganese, mercury, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

116.    Additionally, 68th Street Site records describe Monarch Rubber Co.'s waste as containing at least the following: drums, rubber dust, and rubber scrap.

117.    By letter dated August 28, 2020, Plaintiff demanded that Armacell reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

118.    To date, Armacell has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

119.    According to 68th Street Site records, American Smelting & Refining and Asarco Incorporated by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

120.    Defendant Asarco LLC ("Asarco") is formerly known as American Smelting & Refining and Asarco Incorporated.

121.    American Smelting & Refining and Asarco Incorporated were engaged in the business of smelting and refining.

122.    American Smelting & Refining and Asarco Incorporated's waste streams consisted of metal processing, fabrication and finishing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, manganese, methylene chloride, methyl ethyl ketone, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

123.    To date, Asarco has not paid any response costs incurred by Plaintiff at the 68th Street Site.

124.    According to 68th Street Site records, St. Agnes Hospital by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

125.    Defendant Ascension St. Agnes Hospital ("Ascension St. Agnes") is the successor to and/or is one and the same as St. Agnes Hospital.

126.    According to City of Baltimore archival records, during the time frame of Site operations St. Agnes Hospital was located at 900 South Caton Avenue in Baltimore, Maryland.

127.    In or about 2012, a health conglomerate Ascension Health was formed and restructured to oversee several faith-based healthcare organizations in Baltimore, including St. Agnes Hospital.

128.    According to its own website Ascension Health Care holds itself out to be the successor of Ascension St. Agnes Hospital, which it claims has been in business for "more than 150 years" serving the greater Baltimore area. The website lists the same 900 South Caton Avenue address in Baltimore, Maryland.

129.    Ascension St. Agnes is and/or was engaged in the business of providing health care services.

130.    In addition to producing waste containing hazardous substances associated with the business of providing health care services, St. Agnes Hospital's waste streams consisted of at least hospital waste, maintenance waste, metal finishing waste, septic waste and general office waste, which contained the following hazardous substances: acetone, arsenic, benzene, cadmium, chromium, copper, dichloroethylene, lead, manganese, mercury, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

131.    By letter dated August 28, 2020, Plaintiff demanded that Ascension St. Agnes reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

132.    To date, Ascension St. Agnes Healthcare has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

133.    According to 68th Street Site records, Defendant Avis Rent a Car System, LLC ("Avis") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

134.    Avis is and/or was engaged in the business of automobile rental and service.

135.    Avis's waste streams consisted of automobile service and repair waste, transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead,

manganese, methylene chloride, methyl ethyl ketone, nickel, perchloroethylene, toluene,

trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc

136.     By letter dated August 28, 2020, Plaintiff demanded that Avis reimburse Plaintiff

for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street

Site.

137.     To date, Avis has refused to cooperate and has not paid any response costs

incurred by Plaintiff at the 68th Street Site.

138.     According to 68th Street Site records, Batesville Casket Sales by contract,

agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for

transport for disposal or treatment of waste containing hazardous substances at the 68th Street

Site.

139.     Defendant Batesville Casket Company, Inc. ("Batesville Casket") is one and the

same as Batesville Casket Sales.

140.     Batesville Casket is and/or was engaged in the business of funerary products and

distribution.

141.     In addition to the hazardous substances associated with funeray products,

Batesville Casket's waste streams also consisted of fabrication waste and general office waste,

which contained the following hazardous substances: acetone, benzene, cadmium, copper,

dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene,

trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

142.     By letter dated August 28, 2020, Plaintiff demanded that Batesville Casket

reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by

Plaintiff at the 68th Street Site.

143.    To date, Batesville Casket has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

144.    According to 68th Street Site records, Ditto Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

145.    Defendant Bell and Howell, LLC ("Bell and Howell") is the successor to Ditto Inc.

146.    In or about 1962, Ditto Inc. merged into Bell and Howell.

147.    Ditto Inc. is and/or was engaged in the business of printing sales and distribution.

148.    Ditto Inc.'s waste streams consisted of commercial printing waste and general office waste, which contained the following hazardous substances: acetone, barium, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

149.    By letter dated August 28, 2020, Plaintiff demanded that Bell and Howell reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

150.    To date, Bell and Howell has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

151.    According to 68th Street Site records, Lenmar Lacquers and Len Mar Lacquers by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

24

152.    Defendant Benjamin Moore & Co. ("Benjamin Moore") is the successor to Lenmar Lacquers and Len Mar Lacquers.

153.    Lenmar Lacquers was also known as Lenmar Inc.

154.    Insl-x Products Corp. acquired Lenmar Inc.

155.    In or about 2007, Benjamin Moore acquired Insl-x Products Corp.

156.    Lenmar Lacquers and Len Mar Lacquers were engaged in the business of paint product manufacturing and distribution.

157.    In addition to the hazardous substances associated with paint product manufacturing and distribution, Lenmar Lacquers and Len Mar Lacquers' waste streams also consisted of fabrication waste, which contained the following hazardous substances: acetone, copper, lead, methyl ethyl ketone, toluene, trichloroethane, and xylene.

158.    Additionally, 68th Street Site records describe Lenmar Lacquers and Len Mar Lacquers' waste as containing at least the following: empty pigment bags, empty cans, strainers, rags, wrapping, and empty metal galvanized drums.

159.    To date, Benjamin Moore has not paid any response costs incurred by Plaintiff at the 68th Street Site.

160.    According to 68th Street Site records, Burt Machine Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

161.    Defendant Berwind Corporation ("Berwind") is the successor to Burt Machine Co.

162.    In or about 1971, Berwind acquired Burt Machine Co.

163.    Burt Machine Co. is and/or was engaged in the business of machine manufacturing and fabrication.

164.    In addition to the hazardous substances associated with machine manufacturing, Burt Machine Co.'s waste streams also consisted of metal fabrication waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

165.    By letter dated October 6, 2020, Plaintiff demanded that Berwind reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

166.    To date, Berwind has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

167.    According to 68th Street Site records, Bell Body Shop, Belair Road Chevrolet; Charles Irish Chevrolet, McKenna Pontiac and Park Circle Motors by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

168.    Defendant Bob Bell Automotive Group, Inc. ("Bob Bell Automotive") is the successor to and/or formerly known as Bell Body Shop, Belair Road Chevrolet, Charles Irish Chevrolet, McKenna Pontiac and Park Circle Motors.

169.    In or about 1977, Park Circle Motor Company acquired Charlie Irish Chevrolet, Inc.

170.    In or about 1989, Bob Bell Chevrolet/Nissan, Inc. acquired Park Circle Motor Company.

171.    Bob Bell Chevrolet/Nissan, Inc. is also known as Bob Bell Automotive.

172.    In or about 1970, Penn Pontiac acquired McKenna Pontiac.

173.    In or about 2007, Bob Bell Automotive acquired Penn Pontiac.

174.    Bell Body Shop, Belair Road Chevrolet, Charles Irish Chevrolet, McKenna Pontiac and Park Circle Motors were engaged in the business of automotive sales and service.

175.    The waste streams attributable to Bell Body Shop, Belair Road Chevrolet, Charles Irish Chevrolet, McKenna Pontiac and Park Circle Motors consisted of auto service and repair waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, perchloroethylene, nickel, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

176.    By letter dated August 28, 2020, Plaintiff demanded that Bob Bell Automotive reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

177.    To date, Bob Bell Automotive has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

178.    According to 68th Street Site records, Defendant Bob Davidson Ford, Inc. ("Davidson Ford") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

179.    Davidson Ford is and/or was engaged in the business of automotive sales and service.

180.    Davidson Ford's waste streams consisted of automobile service and repair waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, perchloroethylene, nickel, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

181.    By letter dated August 28, 2020, Plaintiff demanded that Davidson Ford reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

182.    To date, Davidson Ford has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

183.    According to 68th Street Site records, Safeway Steel Scaffolds by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

184.    Defendant Brand Industrial Services, Inc. ("Brand Industrial") is the successor to and/or formerly known Safeway Steel Scaffolds.

185.    Safeway Steel Scaffolds was a division of Safeway Steel Products, Inc.

186.    In or about 2003, Safeway Steel Products, Inc. changed its name to Safway Services, Inc.

187.    In or about 2007, Safway Services, Inc. changed its name to Thyssenkrupp Safway, Inc.

188.    In or about 2009, Thyssenkrup Safway, Inc. changed its name to Safway Services, LLC.

189.    In or about 2017, Safway Services, LLC merged into Brand Industrial Services, Inc.

190.    Safeway Steel Scaffolds is and/or was engaged in the business of construction equipment rental and sales.

191.    Safeway Steel Scaffolds' waste streams consisted of equipment rental waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

192.    By letter dated August 28, 2020, Plaintiff demanded that Brand Industrial reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

193.    To date, Brand Industrial has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

194.    According to 68th Street Site records, Federal Armor Express Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

195.    Defendant Brink's Inc. ("Brink's") is the successor to and/or formerly known as Federal Armor Express Co.

196.    Federal Armor Express Co. was also known as Dunbar Armored.

197.   In or about 2018, Brink's acquired Dunbar Armored.

198.   Federal Armor Express Co. is and/or was engaged in the business of transportation and financial services.

199.   Federal Armor Express Co.'s waste streams also consisted of automotive service and repair waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

200.   By letter dated August 28, 2020, Plaintiff demanded that Brink's reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

201.   To date, Brink's has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

202.   According to 68th Street Site records, L. Gordon & Son by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

203.   Defendant Burt Rigid Box, Inc. ("Burt Box") is the successor to L. Gordon & Son.

204.   In or about 1997, Jesco, Inc. acquired L. Gordon & Son, Incorporated.

205.   In or about 2002, Burt Rigid Box, Inc. acquired Jesco, Inc.

206.   L. Gordon & Son is and/or was engaged in the business of package manufacturing and distribution.

207.     In addition to the hazardous substances associated with package manufacturing and distribution, L. Gordon & Son's waste streams also consisted of printing waste and general office waste, which contained the following hazardous substances: acetone, barium, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

208.     By letter dated August 28, 2020, Plaintiff demanded that Burt Box reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

209.     To date, Burt Box has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

210.     According to 68th Street Site records, Allegheny Beverage Company, Allegheny Pepsi-Cola Bottling Company, American Brewery, Inc., Pepsi Cola Bottling Co. and Suburban Club Beverage by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

211.     Defendant C&I Leasing, Inc. ("C&I Leasing") is the successor to and/or formerly known as and/or also known as Allegheny Beverage Company, Allegheny Pepsi-Cola Bottling Company, American Brewery, Inc., Pepsi Cola Bottling Co. and Suburban Club Beverage.

212.     Allegheny Pepsi-Cola Bottling Co. owned American Brewery, Inc. and Suburban Club Beverage.

213.     Allegheny Pepsi-Cola Bottling Co. is and/or was a subsidiary of PepsiCo Inc.

214.     C&I Leasing is formerly known as Pepsi-Cola Bottling Co.

215.     C&I Leasing is a member of the PepsiCo Inc./PBG Organization.

216.    Allegheny Beverage Company, Allegheny Pepsi-Cola Bottling Company, American Brewery, Inc., Pepsi Cola Bottling Co. and Suburban Club Beverage are and/or were engaged in the business of beverage manufacturing and distribution.

217.    In addition to the hazardous substances associated with beverage manufacturing and distribution, the waste streams attributable to Allegheny Beverage Company, Allegheny Pepsi-Cola Bottling Company, American Brewery, Inc., Pepsi Cola Bottling Co. and Suburban Club Beverage also consisted of food processing waste, printing waste, transportation waste and general office waste, which contained the following hazardous substances: acetone, barium, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

218.    Additionally, 68th Street Site records describe the waste streams attributable to Allegheny Beverage Company, Allegheny Pepsi-Cola Bottling Company, American Brewery, Inc., Pepsi Cola Bottling Co. and Suburban Club Beverage as containing at least the following: empty drums and empty soda cans.

219.    By letter dated August 28, 2020, Plaintiff demanded that C&I Leasing reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

220.    To date, C&I Leasing has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

221.    According to 68th Street Site records, Defendant Caplan Brothers, Inc. ("Caplan Brothers") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged

with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

222.    Caplan Brothers is and/or was engaged in the business of glass replacement services.

223.    Caplan Brothers's waste streams consisted of auto repair waste, transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

224.    By letter dated August 28, 2020, Plaintiff demanded that Caplan Brothers reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

225.    To date, Caplan Brothers has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

226.    According to 68th Street Site records, Chesapeake Paperboard Company by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

227.    Defendant Caraustar Industries, Inc. ("Caraustar Industries") is the successor to and/or is formerly known as Chesapeake Paperboard Company.

228.    In or about 2001, Caraustar Custom Packaging Group (Maryland), Inc. merged into The Chesapeake Paperboard Company as the surviving corporation, which changed its name to Caraustar Custom Packaging Group (Maryland), Inc.

33

229.    In or about 2009, Caraustar Custom Packaging Group (Maryland), Inc. merged into Caraustar Custom Packaging Group, Inc., a Delaware corporation.

230.    Caraustar Custom Packaging Group (Maryland), Inc. is owned by and/or was acquired by and/or is one and the same as Caraustar Industries.

231.    Publicly available information shows both at 5000 Austell-Powder Springs Road in Austell, GA and directs to the same website. Publicly available information also identifies Caraustar Industries' four business lines as Recycling Services, Mill Group, Industrial Products Group and Consumer Packaging.

232.    Chesapeake Paperboard Company is and/or was engaged in the business of industrial packaging for distribution.

233.    In addition to the hazardous substances associated with industrial packaging and distribution, Chesapeake Paperboard Company waste streams also consisted of metal processing, fabrication and finishing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

234.    Additionally, 68th Street Site records describe Chesapeake Paperboard Company's waste as containing steel wire known as "snake" which contained some of the same hazardous substances listed above.

235.    To date, Caraustar Industries has not paid any response costs incurred by Plaintiff at the 68th Street Site.

236.    Alternatively, Defendant Greif, Inc. ("Greif") is the successor to Chesapeake Paperboard Company.

237.    In or about 2019, Greif acquired Caraustar Industries and all four of its business lines, including its Consumer Packaging line.

238.    On or about February 11, 2019, Greif announced the completion of its acquisition of Caraustar Industries.

239.    Caraustar Industries holds itself out as having been acquired by Greif in ealry 2019.

240.    Additionally, according to 68th Street Site records, The Greif Brothers by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

241.    Grief is formerly known as Greif Bros. Company and Greif Bros. Cooperage Corporation.

242.    The Greif Brothers is and/or was engaged in the business of manufacturing barrels and industrial packaging for distribution.

243.    The Greif Brothers' waste streams consisted of metal processing, fabrication and finishing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

244.    By letter dated August 28, 2020, Plaintiff demanded that Greif reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

245.     To date, Greif has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

246.     According to 68th Street Site records, Samuel Misel Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

247.     Defendant Carisam-Samuel Meisel (MD), Inc. ("Carisam-Samuel") is the successor to and/or formerly known as Samuel Misel Co.

248.     Samuel Meisel and Company, Inc. was also known as Samuel Misel Co.

249.     In or about 1999, Samuel Meisel and Company, Inc. merged into World Duty Free Exports.

250.     In or about 1999, World Duty Free Exports changed its name to Carisam-Samuel Meisel (MD), Inc.

251.     Samuel Misel Co. is and/or was engaged in the business of wholesale distribution.

252.     Samuel Misel Co.'s waste streams consisted of transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

253.     By letter dated August 28, 2020, Plaintiff demanded that Carisam-Samuel reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

254.     To date, Carisam-Samuel has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

255.     According to 68th Street Site records, Chesapeake Operating Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

256.     Defendant Ceres Marine Terminals Inc. ("Ceres Marine") is the successor to Chesapeake Operating Co.

257.     In or about 1984, Ceres Marine acquired Chesapeake Operating Co.

258.     Chesapeake Operating Co. is and/or was engaged in the business of terminal operations and stevedore services.

259.     In addition to the hazardous substances associated with terminal operations and stevedore services, Chesapeake Operating Co.'s waste streams also consisted of transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

260.     By letter dated August 28, 2020, Plaintiff demanded that Ceres Marine reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

261.     To date, Ceres Marine has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

262.     According to 68th Street Site records, United Fruit Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

263.    Defendant Chiquita Brands LLC ("Chiquita") is the successor to and/or formerly known as United Fruit Co.

264.    In or about 1970, United Fruit merged with AMK to become United Brands Company.

265.    In or about 1984, United Brands Company was rebranded as Chiquita Brands International.

266.    United Fruit Co. is and/or was engaged in the business of wholesale food distribution.

267.    United Fruit Co.'s waste streams consisted of transportation waste, food processing and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

268.    By letter dated August 28, 2020, Plaintiff demanded that Chiquita reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

269.    To date, Chiquita has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

270.    According to 68th Street Site records, C C Supply Co., Commercial Credit Corp. and Family Finance Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

271.    Defendant Citifinancial Credit Company ("Citifinancial") is the successor to and/or formerly known as C C Supply Co., Commercial Credit Corp. and Family Finance Co.

272.    C C Supply Co., Commercial Credit Corp. and Family Finance Co. were engaged in the business of financial services.

273.    The waste streams attributable to C C Supply Co., Commercial Credit Corp. and Family Finance Co. consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

274.    By letter dated August 28, 2020, Plaintiff demanded that Citifinancial reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

275.    To date, Citifinancial has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

276.    According to 68th Street Site records, Defendants Clark Equipment Company ("Clark Equipment") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

277.    Clark Equipment is and/or was engaged in the business of construction machinery manufacturing.

278.    Clark Equipment's waste streams consisted of fabrication waste, retail waste and general office waste, which contained the following hazardous substances: acetone, benzene,

cadmium, copper, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

279.    By letter dated August 28, 2020, Plaintiff demanded that Clark Equipment reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

280.    To date, Clark Equipment has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

281.    According to 68th Street Site records, Aristocrat Dairy, Cloverland Farm Dairy, Greenspring Dairy, Royal Dunloggin Dairy and White Jug by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

282.    Defendant Cloverland Dairy Limited Partnership ("Cloverland Dairy") is the successor to and/or formerly known as Aristocrat Dairy, Cloverland Farm Dairy, Greenspring Dairy, Royal Dunloggin Dairy and White Jug.

283.    In or about 1959, Cloverland Dairy began operating White Jug milk stores.

284.    In or about 1966, Aristocrat Dairy merged into Cloverland Dairy.

285.    In or about 1995, Cloverland Dairy acquired Greenspring Dairy.

286.    Cloverland Dairy acquired Royal Dunloggin Dairy.

287.    Aristocrat Dairy, Cloverland Farm Dairy, Greenspring Dairy, Royal Dunloggin Dairy and White Jug are and/or were engaged in the business of food product distribution and food processing.

288.    The waste streams attributable to Aristocrat Dairy, Cloverland Farm Dairy, Greenspring Dairy, Royal Dunloggin Dairy and White Jug consisted of food processing waste,

dairy products and manufacturing waste, transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

289.    Additionally, 68th Street Site records describe the waste streams attributable to Aristocrat Dairy, Cloverland Farm Dairy, Greenspring Dairy, Royal Dunloggin Dairy and White Jug as containing at least the following: milk buckets and cans.

290.    By letter dated August 28, 2020, Plaintiff demanded that Cloverland Dairy reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

291.    To date, Cloverland Dairy has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

292.    According to 68th Street Site records, McMahon Transportation by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

293.    Defendant Coach USA, Inc. ("Coach") is the successor to McMahon Transportation.

294.    In or about 2000, Coach acquired McMahon Transportation Co.

295.    McMahon Transportation is and/or was engaged in the business of transportation services.

296.    McMahon Transportation's waste streams consisted of transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

297.    By letter dated August 28, 2020, Plaintiff demanded that Coach reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

298.    To date, Coach has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

299.    According to 68th Street Site records, Chas H. Steffey, Inc., Russell T. Baker and Temple H. Pierce Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

300.    Defendant Coldwell Banker Real Estate LLC ("Coldwell Banker") is the successor to Chas H. Steffey, Inc., Russell T. Baker and Temple H. Pierce Co.

301.    In or about 1985, Temple H. Pierce Co. merged with O'Connor, Piper & Flynn.

302.    In or about 1986, Coldwell Banker acquired Russell T. Baker.

303.    In or about 1991, Coldwell Banker acquired Steffey Realtors.

304.    In or about 1998, Coldwell Banker acquired O'Connor, Piper & Flynn.

305.    Chas H. Steffey, Inc., Russell T. Baker and Temple H. Pierce Co. are and/or were engaged in the business of real estate services.

306.     The waste streams attributable to Chas H. Steffey, Inc., Russell T. Baker and Temple H. Pierce Co. consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

307.     Additionally, 68th Street Site records describe Temple H. Pierce Co.'s waste stream as containing at least the following: 55 gallon drum and lid.

308.     By letter dated August 28, 2020, Plaintiff demanded that Coldwell Banker reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

309.     To date, Coldwell Banker has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

310.     According to 68th Street Site records, W T Cowam Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

311.     Defendant Cowan Systems, Inc. ("Cowan Systems") is the successor to and/or formerly known as W T Cowam Inc.

312.     In or about 1979, Key Warehouse Services, Inc. merged into W.T. Cowan, Incorporated and changed its name to Cowan Enterprises, Inc.

313.     W T Cowam Inc. is and/or was engaged in the business of transportation and delivery services.

314.     W T Cowam Inc.'s waste streams consisted of transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium,

chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

315.    By letter dated August 28, 2020, Plaintiff demanded that Cowan Systems reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

316.    To date, Cowan Systems has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

317.    According to 68th Street Site records, Crown Central Petroleum Corp. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

318.    Defendant Crown Central LLC ("Crown Central") is the successor to and/or formerly known as Crown Central Petroleum Corp.

319.    In or about 2005, Crown Central Petroleum Corp. merged into Crown Central LLC.

320.    Crown Central Petroleum Corp. is and/or was engaged in the business of petroleum production and distribution.

321.    In addition to the hazardous substances associated with petroleum production and distribution, Crown Central Petroleum Corp.'s waste streams also consisted of transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl

ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane,

trichloroethylene, vinyl chloride, xylene, and zinc.

322.    Additionally, 68th Street Site records describe Crown Central Petroleum Corp.'s

waste stream as containing at least the following: cans, filters and oil cans.

323.    By letter dated August 28, 2020, Plaintiff demanded that Crown Central

reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by

Plaintiff at the 68th Street Site.

324.    To date, Crown Central has refused to cooperate and has not paid any response

costs incurred by Plaintiff at the 68th Street Site.

325.    According to 68th Street Site records, Chesapeake Rim & Wheel by contract,

agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for

transport for disposal or treatment of waste containing hazardous substances at the 68th Street

Site.

326.    Defendant CRW Parts Inc. ("CRW") is formerly known as Chesapeake Rim &

Wheel.

327.    In or about 1996, Chesapeake Rim & Wheel changed its name to CRW Parts Inc.

328.    Chesapeake Rim & Wheel is and/or was engaged in the business of automotive

accessory distribution.

329.    Chesapeake Rim & Wheel's waste streams consisted of automotive accessory

waste, retail waste and general office waste, which contained the following hazardous

substances: acetone, benzene, cadmium, copper, dichloroethylene, lead, mercury, methyl ethyl

ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl

chloride, xylene, and zinc.

330.     By letter dated August 28, 2020, Plaintiff demanded that CRW reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

331.     To date, CRW has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

332.     According to 68th Street Site records, W B Doner Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

333.     Defendant Detroit Royalty, Inc. ("Detroit Royalty") is the successor to and/or formerly known as W B Doner Co.

334.     In or about 2014, W. B. Doner & Company changed its name to Detroit Royalty, Inc.

335.     W B Doner Co. is and/or was engaged in the business of advertising.

336.     In addition to the hazardous substances associated with advertising, W B Doner Co.'s waste streams also consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

337.     By letter dated August 28, 2020, Plaintiff demanded that Detroit Royalty reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

338.     To date, Detroit Royalty has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

339.     According to 68th Street Site records, J F Donohoe Realty Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

340.     Defendant Donohoe Real Estate Services ("Donohoe") also known as The Donohoe Companies, Inc. is formerly known as and/or the successor to J F Donohoe Realty Co.

341.     According to Donohoe, it was established in 1884 as John F. Donohoe Real Estate as a residential real estate firm.

342.     In or about 1900, John F. Donohoe Real Estate changed its name to John F Donohoe & Sons.

343.     In or about 1955,  John F Donohoe & Sons started Donohoe Construction Company and Donohoe Development Company.

344.     John F Donohoe & Sons is also known as J F Realty Co.

345.     In or about 2006, The Donohoe Companies, Inc. changed its name to Donohoe Real Estate Services.

346.     J F Donohoe Realty Co. is and/or was engaged in the business of real estate services.

347.     J F Donohoe Realty Co.'s waste streams consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

348.    By letter dated August 28, 2020, Plaintiff demanded that Donohoe reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

349.    To date, Donohoe has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

350.    According to 68th Street Site records, Drug City Pharmacy by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

351.    Defendant Drug City Pharmacy, LLC ("Drug City") is the successor to and/or formerly known as Drug City Pharmacy.

352.    In or about 2016, Drug City Pharmacy Company transferred to Drug City Pharmacy, LLC.

353.    Drug City Pharmacy is and/or was engaged in the business of pharmacy services.

354.    In addition to the hazardous substances associated with pharmacy services, Drug City Pharmacy's waste streams also consisted of retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

355.    By letter dated August 28, 2020, Plaintiff demanded that Drug City reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

356.    To date, Drug City has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

357.    According to 68th Street Site records, Metal Masters of Baltimore by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

358.    Defendant Eagle Group ("Eagle Group") is the successor to and/or also known as Metal Masters of Baltimore.

359.    Metal Masters of Baltimore is also known as Metal Masters.

360.    Metal Masters is a division of Eagle Group.

361.    Metal Masters of Baltimore is and/or was engaged in the business of kitchen product manufacturing.

362.    In addition to the hazardous substances associated with kitchen product manufacturing, Metal Masters of Baltimore's waste streams also consisted of household appliance waste, metal fabrication waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

363.    To date, Eagle Group has not paid any response costs incurred by Plaintiff at the 68th Street Site.

364.    According to 68th Street Site records, F A Davis & Son by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

365.    Defendant Eby-Brown Company, LLC ("Eby-Brown") is the successor to and/or formerly known as F A Davis & Son.

366.    F.A. Davis and Sons transferred to Eby F.A. Davis LLC.

367.    Eby-Brown Company, LLC was formerly known as Eby F.A. Davis LLC.

368.    Eby F.A. Davis LLC operated under the assumed name of Eby-Brown Mid Atlantic.

369.    F A Davis & Son is and/or was engaged in the business of wholesale tobacco sales.

370.    F A Davis & Son's waste streams consisted of transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

371.    By letter dated August 28, 2020, Plaintiff demanded that Eby-Brown reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

372.    To date, Eby-Brown has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

373.    According to 68th Street Site records, American Bedding of Baltimore and Eclipse Sleep Products by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

374.     Defendant Eclipse International, Inc. ("Eclipse International") is the successor to and/or formerly known as American Bedding of Baltimore and/or Eclipse Sleep Products.

375.     American Bedding of Baltimore and Eclipse Sleep Products are and/or were engaged in the business of mattress distribution.

376.     The waste streams attributable to American Bedding of Baltimore and Eclipse Sleep Products consisted of retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

377.     By letter dated August 28, 2020, Plaintiff demanded that Eclipse International reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

378.     To date, Eclipse International has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

379.     According to 68th Street Site records, H Klaff & Co. Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

380.     Defendant Elg Metals, Inc. ("Elg Metals") is the successor to H Klaff & Co. Inc.

381.     In or about 1987, H Klaff and Company, Inc. merged into Steelmet, Inc.

382.     ELG Metals, Inc. is formerly known as Steelmet, Inc.

383.     H Klaff & Co. Inc. is and/or was engaged in the business of metal scrap trading.

384.     H Klaff & Co. Inc.'s waste streams consisted of metal processing, fabrication and finishing waste and general office waste, which contained the following hazardous substances:

acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

385.    By letter dated August 28, 2020, Plaintiff demanded that Elg Metals reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

386.    To date, Elg Metals has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

387.    According to 68th Street Site records, Defendants Enterprise Electric Company ("Enterprise Electric") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

388.    Enterprise Electric is and/or was engaged in the business of electrical construction.

389.    Enterprise Electric's waste streams consisted of electrical contractor waste, electrical component waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

390.    By letter dated August 28, 2020, Plaintiff demanded that Enterprise Electric reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

391.    To date, Enterprise Electric has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

392.    According to 68th Street Site records, Lyon Conklin & Co. and SACO by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

393.    Defendant Ferguson Enterprises, Inc. ("Ferguson Enterprises") is the successor to Lyon Conklin & Co. and SACO.

394.    In or about 1986, SACO Supply, Inc. and Lyon, Conklin of Virginia, Inc. merged into Lyon, Conklin & Co., Inc., the surviving corporation.

395.    In or about 2010, Ferguson Enterprises acquired Lyon, Conklin & Co., Inc.

396.    Lyon, Conklin & Co., Inc. was founded in or about 1860 and Ferguson Enterprises holds itself out on its website as having been in business 155 years as of October 2015.

397.    Lyon Conklin & Co. and SACO are or were engaged in the business of HVAC distribution.

398.    The waste streams attributable to Lyon Conklin & Co. and SACO consisted of equipment maintenance waste and general office waste, which contained the following hazardous substances: acetone, arsenic, benzene, cadmium, chromium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

399.    Additionally, 68th Street Site records describe Lyon Conklin & Co. Inc.'s waste as generating from a sheet metal facility. Metal fabrication waste contains the following

hazardous substances: chromium, copper, lead, manganese, methyl ethyl ketone, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, and xylene.

400.    By letter dated August 28, 2020, Plaintiff demanded that Ferguson Enterprises reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

401.    To date, Ferguson Enterprises has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

402.    According to 68th Street Site records, West Baltimore Building Association by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

403.    Defendant First National Bank of Pennsylvania ("FNB Pennsylvania") is the successor to West Baltimore Building Association.

404.    West Baltimore Building Association was formed in or about 1902, changed its name to Heritage Savings Association in or about 1975, and changed its name to Heritage Savings Bank in or about 1987.

405.    In or about 2002, Heritage Savings Bank merged into Baltimore County Savings Bank.

406.    In or about 2014, BCSB Bancorp, Inc., the holding company for its wholly owned subsidiary Baltimore County Savings Bank merged into F.N.B. Corporation, which trades under the name First National Bank of Pennsylvania. Baltimore County Savings Bank is also identified as having merged into First National Bank of Pennsylvania in 2014.

407.    West Baltimore Building Association was engaged in the business of banking.

54

408.     West Baltimore Building Association's waste streams consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

409.     By letter dated August 28, 2020, Plaintiff demanded that FNB Pennsylvania reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

410.     To date, FNB Pennsylvania has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

411.     Alternatively, Defendant F.N.B. Corporation ("F.N.B.") is the successor to West Baltimore Building Association by virtue of the 2014 merger of BCSB Bancorp. Inc., and/or Baltimore County Savings Bank into F.N.B.

412.     In or about 2014, BCSB Bancorp, Inc., the holding company for and/or the parent company of Baltimore County Savings Bank. merged into F.N.B. Corporation.

413.     F.N.B Corporation trades under the name First National Bank of Pennsylvania and/or is one and the same as or a parent corporation of First National Bank of Pennsylvania.

414.     To date, F.N.B. has not paid any response costs incurred by Plaintiff at the 68th Street Site.

415.     According to 68th Street Site records, Albin Sales Co. and F W Woolworth by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

416.     Defendant Foot Locker Specialty, Inc. ("Foot Locker") is formerly known as as F.W. Woolworth Co.

417.     Additionally, Foot Locker is the successor to Albin Sales Co.

418.     In or about 1972, Lee's Outdoor Stores, Inc. merged into Albin Sales Co., Inc., which changed its name to Lee's Sports, Inc. in or about 1976.

419.     In or about 1986, Armel Inc. acquired Lee's Sports, Inc. which began operating as Champ's Sporting Goods.

420.     In or about 1987, F.W. Woolworth Co., now known as Foot Locker, acquired Armel Inc., including its Champ's Sporting Goods line, in a stock acquisition.

421.     Foot Locker and Albin Sales Co. are and/or were engaged in the business of retail shoe and apparel stores.

422.     The waste streams attributable to Foot Locker and Albin Sales Co. consisted of retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

423.     By letter dated August 28, 2020, Plaintiff demanded that Foot Locker reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

424.     To date, Foot Locker has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

425.    According to 68th Street Site records, Penniman & Brown by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

426.    Defendant Froehling & Robertson, Inc. ("Froehling & Robertson") is the successor to Penniman & Brown.

427.    In or about June 2012, Froehling & Robertson acquired Penniman & Brown, Penniman & Brown then changed its name to PB Fuel, Inc. in the same month and dissolved shortly thereafter.

428.    Penniman & Brown is and/or was engaged in the business of soil engineering, including groundwater remediation and wet soil mixing.

429.    In addition to the hazardous substances associated with soil engineering and groundwater remediation waste, Penniman & Brown's waste streams also consisted of building construction waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, cobalt, copper, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc

430.    By letter dated August 28, 2020, Plaintiff demanded that Froehling & Robertson reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

431.    To date, Froehling & Robertson has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

432.     According to 68th Street Site records, Autoline Oil by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

433.     Defendant Fuchs Lubricants Co. ("Fuchs Lubricants") is the successor to Autoline Oil.

434.     The Autoline Oil Company merged into 1832 Corporation with the surviving corporation changing its name to Autoline Lubricants, Inc.

435.     In or about 1988, Autoline Lubricants Inc. merged into Century Autoline, Inc.

436.     In or about 2000, Century Lubricants Co. merged into Fuchs Lubricants Co.

437.     Autoline Oil is and/or was engaged in the business of development, production and sale of lubricants in six categories: automotive lubricants, industrial lubricants, lubricating greases, metal processing lubricants, special application lubricants and related services.

438.     In addition to the hazardous substances associated with lubricant prodcution waste, Autoline Oil's waste streams also consisted of auto repair waste, maintenance waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

439.     To date, Fuchs Lubricants has not paid any response costs incurred by Plaintiff at the 68th Street Site.

440.     According to 68th Street Site records, L. Grief & Bros. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

441.     Defendant Genesco Inc. ("Genesco") is one and the same as L. Grief & Bros.

442.     L. Greif & Bros., Inc. was incorporated in or about 1917.

443.     In or about 1959, Genesco acquired L. Grief & Bros., Inc. and continued it as a division. L. Greif & Bro. was a division of Genesco during the relevant time period.

444.     L. Grief & Bros. is and/or was engaged in the business of manufacturing men's clothing.

445.     In addition to the hazardous substances associated with clothing manufacturing waste, L. Grief & Bros.'s waste streams also consisted of maintenance waste and office waste, which contained the following hazardous substances: acetone, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

446.     By letter dated August 28, 2020, Plaintiff demanded that Genesco reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

447.     To date, Genesco has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

448.     According to 68th Street Site records, Flavorex Co. and Naarden Flavorex Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

449.     Defendant Givaudan Flavors Corporation ("Givaudan") is the successor to Flavorex Co. and Naarden Flavorex Inc.

450.     In or about 1964, Flavorex Co. changed its name to Naarden Flavorex Inc.

451.    In or about 1987, Naarden Flavorex Inc. changed its name to Quest International Fragrances USA Inc.

452.    In or about 1989, Quest International Fragrances USA Inc. merged into National Starch and Chemical Corporation.

453.    In or about 1997, Imperial Chemical Industries acquired National Starch and Chemical Company and Quest International.

454.    In or about 2006, Givaudan acquired Quest Flavors.

455.    Flavorex Co. and Naarden Flavorex Inc. are and/or were engaged in the business of fragrance and flavor production.

456.    In addition to the hazardous substances associated with fragrance and flavor production waste, the waste streams attributable to Flavorex Co. and Naarden Flavorex Inc. also consisted of food processing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

457.    To date, Givaudan has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

458.    Alternatively, Defendant Unilever United States, Inc. ("Unilever") is the successor to Flavorex Co. and Naarden Flavorex Inc. and responsible for the waste streams attributed to Flavorex Co. and Naarden Flavorex Inc.

459.    To date, Unilever has not paid any response costs incurred by Plaintiff at the 68th Street Site.

460.     According to 68th Street Site records, United Clay and Supply Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

461.     Defendant Glen-Gery Corporation ("Glen-Gery") is one and the same as and/or the successor to United Clay and Supply Co.

462.     In or about 1964, United Clay & Supply Corp. was located at 3000 Druid Park Dr., Baltimore, MD. By at least 1971, United Clay & Supply Corp. was named or doing business as The United Clay Products Co., still located at the same address.

463.     In or about 1973, The United Clay Products Co. became United Materials and Services, Inc. and relocated its main office to 801 Jackson St., N.E. in the Washington-Baltimore area.

464.     In or about 1980, L & L Supply Corporation acquired United Materials and Services, Inc. f/k/a United Clay Products Co.

465.     Glen-Gery is formerly known as L & L Supply Corporation.

466.     United Clay and Supply Co. is and/or was engaged in the business of masonry supply.

467.     United Clay and Supply Co.'s waste streams consisted of masonry contractor waste, general office waste and auto repair waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, perchloroethylene, nickel, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

468.     By letter dated August 28, 2020, Plaintiff demanded that Glen-Gery reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

469.     To date, Glen-Gery has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

470.     According to 68th Street Site records, Harringtons Market by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

471.     Defendant Graul's Market, Inc. ("Graul's Market") is the successor to Harringtons Market.

472.     In or about 1973, Graul's Market acquired Harringtons Market.

473.     Harringtons Market is and/or was engaged in the grocery business.

474.     Harringtons Market's waste streams consisted of food processing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

475.     By letter dated August 28, 2020, Plaintiff demanded that Graul's Market reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

476.     To date, Graul's Market has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

477.     According to 68th Street Site records, Defendant Graybar Electric Company Inc. ("Graybar Electric") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

478.     Graybar Electric is and/or was engaged in the business of distributing electrical components, equipment and materials.

479.     Graybar Electric's waste streams consisted of electrical waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

480.     By letter dated August 28, 2020, Plaintiff demanded that Graybar Electric reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

481.     To date, Graybar Electric has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

482.     According to 68th Street Site records, Defendant H&R Block, Inc. ("H&R Block") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

483.     H&R Block is and/or was engaged in the business of accounting services.

484.     H&R Block's waste streams consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl

ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

485. By letter dated August 28, 2020, Plaintiff demanded that H&R Block reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

486. To date, H&R Block has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

487. According to 68th Street Site records, John H. Hampshire, Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

488. Defendant Hampshire Industries, Inc. ("Hampshire Industries") is one and the same as and was formerly known as John H. Hampshire, Inc.

489. In or about 1981, John H. Hampshire, Inc. changed its name to Hampshire Industries.

490. Hampshire Industries is and/or was engaged in the business of commercial contractor services.

491. Hampshire Industries' waste streams consisted of general contractor waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

492.     By letter dated August 28, 2020, Plaintiff demanded that Hampshire Industries reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

493.     To date, Hampshire Industries has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

494.     According to 68th Street Site records, The American Bank Stationery Company by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

495.     Defendant Harland Clarke Corp. ("Harland Clarke") is the successor to The American Bank Stationery Company.

496.     In or about 1967, The American Bank Stationery Company was incorporated.

497.     In or about 1986, American Bank acquired The American Bank Stationery Company.

498.     In or about, 1989, MB Group Plc. acquired American Bank.

499.     American Bank was then merged into MB Group Plc. subsidiary Clarke Checks Inc. to form Clark American Corp.

500.     In or about 2007, Clark American Corp. was merged with the John H. Harland Company to form the Harland Clarke Corp.

501.     The American Bank Stationery Company is and/or was engaged in the business of check printing and related sales.

502.     The American Bank Stationery Company's waste streams consisted of printing waste and general office waste, which contained the following hazardous substances: acetone,

barium, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene

chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene,

and zinc.

503.    To date, Harland Clarke has not paid any response costs incurred by Plaintiff at

the 68th Street Site.

504.    According to 68th Street Site records, Brooks-Price Co. and Schmidt Ford Tractor

Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a

transporter for transport for disposal or treatment of waste containing hazardous substances at the

68th Street Site.

505.    Defendant Heritage Chevrolet-Buick, Inc. ("Heritage Chevrolet-Buick") is the

successor to Brooks-Price Co. and Schmidt Ford Tractor Inc.

506.    In or about 1971, Schmidt Ford Used Cars, Inc. and Schmidt Ford Tractors, Inc.

merged to become Larry's Dodge, Inc.

507.    In or about 1990, Larry's Dodge, Inc. changed its name to Larry's Mazda, Inc.

and then merged into Larry's Chevrolet, Inc., the surviving corporation.

508.    In or about 1991, Larry's Chevrolet, Inc. changed its name to Venture Sales, Inc.

509.    In or about 1991, Venture Sales, Inc. transferred substantially all assets to Best

Chevrolet/GEO, Inc.

510.    In or about 1993, Heritage Chevrolet, Inc. merged into Best Chevrolet/GEO, Inc.,

the surviving corporation

511.    In or about 1997, Best Chevrolet/GEO, Inc. changed its name to Heritage

Chevrolet, Inc.

512.     In or about 2000, Heritage Chevrolet, Inc. changed its name to Heritage Chevrolet-Oldsmobile, Inc.

513.     In or about 2003, Heritage Chevrolet-Oldsmobile, Inc. changed its name to Heritage Chevrolet-Buick, Inc.

514.     Additionally, Heritage Chevrolet-Buick is the successor to Brooks-Price Co.

515.     In or about 1980, Brooks-Price Co. changed its name to Bud Schmidt Buick, Inc.

516.     Heritage Group acquired Bud Schmidt Buick, Inc. through its subsidiary Heritage Chevrolet-Buick.

517.     Heritage Chevrolet-Buick, Brooks-Price Co. and Schmidt Ford Tractor Inc. are and/or were engaged in the business of automotive sales and service.

518.     The waste streams attributable to Brooks-Price Co. and Schmidt Ford Tractor Inc. consisted of auto repair waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

519.     By letter dated August 28, 2020, Plaintiff demanded that Heritage Chevrolet reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

520.     To date, Heritage Chevrolet has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

521.     According to 68th Street Site records, High's Ice Cream House and High's Store by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a

transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

522.    Defendant High's of Baltimore, LLC ("High's of Baltimore") is the successor to and/or is formerly known as High's Ice Cream House and High's Store.

523.    High's of Baltimore, Inc. was incorporated in or about 1947 and operated High's Ice Cream Stores in the Baltimore area.

524.    In or about 2011, in connection with its acquisition of the High's businesses, Carroll Independent Fuel Company created Carroll Newco, LLC, which changed its name to High's of Baltimore, LLC.

525.    In or about March 2012, coinciding with Carroll Independent Fuel Company's acquisition of High's businesses, High's of Baltimore, Inc. transferred substantially all property and assets to High's of Baltimore, LLC. Thereafter, High's of Baltimore, LLC continued the business of High's of Baltimore, Inc. and High's of Baltimore, Inc. changed its name to New Ridge Associates, Inc.

526.    High's Ice Cream House and High's Store are and/or were engaged in the business of food services and retail.

527.    The waste streams attributable to High's Ice Cream House and High's Store consisted of food processing waste, retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

528.    By letter dated August 28, 2020, Plaintiff demanded that High's of Baltimore reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

529.    To date, High's of Baltimore has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

530.    Alternatively, Defendant New Ridge Associates, Inc. ("New Ridge Associates") is the successor to High's Ice Cream House and High's Store and is responsible for the waste streams attributable to High's Ice Cream House and High's Store.

531.    To date, New Ridge Associates has not paid any response costs incurred by Plaintiff at the 68th Street Site.

532.    According to 68th Street Site records, Statler Hilton Hotel by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

533.    Defendant Hilton Worldwide, Inc. ("Hilton Worldwide") is one and the same as and/or is formerly known as Statler Hilton Hotel.

534.    Statler Hilton Hotel is and/or was engaged in the business of hospitality services and lodging.

535.    In addition to the hazardous substances associated with hospitality services and lodging waste, Statler Hilton Hotel's waste streams also consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

536.    By letter dated August 28, 2020, Plaintiff demanded that Hilton Worldwide reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

537.    To date, Hilton Worldwide has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

538.    According to 68th Street Site records, Dur-O-Wal Products by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

539.    Defendant Hohmann & Barnard, Inc. ("Hohmann & Barnard") is the successor to Dur O Wal Products.

540.    In or about April 2010, Hohmann & Barnard acquired Dur-O-Wal Products from Dayton Superior Corporation and merged Dur-O-Wal Products with its product line. Hohmann & Barnard holds Dur-O-Wal out as "A Hohmann & Barnard Company" on its website.

541.    Dur-O-Wal Products is and/or was engaged in the business of masonry product manufacturing and distribution.

542.    In addition to the hazardous substances associated with masonry product manufacturing waste, Dur O Wal Products' waste streams also consisted of fabrication waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

543.     By letter dated August 28, 2020, Plaintiff demanded that Hohmann & Barnard reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

544.     To date, Hohmann & Barnard has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

545.     Alternatively, Defendant Dayton Superior Corporation ("Dayton Superior") is the successor to Dur-O-Wal and is responsible for the waste streams attributable to Dur O Wal Products.

546.     To date, Dayton Superior has not paid any response costs incurred by Plaintiff at the 68th Street Site.

547.     According to 68th Street Site records, Defendant Holly Poultry, Inc. ("Holly Poultry") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

548.     Holly Poultry is and/or was engaged in the business of food service distribution and processing services.

549.     Holly Poultry's waste streams consisted of food processing waste, retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

550.    By letter dated August 28, 2020, Plaintiff demanded that Holly Poultry reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

551.    To date, Holly Poultry has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

552.    According to 68th Street Site records, Ameche's Drive-In Restaurant; Five Star Food Corp.; Gino's Store No. 01 001; Gino's Store No. 01 002; Gino's Store No. 01 003; Gino's Store No. 01 004; Gino's Store No. 01 005; Gino's Store No. 01 006; Gino's Store No. 01 007; Gino's Store No. 01 008; Gino's Store No. 01 009; Gino's Store No. 01 010; Gino's Store No. 01 011; Gino's Store No. 01 012; Gino's Store No. 01 014; Gino's Store No. 01 019; Gino's Store No. 01 020; Gino's Store No. 01 021; Gino's Store No. 01 022; Gino's Store No. 01 023; Gino's Store No. 01 024; Gino's Store No. 01 025; Gino's Store No. 01 027; Gino's Store No. 81 001; Gino's Store No. 83 001; Gino's Store No. 84 001; Gino's Store No. 85 001; Gino's Store No. 86 001; Gino's Store No. 87 001; Gino's Store No. 88 001; Howard Johnson 88545; Howard Johnson Rest 8854; Roy Rogers; Rustler Steak House; Rustler Steak House 4,0003 and Rustler Inc. House 4,0004 by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

553.    Defendant Host Hotels and Resorts, Inc. ("Host Hotels") is the successor to Ameche's Drive-In Restaurant; Five Star Food Corp.; Gino's Store No. 01 001; Gino's Store No. 01 002; Gino's Store No. 01 003; Gino's Store No. 01 004; Gino's Store No. 01 005; Gino's Store No. 01 006; Gino's Store No. 01 007; Gino's Store No. 01 008; Gino's Store No. 01 009; Gino's Store No. 01 010; Gino's Store No. 01 011; Gino's Store No. 01 012; Gino's Store No.

01 014; Gino's Store No. 01 019; Gino's Store No. 01 020; Gino's Store No. 01 021; Gino's Store No. 01 022; Gino's Store No. 01 023; Gino's Store No. 01 024; Gino's Store No. 01 025; Gino's Store No. 01 027; Gino's Store No. 81 001; Gino's Store No. 83 001; Gino's Store No. 84 001; Gino's Store No. 85 001; Gino's Store No. 86 001; Gino's Store No. 87 001; Gino's Store No. 88 001; Howard Johnson 88545; Howard Johnson Rest 8854; Roy Rogers; Rustler Steak House; Rustler Steak House 4,0003 and Rustler Inc. House 4,0004.

554.    Ameche's Drive-In Restaurant; Five Star Food Corp.; Gino's Store No. 01 001; Gino's Store No. 01 002; Gino's Store No. 01 003; Gino's Store No. 01 004; Gino's Store No. 01 005; Gino's Store No. 01 006; Gino's Store No. 01 007; Gino's Store No. 01 008; Gino's Store No. 01 009; Gino's Store No. 01 010; Gino's Store No. 01 011; Gino's Store No. 01 012; Gino's Store No. 01 014; Gino's Store No. 01 019; Gino's Store No. 01 020; Gino's Store No. 01 021; Gino's Store No. 01 022; Gino's Store No. 01 023; Gino's Store No. 01 024; Gino's Store No. 01 025; Gino's Store No. 01 027; Gino's Store No. 81 001; Gino's Store No. 83 001; Gino's Store No. 84 001; Gino's Store No. 85 001; Gino's Store No. 86 001; Gino's Store No. 87 001; Gino's Store No. 88 001; Howard Johnson 88545; Howard Johnson Rest 8854; Roy Rogers; Rustler Steak House; Rustler Steak House 4,0003 and Rustler Inc. House 4,0004 were engaged in the business of food services and retail.

555.    The waste streams attributable to Ameche's Drive-In Restaurant; Five Star Food Corp.; Gino's Store No. 01 001; Gino's Store No. 01 002; Gino's Store No. 01 003; Gino's Store No. 01 004; Gino's Store No. 01 005; Gino's Store No. 01 006; Gino's Store No. 01 007; Gino's Store No. 01 008; Gino's Store No. 01 009; Gino's Store No. 01 010; Gino's Store No. 01 011; Gino's Store No. 01 012; Gino's Store No. 01 014; Gino's Store No. 01 019; Gino's Store No. 01 020; Gino's Store No. 01 021; Gino's Store No. 01 022; Gino's Store No. 01 023; Gino's

Store No. 01 024; Gino's Store No. 01 025; Gino's Store No. 01 027; Gino's Store No. 81 001; Gino's Store No. 83 001; Gino's Store No. 84 001; Gino's Store No. 85 001; Gino's Store No. 86 001; Gino's Store No. 87 001; Gino's Store No. 88 001; Howard Johnson 88545; Howard Johnson Rest 8854; Roy Rogers; Rustler Steak House; Rustler Steak House 4,0003 and Rustler Inc. House 4,0004 consisted of food processing waste, retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

556.   To date, Host Hotels has not paid any response costs incurred by Plaintiff at the 68th Street Site.

557.   Alternatively, Defendant HMS Host Family Restaurants, Inc. ("HMS Host Family Restuarants") is the successor to, and is responsible for the waste streams attributable to Ameche's Drive-In Restaurant; Five Star Food Corp.; Gino's Store No. 01 001; Gino's Store No. 01 002; Gino's Store No. 01 003; Gino's Store No. 01 004; Gino's Store No. 01 005; Gino's Store No. 01 006; Gino's Store No. 01 007; Gino's Store No. 01 008; Gino's Store No. 01 009; Gino's Store No. 01 010; Gino's Store No. 01 011; Gino's Store No. 01 012; Gino's Store No. 01 014; Gino's Store No. 01 019; Gino's Store No. 01 020; Gino's Store No. 01 021; Gino's Store No. 01 022; Gino's Store No. 01 023; Gino's Store No. 01 024; Gino's Store No. 01 025; Gino's Store No. 01 027; Gino's Store No. 81 001; Gino's Store No. 83 001; Gino's Store No. 84 001; Gino's Store No. 85 001; Gino's Store No. 86 001; Gino's Store No. 87 001; Gino's Store No. 88 001; Howard Johnson 88545; Howard Johnson Rest 8854; Roy Rogers; Rustler Steak House; Rustler Steak House 4,0003 and Rustler Inc. House 4,0004.

558.    To date, HMS Host Family Restaurants has not paid any response costs incurred by Plaintiff at the 68th Street Site.

559.    According to 68th Street Site records, Aurora Fed Saving & Loan, Beneficial Finance Co., Baltimore Federal, Baltimore Federal Savings & Loan, King Sealy, and King Seely Division by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

560.    Defendant HSBC North America Holdings, Inc. ("HSBC") is the successor to and/or formerly known as Aurora Fed Saving & Loan, Beneficial Finance Co., Baltimore Federal, Baltimore Federal Savings & Loan, King Sealy, and King Seely Division.

561.    Aurora Fed Saving & Loan, Beneficial Fiannce Co., Baltimore Federal, Baltimore Federal Savings & Loan, King Sealy, and King Seely Division are and/or were engaged in the business of financial services.

562.    The waste streams attributable to Aurora Fed Saving & Loan, Beneficial Fiannce Co., Baltimore Federal, Baltimore Federal Savings & Loan, King Sealy, and King Seely Division consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

563.    By letter dated August 28, 2020, Plaintiff demanded that HSBC reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

564.    To date, HSBC has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

565.     According to 68th Street Site records, Englander Mattress by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

566.     Defendant Illinois Sleep Products, Inc. ("Illinois Sleep") is the successor to Englander Mattress

567.     In or about 1986, Illinois Sleep acquired the license rights to Englander mattresses and began manufacturing and distributing them. Englander Mattress has ceased to exist independently.

568.     Illinois Sleep does business as Englander of Illinois, Co.

569.     Englander Mattress is and/or was engaged in the business of mattress manufacturing and distribution.

570.     Englander Mattress's waste streams consisted of fabrication waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

571.     By letter dated August 28, 2020, Plaintiff demanded that Illinois Sleep reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

572.     To date, Illinois Sleep has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

573.     According to 68th Street Site records, The Abbey Drum Company by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for

transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

574.    Defendant Industrial Container Services, LLC ("Industrial Container") is the successor to The Abbey Drum Company.

575.    In or about 2015, Industrial Container acquired The Abbey Drum Company, which changed its name to ADCO Holdings, Inc. and ceased to operate.

576.    Industrial Container continued the business of The Abbey Drum Company and retained at least The Abbey Drum Company's Vice President, Jonathan Neuman, and other members of his team.

577.    Industrial Container and The Abbey Drum Company are and/or were engaged in the business of industrial drum reconditioning and distribution.

578.    The Abbey Drum Company's waste streams consisted of metal processing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

579.    By letter dated August 28, 2020, Plaintiff demanded that Industrial Container reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

580.    To date, Industrial Container has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

581.    According to 68th Street Site records, Govans Chevrolet, Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for

transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

582.    Defendant Jerry's Chevrolet, Inc. ("Jerry's Chevrolet") is one and the same as and formerly known as Govans Chevrolet, Inc.

583.    In or about 1971, Govans Chevrolet, Inc. changed its name to Jerry's Chevrolet, Inc.

584.    Jerry's Chevrolet is and/or was engaged in the business of automotive sales and service.

585.    Jerry's Chevrolet's waste streams consisted of auto repair waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

586.    By letter dated October 6, 2020, Plaintiff demanded that Jerry's Chevrolet reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

587.    To date, Jerry's Chevrolet has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

588.    According to 68th Street Site records, Canada Dry Inc. and Marbert Products by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

589.    Defendant Keurig Dr. Pepper, Inc. ("Keurig") is the successor to Canada Dry Inc.

590.    In or before 1969, Royal Crown-Dr. Pepper Company began distributing Canada Dry Products in the Baltimore area.

591.    In or about 1981, Dr. Pepper Company, Inc. acquired Canada Dry from its parent corporation Norton Simon Inc.

592.    Dr. Pepper Company changed its name several times before Dr. Pepper Snapple Group merged with Keurig Green Mountain in or about 2018.

593.    Additionally, Keurig is the successor to MarBert Products.

594.    Marbert, Inc. traded as or was one and the same as Marbert Products.

595.    In or about 1992, Marbert, Inc. and Dixi-Cola, Inc. merged into The Seven-Up Company.

596.    In or about 1993, the Seven-Up Company merged into Dr. Pepper Company, Inc.

597.    Canada Dry Inc. and Marbert Products are and/or were engaged in the business of beverage production and distribution.

598.    In addition to the hazardous substances associated with beverage production and distribution waste, the waste streams attributable to Canada Dry Inc. and Marbert Products also consisted of food processing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

599.    By letter dated August 28, 2020, Plaintiff demanded that Keurig reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

600.     To date, Keurig has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

601.     According to 68th Street Site records, Milford Manor by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

602.     Defendant King David at Autumn Lake LLC ("King David") is the successor to Milford Manor.

603.     In or about 2017, Raffel Senior Housing, LLC sold Milford Manor Nursing and Rehabilitation Center to Autumn Lake Healthcare, which named the facility King David at Autumn Lake.

604.     King David and Milford Manor are and/or were engaged in the business of care services and housing.

605.     In addition to the hazardous substances associated with care services and housing waste, Milford Manor's waste streams also consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

606.     By letter dated August 28, 2020, Plaintiff demanded that King David reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

607.     To date, King David has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

608.    According to 68th Street Site records, S. S. Kresge Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

609.    Defendant Kmart Corporation ("Kmart") is the successor to S. S. Kresge Co.

610.    In or about 1977, S.S. Kresge Company changed its name to Troy CMBS Property, L.L.C., which merged into Kmart in or about 2003.

611.    S. S. Kresge Co. is and/or was engaged in the business of department retail.

612.    S. S. Kresge Co.'s waste streams consisted of retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

613.    By letter dated August 28, 2020, Plaintiff demanded that Kmart reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

614.    To date, Kmart has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

615.    According to 68th Street Site records, HCA Food Corp. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

616.    Defendant Kohlberg Kravis Roberts & Co. L.P. ("Kohlberg") is the successor to H C A Food Corp.

617.    In or about 1971, HCA Food Corp. became Doxsee Food Corp. which later merged into Borden Inc.

618.    In or about 1994, Kohlberg acquired Borden Inc.

619.    HCA Food Corp. is and/or was engaged in the business of food processing and distribution.

620.    HCA Food Corp.'s waste streams consisted of food processing, general office and transportation waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

621.    By letter dated August 28, 2020, Plaintiff demanded that Kohlberg reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

622.    To date, Kohlberg has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

623.    According to 68th Street Site records, Double T Diner by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

624.    Defendant Koros, LLC ("Koros") is also known as Double T Diner.

625.    Koros is and/or was engaged in the business of food service.

626.    Koros's waste streams consisted of food processing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

627.     By letter dated August 28, 2020, Plaintiff demanded that Koros reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

628.     To date, Koros has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

629.     According to 68th Street Site records, Almac Plastics of Maryland, Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

630.     Defendant Laird Plastics, Inc. ("Laird Plastics") is formerly known as Almac Plastics of Maryland, Inc.

631.     In or about 1981, Almac Plastics of Maryland, Inc. merged into Almac Plastics, Inc., a New York entity, which changed its name to Laird Plastics in or about 1992.

632.     Almac Plastics of Maryland, Inc. is and/or was engaged in the business of plastic distribution.

633.     Almac Plastics of Maryland, Inc.'s waste streams consisted of fabrication waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

634.     Additionally, 68th Street Site records describe Almac Plastics of Maryland, Inc.'s waste as containing all liquid waste with a lead smell.

635.    By letter dated August 28, 2020, Plaintiff demanded that Laird Plastics reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

636.    To date, Laird Plastics has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

637.    According to 68th Street Site records, Defendant Lane Bryant, Inc. ("Lane Bryant") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

638.    Lane Bryant is and/or was engaged in the business of clothing retail.

639.    Lane Bryant's waste streams consisted of retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

640.    By letter dated August 28, 2020, Plaintiff demanded that Lane Bryant reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

641.    To date, Lane Bryant has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

642.    According to 68th Street Site records, American Metal Products Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

643.    Defendant Lear Corporation ("Lear") is the successor to American Metal Products Co.

644.    In or about 1966, American Metal Products Co. merged into Lear Siegler, Inc. At the time, American Metal Products Co. manufactured metal seat frames for cars and airplanes.

645.    In or about 1987, Lear Siegler, Inc. spun off its seating business as Lear Seating, and in or about1996, Lear Seating changed its name to Lear Corporation.

646.    American Metal Products Co. is and/or was engaged in the business of automotive accessory manufacturing.

647.    American Metal Products Co.'s waste streams consisted of metal fabrication, finishing and processing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

648.    To date, Lear has not paid any response costs incurred by Plaintiff at the 68th Street Site.

649.    According to 68th Street Site records, Lebanon Chemical Corp. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

650.    Defendant Lebanon Seaboard Corporation ("Lebanon Seaboard") is formerly known as Lebanon Chemical Corp.

651.    In or about 2005, Lebanon Chemical Corp. changed its name to Lebanon Seaboard Corporation.

652.     Lebanon Seaboard is and/or was engaged in the business of fertilizer production.

653.     In addition to the hazardous substances associated with fertilizer production waste, Lebanon Seaboard's waste streams also consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

654.     Additionally, 68th Street Site records describe Lebanon Chemical Corp.'s waste as containing at least the following: office waste, locker room waste, maintenance shop waste, empty fertilizer bags, pallets, boxes and wrappings, with unused metal parts sold to a separate scrap yard.

655.     By letter dated August 28, 2020, Plaintiff demanded that Lebanon Seaboard reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

656.     To date, Lebanon Seaboard has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

657.     According to 68th Street Site records, Legg & Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

658.     Defendant Legg Mason, Inc. ("Legg Mason") is the successor to and/or formerly known as Legg & Co.

659.     In or about 1899, Legg & Co. was founded.

660.     In or about 1962, Mason & Company was founded.

661.    In or about 1970, Legg & Co. merged with Mason & Company to form Legg Mason & Company.

662.    Legg Mason & Company is now known as Legg Mason, Inc.

663.    Legg & Co. is and/or was engaged in the business of financial services.

664.    Legg & Co.'s waste streams consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

665.    By letter dated August 28, 2020, Plaintiff demanded that Legg Mason reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

666.    To date, Legg Mason has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

667.    According to 68th Street Site records, Len Stoler Ford by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

668.    Defendant Len Stoler, Inc. ("Len Stoler") is also known as Len Stoler Ford.

669.    Len Stoler is and/or was engaged in the business of automotive sales and service.

670.    Len Stoler's waste streams consisted of automotive service and repair waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

671.    By letter dated August 28, 2020, Plaintiff demanded that Len Stoler reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

672.    To date, Len Stoler has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

673.    According to 68th Street Site records, American Ambulance by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

674.    Defendant Lifestar Response Corporation ("Lifestar Response") is the successor to American Ambulance.

675.    American Ambulance is also known as Best American Ambulance and Medical Transportation Services, Inc.

676.    In or about 2009, Lifestar Response Corporation acquired Best American Ambulance and Medical Transportation Services, Inc.

677.    American Ambulance is and/or was engaged in the business of ambulance services.

678.    In addition to the hazardous substances associated with ambulance servies waste, American Ambulance's waste streams also consisted of transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, manganese, lead, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

679.    By letter dated August 28, 2020, Plaintiff demanded that Lifestar Response reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

680.    To date, Lifestar Response has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

681.    According to 68th Street Site records, Segall-Majestic Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

682.    Defendant Lifetouch National School Studios, LLC ("Lifetouch National") is the successor to Segall-Majestic Inc.

683.    In or about 1995, Lifetouch National School Studios, LLC acquired Segall-Majestic Inc.

684.    Segall-Majestic is and/or was engaged in the business of photography services.

685.    In addition to the hazardous substances associated with photography services wastes, Segall-Majestic's waste streams also consisted of printing waste and general office waste, which contained the following hazardous substances: acetone, barium, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

686.    By letter dated August 28, 2020, Plaintiff demanded that Lifetouch National reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

687.    To date, Lifetouch National has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

688.    According to 68th Street Site records, Lifelike Products by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

689.    Defendant Lifoam Industries, LLC ("Lifoam Industries") is formerly known as Lifelike Products.

690.    Lifelike Products is and/or was engaged in the business of model train retail.

691.    In addition to the hazardous substances associated with model train retail waste, Lifelike Products' waste streams also consisted of retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

692.    By letter dated August 28, 2020, Plaintiff demanded that Lifoam Industries reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

693.    To date, Lifoam Industries has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

694.    According to 68th Street Site records, Defendant Lion Brothers Company, Inc. ("Lion Brothers") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

695.    Lion Brothers is and/or was engaged in the business of textile manufacturing.

696.    Lion Brothers' waste streams consisted of fabrication waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, copper,

dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

697. By letter dated August 28, 2020, Plaintiff demanded that Lion Brothers reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

698. To date, Lion Brothers has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

699. According to 68th Street Site records, Bryant Realty and Donald E. Grempler Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

700. Defendant Long & Foster Real Estate, Inc. ("Long & Foster") is the successor to and/or formerly known as Bryant Realty and Donald E. Grempler Inc.

701. In or about 1975, Donald E. Grempler Realty - North Baltimore County, Inc. changed its name to Grempler Realty, Inc.

702. Donald E. Grempler Realty - North Baltimore County, Inc. is also known as Donald E. Grempler Inc.

703. In or about 2000, Long & Foster Real Estate, Inc. acquired Grempler Realty, Inc.

704. Bryant Realty and Donald E. Grempler Inc. are and/or were engaged in the business of real estate services.

705. The waste streams attributable to Bryant Realty and Donald E. Grempler Inc. waste streams consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene

chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

706.    By letter dated August 28, 2020, Plaintiff demanded that Long & Foster reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

707.    To date, Long & Foster has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

708.    According to 68th Street Site records, Essex Manufacturing Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

709.    Defendant M. Weinman Company, Inc. ("Weinman") is the successor to and/or formerly known as Essex Manufacturing Co.

710.    In or about 1973, Essex Manufacturing Co. changed its name to The Essex Company.

711.    In or about 1995, The Essex Company merged into The Morris Weinman Company.

712.    In or about 2019, The Morris Weinman Company changed its name to M. Weinman Company, Inc.

713.    Essex Manufacturing Co. is and/or was engaged in the business of clothing manufacturing.

714.    In addition to the hazardous substances associated with clothing manufacturing, Essex Manufacturing Co.'s waste streams consisted of general office waste, which contained the

following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

715.     By letter dated August 28, 2020, Plaintiff demanded that Weinman reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

716.     To date, Weinman has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

717.     According to 68th Street Site records, Allied Research Products, Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

718.     Defendant MacDermid, Inc. ("MacDermid") is the successor to and/or formerly known as Allied Research Products, Inc.

719.     In or about, 1966, Allied Research Products, Inc. was formed.

720.     In or about 1972, Richardson Chemical Company acquired Allied Research Products, Inc.

721.     In or about 1994, Richardson Chemical Company changed its name to Allied-Kelite Company.

722.     In or about 1994, MacDermid acquired Allied-Kelite Company.

723.     Allied Research Products, Inc. is and/or was engaged in the business of chemical manufacturing, including electroplating solutions.

724.     In addition to the hazardous substances associated with chemical manufactuing waste, Allied Research Products, Inc.'s waste streams also consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

725.     By letter dated August 28, 2020, Plaintiff demanded that MacDermid reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

726.     To date, MacDermid has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

727.     According to 68th Street Site records, Maryland Management by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

728.     Defendant The Maryland Management Company ("MD Management") the successor to and/or also known as Maryland Management.

729.     The Maryland Management Company was formed in 1949.

730.     MD Management is and/or was engaged in the business of housing and residential services.

731.     In addition to the hazardous substances associated with housing and residential services waste, MD Management's waste streams also consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene,

lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

732.    By letter dated August 28, 2020, Plaintiff demanded that MD Management reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

733.    To date, MD Management has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

734.    According to 68th Street Site records, Defendant Master-Halco, Inc. ("Master-Halco") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

735.    Master-Halco is and/or was engaged in the business of fencing production and distribution.

736.    Master-Halco's waste streams consisted of fabrication waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

737.    To date, Master-Halco has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

738.    According to 68th Street Site records, Mawson & Maws O by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

739.    Defendant Mawson and Mawson, Inc. ("Mawson") is one and the same as Mawson & Maws O.

740.    Mawson is and/or was engaged in the business of transportation services.

741.    Mawson's waste streams consisted of transportation waste, auto repair waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

742.    By letter dated August 28, 2020, Plaintiff demanded that Mawson reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

743.    To date, Mawson has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

744.    According to 68th Street Site records, McCormick Spices by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

745.    Defendant McCormick & Company, Inc. ("McCormick") is formerly known as and/or also known as McCormick Spices.

746.    McCormick is and/or was engaged in the business of food manufacturing and distribution.

747.    McCormick's waste streams consisted of food processing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, methylene

chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

748.     To date, McCormick has not paid any response costs incurred by Plaintiff at the 68th Street Site.

749.     According to 68th Street Site records, David Fulton and Plantabbs Corp. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

750.     Defendant Melibelle USA, Inc. ("Melibelle USA") is the successor to David Fulton and Plantabbs Corp.

751.     Plantabbs Corporation was founded by David Fulton.

752.     Plantabbs Products is a division of Melibelle USA, Inc.

753.     David Fulton and Plantabbs Corp. are and/or were engaged in the business of fertilizer production.

754.     In addition to the hazardous substances associated with fertilizer production waste, the waste streams attributable to David Fulton and Plantabbs Corp. also consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

755.     Additionally, 68th Street Site records describe David Fulton and Plantabbs Corp.'s waste as containing barrels.

756.    By letter dated August 28, 2020, Plaintiff demanded that Melibelle USA reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

757.    To date, Melibelle USA has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

758.    According to 68th Street Site records, M ECH S HRPE & Dohme and M ECK Sharpe & DHME by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

759.    Defendant Merck Sharp & Dohme Corp. ("Merck Sharp") is one and the same as M ECH S HRPE & Dohme and M ECK Sharpe & DHME.

760.    Merck Sharp is and/or was engaged in the business of biopharmaceutical research.

761.    In addition to the hazardous substances associated with biopharmaceutical research waste, Merck Sharp's waste streams also consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

762.    By letter dated August 28, 2020, Plaintiff demanded that Merck Sharp reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

763.    To date, Merck Sharp has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

764.   According to 68th Street Site records, Natl Biscuit Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

765.   Defendant Mondelez International, Inc. ("Mondelez") is the successor to Natl Biscuit Co. and Standard Brands.

766.   Natl Biscuit Co. is shorthand for the National Biscuit Company.

767.   In or about 1983, Standard Brands, inc. merged into Nabisco Inc.

768.   National Biscuit Company changed its name to Nabisco, Inc. in 1971.

769.   In or about 2001, Nabisco, Inc. merged into Kraft Foods North America, Inc.

770.   In or about 2012, Kraft Foods North America, Inc. changed its name to Mondelez International, Inc.

771.   Natl Biscuit Co. and Standard Brands are and/or were engaged in the business of food production and distribution.

772.   Natl Biscuit Co. and Standard Brands' waste streams consisted of food processing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

773.   By letter dated August 28, 2020, Plaintiff demanded that Mondelez reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

774.   To date, Mondelez has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

775.     According to 68th Street Site records, Forest Height Apts., Marylander Apts., University Associates, Westerly Apts and The Westridge Apts. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

776.     Defendant Morgan Properties Management Company, LLC ("Morgan Properties") is the successor to and/or also known as Forest Height Apts., Marylander Apts., University Associates, Westerly Apts and The Westridge Apts.

777.     Forest Height Apts., Marylander Apts., University Associates, Westerly Apts and The Westridge Apts. are and/or were engaged in the business of residential services.

778.     In addition to the hazardous substances associated with residential services waste, the waste streams attributable to Forest Height Apts., Marylander Apts., University Associates, Westerly Apts and The Westridge Apts. 's waste streams also consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

779.     By letter dated August 28, 2020, Plaintiff demanded that Morgan Properties reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

780.     To date, Morgan Properties has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

781.     According to 68th Street Site records, LaFrance Industries by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

782.    Defendant Mount Vernon Mills, Inc. ("Mt. Vernon Mills") is the successor to LaFrance Industries.

783.    LaFrance Industries is and/or was engaged in the business of fabric production.

784.    LaFrance Industries' waste streams consisted of fabrication waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

785.    By letter dated August 28, 2020, Plaintiff demanded that Mt. Vernon Mills reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

786.    To date, Mt. Vernon Mills has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

787.    According to 68th Street Site records, National Institute of HFAL by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

788.    Defendant National Institutes of Health ("NIH") is one and the same as National Institute of HFAL.

789.    NIH is and/or was engaged in the business of medical research.

790.    In addition to the hazardous substances associated with medical research waste, NIH's waste streams also consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone,

methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

791.    By letter dated August 28, 2020, Plaintiff demanded that NIH reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

792.    To date, NIH has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

793.    According to 68th Street Site records, Nationwide Motors by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

794.    Defendant Nationwide Auto Sales Corp. ("Nationwide Auto") is formerly known as and/or also known as Nationwide Motors.

795.    Nationwide Auto is and/or was in the business of automotive sales.

796.    Nationwide Auto's waste streams consisted of auto repair waste, general office waste and retail waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

797.    By letter dated August 28, 2020, Plaintiff demanded that Nationwide Auto reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

798.    To date, Nationwide Auto has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

799.    According to 68th Street Site records, Natl. Cash Register ("The National Cash Register Co.") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

800.    Defendant NCR Corporation ("NCR") is one and the same as and/or is formerly known as Natl. Cash Register.

801.    In or about 1881, a group of investors acquired a cash register, company and patents to establish The National Manufacturing Company.

802.    In or about 1884, The National Manufacturing Company was renamed to The National Cash Register Company, which became a manufacturer of mechanical cash registers.

803.    According to publicly available records, The National Cash Register Company filed articles of incorporation on June 16, 2970 with its principal place of business and registered agent both located in Baltimore, Maryland.

804.    NCR is and/or was engaged in the business of cash register manufacturing and sales.

805.    NCR's waste streams consisted of electrical waste, fabrication waste, metal fabrication waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

806.    By letter dated August 28, 2020, Plaintiff demanded that NCR reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

807.    To date, NCR has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

808.    According to 68th Street Site records, Natl. Lead Co. ("National Lead Company") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

809.    Defendant NL Industries, Inc. ("NL Industries") is the successor to and/or is formerly known as National Lead Company.

810.    In or about 1891, National Lead Company formed a general holding company to lead mining and smelting operations over separate companies.

811.    On or about May 28, 1971, National Lead Company changed its name to NL Industries, Inc.

812.    NL Industries is and/or was engaged in the business of mining and manufacturing oxides, pigments, machinery components, and precision ball bearing slides.

813.    In addition to the hazardous substances associated with mining waste, NL Industries' waste streams also consisted of electrical waste, manufactuiring waste, metal fabrication waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

814.    By letter dated August 28, 2020, Plaintiff demanded that NL Industries reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

815. To date, NL Industries has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

816. According to 68th Street Site records, George R. Norris, Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

817. Defendant Norris Automotive Holdings LLC ("Norris Auto") is the successor to and/or is formerly known as George R. Norris, Inc.

818. George R. Norris, Inc. was incorporated on or about January 2, 1947 in Baltimore, Maryland.

819. On or about August 31, 1988, Norris Leasing Company merged into George R. Norris, Inc.

820. George R. Norris, Inc. was located at 901 Merritt Boulevard in Dundalk, Maryland, according to publicly available records.

821. On or about January 3, 2005, Norris Automotive Holdings LLC incorporated in Maryland listing its principal office at 901 Merritt Boulevard in Dundalk, Maryland and its registered agent as Andrew Franklin.

822. Norris Auto and George R. Norris, Inc. are and /or were engaged in the business of automotive retail dealerships.

823. George R. Norris, Inc.'s waste streams consisted of auto body repair waste, auto repair waste, tire products waste, retail waste and/or general office waste, which contained the following hazardous substances: acetone, arsenic, benzene, cadmium, chromium, copper,

dichloroethylene, lead, manganese, mercury, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

824.     By letter dated August 28, 2020, Plaintiff demanded that Norris Auto reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

825.     To date, Norris Auto has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

826.     According to 68th Street Site records, Carlings Brewing Company, F&M Schaefer Brewing Co., Mr. Jerold C. Hoffberger, National Brewing Company and P. Ballantine & Sons by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

827.     Defendant Pabst Brewing Co. ("Pabst Brewing") is the successor to Carlings Brewing Company, F&M Schaefer Brewing Co., Mr. Jerold C. Hoffberger, National Brewing Company and P. Ballantine & Sons.

828.     In or about 1975, Carling Brewing Company merged with the National Brewing Co. and became Carling-National Breweries.

829.     In or about 1979, G. Heileman Brewing Co. acquired Carling-National Breweries.

830.     In or about 1994, The Stroh Brewery Company acquired G. Heileman Brewing Co.

831.     In or about 1999, Pabst Brewing acquired The Stroh Brewery Company.

832.     In or about 1981, The Stroh Brewery Company acquired F&M Schaefer Brewing Co., which it also registered as a fictitious name.

833.    Pabst Brewing later acquired The Stroh Brewery Company.

834.    Mr. Jerold C. Hoffberger was the president of National Brewing Co.

835.    In or about 1972, Falstaff Brewing Corporation acquired P. Ballantine & Sons Brewing Company.

836.    In or about 1985, Pabst Brewing acquired Falstaff Brewing Corporation and/or P. Ballantine & Sons Brewing Company.

837.    Carlings Brewing Company, F&M Schaefer Brewing Co., Mr. Jerold C. Hoffberger, National Brewing Company and P. Ballantine & Sons are and/or were engaged in the business of manufacture, production and distribution of alcoholic beverages.

838.     In addition to the hazardous substances associated with the manufacture, production and distribution of alcoholic beverages, the waste streams attributable to Carlings Brewing Company, F&M Schaefer Brewing Co., Mr. Jerold C. Hoffberger, National Brewing Company and P. Ballantine & Sons also consisted of food processing waste, retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, ethyl benzene, lead, manganese, mercury, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

839.    By letter dated August 28, 2020, Plaintiff demanded that Pabst Brewing reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

840.    To date, Pabst Brewing has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

841.     According to 68th Street Site records, Packaging Corporation of America and Reynolds Aluminum Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

842.     Defendant Pactiv LLC ("Pactiv") is the successor to Packing Corporation of America and Reynolds Aluminum Co.

843.     Packaging Corporation of America was formed in or about 1965, and changed its name to Tenneco Packaging Inc. in or about 1995.

844.     According to the Maryland Secretary of State records, Packaging Corporation changed its name to Pactiv.

845.     Pactiv, Packaging Corporation of America, Reynolds Aluminum Co. are and/or were engaged in the business of manufacturing packaging products.

846.     The waste streams attributable to Packing Corporation of America and Reynolds Aluminum Co. consisted of general office waste, retail waste, fabrication waste and maintenance waste, which contained the following hazardous substances: acetone, barium, benzene, cadmium, chromium, copper, dichloroethylene, ethyl benzene, lead, manganese, mercury, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

847.     By letter dated August 28, 2020, Plaintiff demanded that Pactiv reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

848.     To date, Pactiv has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

849.    According to 68th Street Site records, Deliveries Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

850.    Defendant Penske Logistics LLC ("Penske Logistics") is the successor to Deliveries Inc.

851.    On or about December 31, 1980, Deliveries, Inc. merged into Leaseway System of Baltimore Inc., which later changed its name to Leaseway Transportation Corp.

852.    On or about December 27, 1999, Leaseway Transportation Corp. merged into Penske Logistics.

853.    Deliveries Inc. is and/or was engaged in the business of transportation services, warehouse and distribution and supply chain management.

854.    Deliveries Inc.'s waste streams consisted of general office waste and transportation waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

855.    By letter dated August 28, 2020, Plaintiff demanded that Penske Logistics reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

856.    To date, Penske Logistics has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

857.    According to 68th Street Site records, Anchor Motor Freight, Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for

transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

858.    Defendant Penske Truck Leasing Co., L.P. ("Penske Truck") is the successor in interest to Anchor Motor Freight, Inc.

859.    Anchor Motor Freight, Inc. was formed on or about June 4, 1964.

860.    Anchor Motor Freight, Inc. merged with Penske Trunk on or about April 4, 1997.

861.    Penske Truck and Anchor Motor Freight, Inc. are and/or were engaged in the business of transportation services.

862.    Anchor Motor Freight, Inc.'s waste streams consisted of general office waste and transportation waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

863.    By letter dated August 28, 2020, Plaintiff demanded that Penske Truck reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

864.    To date, Penske Truck has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

865.    According to 68th Street Site records, Poly Seal Corporation by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

866.     Defendant Poly-Seal LLC ("Poly-Seal") is one and the same as Poly Seal Corporation.

867.     Poly-Seal is and/or was engaged in the business of custom injection mold manufacturing.

868.     Poly-Seal's waste streams consisted of rubber products waste, fabrication waste and general office waste, which contained the following hazardous substances: acetone, arsenic, benzene, cadmium, chromium, copper, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

869.     By letter dated October 6, 2020, Plaintiff demanded that Poly-Seal reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

870.     To date, Poly-Seal has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

871.     According to 68th Street Site records, Defendant Powercon Corporation ("Powercon") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

872.     Powercon is and/or was engaged in the business of manufacturing electrical power distribution equipment and systems.

873.     Powercon's waste streams consisted of electrical waste, metal processing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone,

methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

874.    By letter dated August 28, 2020, Plaintiff demanded that Powercon reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

875.    To date, Powercon has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

876.    According to 68th Street Site records, Baltimore Copper Paint Company, Glidden-Durkee Division and Pemco Corp. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

877.    Defendant Prince Minerals, LLC ("Prince Minerals") is the successor to Baltimore Copper Paint Company, Glidden-Durkee Division and Pemco Corp.

878.    Pemco Corp.'s plant was sold to Glidden-Durkee Division in or about 1961.

879.    Prince Minerals acquired Glidden-Durkee Division in 2013.

880.    Prince Minerals currently holds itself out to be operating under the same name as Pemco Corp., and is using the same address as Pemco Corp.

881.    Glidden-Durkee Division and Pemco Corp. are and/or were engaged in the business of industrial and commercial paints, coatings, sealings, and packaging

882.    Glidden-Durkee Division's and Pemco Corp.'s waste streams consisted of metal finishing waste, fabrication waste and office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, lead, manganese,

112

methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

883.     By letter dated August August 28, 2020, Plaintiff demanded that Prince Minerals reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

884.     To date, Prince Minerals has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

885.     Alternatively, Defendant Jotun Paints, Inc. ("Jotun Paints") is the successor to Baltimore Copper Paint Company and responsible for the waste streams attributed to Balitmore Copper Paint Company.

886.     In or about 1974, A-S Jotun Grouppen, a Norwegian paint producer, entered into a joint venture with Glidden-Durkee Company in which A-S Jotun Grouppen would share a 50% interest in Baltimore Copper Paint Company which would be known as Jotun-Baltimore Copper Paint Company.

887.     In or about 1974, the same year as the joint venture was announced, Jotun Marine Coatings, Inc. was formed. Jotun Paints is the successor to or otherwise known as Jotun Marine Paints, Inc.

888.     To date, Jotun Paints has not paid any response costs incurred by Plaintiff at the 68th Street Site.

889.     According to 68th Street Site records, Philadelphia Quartz Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

890.     Defendant PQ Corporation ("PQ") is the one and the same as and/or is the successor to Philadelphia Quartz Co.

891.     On or about May 15, 1978, Philadelphia Quartz Company changed its name to PQ Corporation.

892.     Philadelphia Quartz Co. is and/or was engaged in the business of manufacturing and producing catalysts, materials, and chemicals used in a wide array of applications and products, as well as services related to the same.

893.     Philadelphia Quartz Co.'s waste streams consisted of fabrication waste, general office waste and building construction waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

894.     To date, PQ has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

895.     According to 68th Street Site records, Howe Richardson Scale Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

896.     Defendant Premier Technology Inc. ("Premier Tech") is the successor to Howe Richardson Scale Co.

897.     Premier Tech is an Idaho entity that registered to do business in Maryland in or about 2005.

898.    In or about 2002, Premier Tech acquired all or substantially all of Howe Richardson Scale Co. by acquiring Chronos Richardson.

899.    Premier Tech holds itself out to offer complete after-sales service and parts for Howe Richardson, a completely integrated product line and brand of Premier Tech over which it has control.

900.    Howe Richardson Scale Co. is and/or was engaged in the business of manufacturing equipment for packaging and automation processes.

901.    Howe Richardson Scale Co.'s waste streams consisted of maintenance waste, general office waste, electrical waste, fabrication waste and glass fabrication waste, which contained the following hazardous substances: acetone, arsenic, barium, benzene, cadmium, chromium, copper, dichloroethylene, dichloromethane, lead, manganese, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

902.    By letter dated August 28, 2020, Plaintiff demanded that Premier Tech reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

903.    To date, Premier Tech has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

904.    According to 68th Street Site records, Isaac Hamburger & Sons by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

905.    Defendant PVH Corp. ("PVH") is the successor to Isaac Hamburger & Sons.

906.   In or about 1969, Phillips-Van Heusen Corp. acquired Isaac Hamburger & Sons.

907.   In or about 2014, Phillips-Van Heusen Corp. changed its name to PVH Corp.

908.   Isaac Hamburger & Sons is and/or was engaged in the business of clothing retail.

909.   Isaac Hamburger & Sons' waste streams consisted of retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

910.   To date, PVH has not paid any response costs incurred by Plaintiff at the 68th Street Site.

911.   According to 68th Street Site records, CSR Pipe & Concrete Products, Gray Concrete Company, and Gray Concrete Pipe Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

912.   Defendant Quikrete Holdings, Inc. ("Quikrete") is the successor to CSR Pipe & Concrete Products, Gray Concrete Company, and Gray Concrete Pipe Co.

913.   Gray Concrete Company and Gray Concrete Pipe Co. are one and the same, under the legal name Gray Concrete Pipe Company, Inc.

914.   In or about 1987 or 1988, CSR America acquired Gray Concrete Pipe Company, Inc. which merged into Hydro Conduit Corporation, which is one and the same as or the predecessor of Hydro Conduit, LLC.

915.   CSR operated the former Gray Concrete Pipe Company, Inc. concrete pipe manufacturing plant in Baltimore until the facility closed in or about 1992.

916.     Hydro Conduit, LLC is registered to do business as Rinker Materials and operates at 5 Concourse Parkway in Atlanta, GA, the same address as Quickrete.

917.     In or about 2001, CSR America changed its name to Rinker Materials Corp.

918.     In or about 2016, Quikrete Holdings Inc. acquired Rinker Materials Corp., still uses "Rinker Materials" as a trade name, and holds itself out to be Rinker Materials and/or Rinker Pipe on it's website.

919.     CSR Pipe & Concrete Products, Gray Concrete Company and Gray Concrete Pipe Co. are and/or were engaged in the business of manufacturing concrete pipe and related products.

920.     The waste streams attributable to CSR Pipe & Concrete Products, Gray Concrete Company, and Gray Concrete Pipe Co. consisted of building construction waste, fabrication waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

921.     To date, Quikrete has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

922.     According to 68th Street Site records, Alex Brown & Sons and Garrett Bldg. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

923.     Defendant Raymond James & Associates, Inc. ("Raymond James") is the successor to Alex Brown & Sons and Garrett Bldg.

924.    Garrett Bldg. is shorthand for The Garrett Building, which was built and occupied by banking firm Robert Garrett & Sons starting on or about July 28, 2013.

925.    In or about 1974, Robert Garrett & Sons merged into Alex Brown & Sons.

926.    Raymond James formed in or about 1975.

927.    Raymond James operates a division known as Alex Brown, which it also uses as a trade name according to the Maryland Secretary of State.

928.    Alex Brown & Sons no longer exists independently of Raymond James.

929.    Raymond James, Alex Brown & Sons and The Garrett Building are and/or were engaged in the business of financial services, and investment advising and planning.

930.    The waste streams attributable to Alex Brown & Sons and The Garrett Building consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

931.    By letter dated August 28, 2020, Plaintiff demanded that Raymond James reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

932.    To date, Raymond James has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

933.    According to 68th Street Site records, Ridgeway Manor Nursing Home by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

934.    Defendant Ridgeway Manor, Inc. ("Ridgeway Manor") is one and the same as and/or is the successor to Ridgeway Manor Nursing Home.

935.    Ridgeway Manor operated under various trade names at the same location and doing the same type of business since at least 1971.

936.    Ridgeway Manor and Ridgeway Manor Nursing Home are and/or were engaged in the business of assisted living services.

937.    Ridgeway Manor Nursing Home's waste streams consisted of hospital waste, maintenance waste and general office waste, which contained the following hazardous substances: acetone, arsenic, benzene, cadmium, chromium, copper, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

938.    By letter dated August 28, 2020, Plaintiff demanded that Ridgeway Manor reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

939.    To date, Ridgeway Manor has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

940.    According to 68th Street Site records, United States Ceramic Tile by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

941.    Defendant Roca USA Inc. ("Roca USA") is the successor to and/or is formerly known as United States Ceramic Tile.

942.   United States Ceramic Tile was founded in or about 1913 and was acquired by Roca Group, the parent of Roca USA, in or about 1999.

943.   Roca USA holds itself out as a continuation of United States Ceramic Tile.

944.   Roca USA and United States Ceramic Tile are and/or were engaged in the business of manufacture, distribution and marketing of tiles, appliances, and metalware.

945.   United States Ceramic Tile's waste streams consisted of maintenance, electrical component, fabrication, metal finishing and office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

946.   To date, Roca USA has not paid any response costs incurred by Plaintiff at the 68th Street Site.

947.   According to 68th Street Site records, Eastern Products by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

948.   Defendant Roper Corporation ("Roper") is the successor to Eastern Products.

949.   Eastern Products is and/or was engaged in the business of manufacture of appliances.

950.   Eastern Products' waste streams consisted of maintenance, electrical component, fabrication waste, metal finishing waste and office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

951.    By letter dated August 28, 2020, Plaintiff demanded that Roper reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

952.    To date, Roper has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

953.    According to 68th Street Site records, Ruckert Terminal and Ruckerts Terminal by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

954.    Defendant The Rukert Terminals Corporation ("Rukert Terminals") is one and the same as Ruckert Terminal and Ruckerts Terminal.

955.    Rukert Terminals is and/or was engaged in the business of terminal operations and stevedore services.

956.    In addition to the hazardous substances associated with terminal operations and stevedore services waste, Ruckert Terminals' waste streams also consisted of transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

957.    By letter dated August 28, 2020, Plaintiff demanded that Rukert Terminals reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

958.    To date, Rukert Terminals has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

959.    According to 68th Street Site records, EKCO Glaco Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

960.    Defendant Russell T. Bundy Associates, Inc. ("Bundy Associates") is the successor to EKCO Glaco Co.

961.    Bundy Associates and EKCO Glaco Co. are and/or were in the business of manufacture of baking and general appliances.

962.    EKCO Glaco Co.'s waste streams consisted of electrical waste, fabrication waste, metal processing and finishing waste, maintenance waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

963.    By letter dated August 28, 2020, Plaintiff demanded that Bundy Associates reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

964.    To date, Bundy Associates has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

965.    According to 68th Street Site records, Hauswalds Bakery and Schmidt Baking Co. Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a

transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

966.    Defendant Schmidt Baking Company, Inc. ("Schmidt Baking") is one and the same as Schmidt Baking Co. Inc. and is the successor to Hauswald Bakery.

967.    Schmidt Baking started operations in or about 1886 and holds itself out on its website to have been in operations for 130 years.

968.    In or about 1989, Schmidt Baking acquired Hauswald Bakery.

969.    According to Schmidt Baking, its General Offices and Plant are locted at 7801 Fitch Lane, Baltimore, MD 21236.

970.    Hauswalds Bakery and Schmidt Baking Co. Inc. are and/or were engaged in the business of manufacturing baking and general appliances, and baking industry operations.

971.    The waste streams attributable to Hauswalds Bakery and Schmidt Baking Co. Inc. consisted of electrical waste, fabrication waste, metal processing and finishing waste, maintenance waste, food processing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

972.    By letter dated August 28, 2020, Plaintiff demanded that Schmidt Baking reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

973.    To date, Schmidt Baking has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

974.    According to 68th Street Site records, Defendant Schumacher & Seiler, Inc. ("Schumacher & Seiler") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

975.    Schumacher & Seiler is and/or was engaged in the business of wholesale and service of plumbing, heating, ventilation and air conditioning equipment.

976.    Schumacher & Seiler's waste streams consisted of maintenance waste, metal finishing waste, building construction waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, silver, tin, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

977.    By letter dated August 28, 2020, Plaintiff demanded that Schumacher & Seiler reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

978.    To date, Schumacher & Seiler has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

979.    According to 68th Street Site records, Servomation Corp. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

980.    Defendant Service America Corporation ("Service America") is formerly known as Servomation Corp.

981.    In or about 1985, Servomation Corp. changed its name to Service America Food and Vending Corporation a/k/a Service America Corporation, and changed its name to Service America Corporation in or about September 2020.

982.    Servomation Corp. is and/or was engaged in the business of food and beverage service.

983.    Servomation Corp.'s waste streams consisted of food processing waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

984.    By letter dated August 28, 2020, Plaintiff demanded that Service America reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

985.    To date, Service America has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

986.    According to 68th Street Site records, Northwood Shell, Shell Oil Co. and Triangle Shell by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

987.    Defendant Shell Oil Company ("Shell Oil") is one and the same as and/or the successor to Northwood Shell, Shell Oil Co. and Triangle Shell.

988.     Northwood Shell, Shell Oil Co. and Triangle Shell are and/or were engaged in the business of development, production and distribution of petrochemical products including lubricants, oil, and gas.

989.     The waste streams attributable to Northwood Shell, Shell Oil Co. and Triangle Shell consisted of automotive service and repair waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

990.     By letter dated August 28, 2020, Plaintiff demanded that Shell Oil reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

991.     To date, Shell Oil has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

992.     According to 68th Street Site records, Albert S. Smyth Co. Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

993.     Defendant Smyth Jewelers Inc. ("Smyth Jewelers") is the successor to and/or is formerly known as Albert S. Smyth Co. Inc.

994.     Albert S. Smyth Co. Inc. and Smyth Jewelers Inc. are both identified at the same phone number, the same address at 2020 York Road, Timonium, MD, and utilizes the same website.

995.    According to public records Albert S. Smyth Co. Inc. was formed in or about 1933, originally occupied a location on North Howard Street in Baltimore, and moved locations after a 1970 fire damaged its prior location.

996.    According to the Maryland Secretary of State, Smyth Jewelers was formed on May 12, 1986 and its principal office is listed at the same 2020 York Road address in Timonium, Maryland.

997.    Smyth Jewelers holds itself out on its own website to have "more than 100 years of experience" and to have locations in Timonium, Ellicott City and Annapolis.

998.    Smyth Jewelers and Albert S. Smyth Co. Inc. are and/or were engaged in the business of retail jewelry.

999.    In addition to waste containing hazardous substances associated with the business of retail jewelry, Albert S. Smyth Co. Inc.'s waste streams consisted of at least retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1000.   By letter dated August 28, 2020, Plaintiff demanded that Smyth Jewelers reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1001.   To date, Smyth Jewelers has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1002.   Alternatively, Defendant Albert S. Smyth Co., Inc. is one and the same as Albert S. Smythe Co. Inc. and responsible for the waste streams attributed to Albert S. Smythe Co. Inc.

1003.   To date, Albert S. Smyth Co., Inc. has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1004.   According to 68th Street Site records, Maryland Cup Corp., MD Cupcorp, MD Cup Corp., Solo Cup Co. and Sweetheart Cup by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1005.   Defendant Solo Cup Company ("Solo Cup") is one and the same as and/or the successor to Maryland Cup Corp., MD Cupcorp, MD Cup Corp., Solo Cup Co. and Sweetheart Cup.

1006.   Maryland Cup Corp., MD Cupcorp and MD Cup Corp. are abbreviations or references to The Maryland Cup Corporation.

1007.   According to publicly available records, the Maryland Cup Corporation operated in Owings Mills, Maryland and was founded as the Maryland Baking Company by Henry Shapiro in or about 1926.

1008.   Maryland Baking Company manufactured ice cream cones, and then expanded into manufacturing matches, straws, and cups at its Owings Mills plant.

1009.   Maryland Baking Company changed its name to Maryland Cup Corporation when it began concentrating on manufacturing disposable consumer products including plastic cups in or around 1957, and formally registered Maryland Cup Corporation with the Maryland Secretary of State on or about 1969.

1010.   According to publicly available records Mr. Shapiro sold Maryland Cup Corporation on or about 1983.

1011.   According to Maryland Secretary of State records, on December 31, 1984 Maryland Cup Corporation transferred its assets and changed its name to Sweetheart Cup, which merged with Sweetheart Properties, Inc., which merged into Sweetheart Holding Corp.

1012.   Maryland Cup Corp., MD Cupcorp, MD Cup Corp., Solo Cup Co. and Sweetheart Cup are and/or were engaged in the business of manufacture, sales, and distribution of disposable consumer products particularly for food and beverage-related products.

1013.   Maryland Cup Corp., MD Cupcorp, MD Cup Corp., Solo Cup Co. and Sweetheart Cup's waste streams consisted of fabrication waste, retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, copper, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1014.   By letter dated August 28, 2020, Plaintiff demanded that Solo Cup reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1015.   To date, Solo Cup has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1016.   According to 68th Street Site records, Defendant State Farm Life Insurance Company ("State Farm") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1017.   State Farm is and/or was engaged in the business of providing insurance to customers.

1018.   In addition to producing waste containing hazardous substances associated with the business of providing insurance, State Farm's waste streams consisted of at least general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1019.   By letter dated August 28, 2020, Plaintiff demanded that State Farm reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1020.   To date, State Farm has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1021.   According to 68th Street Site records, Stella Maris Hospice by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1022.   Defendant Stella Maris Operating Corp. ("Stella Maris") is one and the same as Stella Maris Hospice.

1023.   Stella Maris Hospice is and/or was engaged in the business of health care and nursing homes.

1024.   Stella Maris Hospice's waste streams consisted of hospital waste, maintenance waste and/or general office waste, which contained the following hazardous substances: acetone, arsenic, benzene, cadmium, chromium, copper, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1025.   By letter dated August 28, 2020, Plaintiff demanded that Stella Maris reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1026.   To date, Stella Maris has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1027.   According to 68th Street Site records, Defendant Tektronix, Inc. ("Tektronix") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1028.   Tektronix is and/or was engaged in the business of designing and manufacturing technology related to testing and measurement.

1029.   Tektronix's waste streams consisted of electrical waste, fabrication waste, maintenance waste, metal finishing waste, retail waste, and office waste, which contained the following hazardous substances: acetone, arsenic, benzene, cadmium, chromium, copper, dichloroethylene, lead, manganese, mercury, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1030.   By letter dated August 28, 2020, Plaintiff demanded that Tektronix reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1031.   To date, Tektronix has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1032.   According to 68th Street Site records, White Motor Co. (shorthand for White Motor Company, Inc.) by contract, agreement or otherwise, arranged for disposal or treatment, or

arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1033.   According to 68th Street Site records, Monumental Life Insurance by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1034.   Defendant Transamerica Premier Life Insurance Company ("Transamerica Premier") is formerly known as Monumental Life Insurance.

1035.   According to publicly available records, including SEC and Secretary of State filings, Monumental Life Insurance Company was incorporated in Maryland on March 5, 1858, and was redomesticated and incorporated in Iowa on April 1, 2007.

1036.   On July 31, 2014, Monumental Life Insurance Company changed its name to Transamerica Premier.

1037.   Transamerica Premier and Monumental Life Insurance is and/or was engaged in the business of insurance.

1038.   In addition to producing waste containing hazardous substances associated with the business of insurance, Monumental Life Insurance's waste streams consisted of at least general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1039.   By letter dated August 28, 2020, Plaintiff demanded that Transamerica Premier reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1040.   To date, Transamerica Premier has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1041.   According to 68th Street Site records, Martin Gillet & Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1042.   Defendant TreeHouse Private Brands, Inc. ("TreeHouse") is the corporate successor via a series of mergers and acquisitions to Martin Gillet & Co.

1043.   According to Maryland Secretary of State records, Martin Gillet & Co. merged with the Red Wing Company in 2000, a subsidiary of Ralcorp Holdings, Inc.

1044.   CongAgra Foods acquired Ralcorp Holdings, Inc. in or about 2013.

1045.   Through a series of mergers and acquisitions, TreeHouse Foods, Inc. acquired ConAgra's Private Brands business including Ralcorp Holdings, Inc. which changed its name to TreeHouse in 2016.

1046.   TreeHouse and Martin Gillet & Co. are and/or were engaged in the business of manufacture and distribution of food and beverage retail products.

1047.   Martin Gillet & Co.'s waste streams consisted of retail waste, food processing waste, maintenance waste equipment, and general office waste, which contained the following hazardous substances: acetone, arsenic, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1048.   By letter dated October 6, 2020, Plaintiff demanded that TreeHouse reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1049.   To date, TreeHouse has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1050.   According to 68th Street Site records, Five-O-Five W. University by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1051.   Defendant Tri-Star Realty, LLP ("Tri-Star") is the owner of and/or the successor to Five-O-Five W. University.

1052.   Five-O-Five W. University is and/or was engaged in the business of real estate development, investment, and management.

1053.   In addition to producing waste containing hazardous substances associated with real estate development, investment, and management, Five-O-Five W. University's waste streams consisted of at least building construction waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1054.   To date, Tri-Star has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1055.   According to 68th Street Site records, American National Building & Loan, Clifton Savings Bank, and Loyola Fed Save and Loan by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1056.   Defendant Truist Financial Corporation ("Truist Financial") is, via a series of mergers and acquisitions and name changes, the liable corporate successor to American National Building & Loan, Clifton Savings Bank and Loyola Fed Save and Loan.

1057.   American National Building & Loan, Clifton Savings Bank and Loyola Fed Save and Loan are and/or were engaged in the business of banking.

1058.   The waste streams attributable to American National Building & Loan, Clifton Savings Bank and Loyola Fed Save and Loan consisted of maintenance waste, and office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1059.   By letter dated August 28, 2020, Plaintiff demanded that Truist Financial reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1060.   To date, Truist Financial has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1061.   According to 68th Street Site records, J H Filbert, Lever Bros., SealTest and Sealtest Dairy Products by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1062.   Defendant Unilever United States, Inc. ("Unilever") is the corporate successor to J H Filbert, Lever Bros., SealTest and Sealtest Dairy Products.

1063.   J H Filbert, Lever Bros., SealTest and Sealtest Dairy Products are and/or were engaged in the business of manufacture and development of a wide array of consumer goods.

1064.   The waste streams attributable to J H Filbert, Lever Bros., SealTest and Sealtest Dairy Products consisted of fabrication waste, food processing waste, metal processing waste, retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1065.   By letter dated August 28, 2020, Plaintiff demanded that Unilever reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1066.   To date, Unilever has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1067.   Alternatively, Bunge North America (East), L.L.C. ("Bunge") is the corporate successor to J H Filbert and responsible for the waste streams attributed to J H Filbert.

1068.   By letter dated August 28, 2020 Plaintiff demanded that Bunge reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1069.   To date, Bunge has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1070.   According to 68th Street Site records, Linde Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1071.   Defendant Union Carbide Corporation ("Union Carbide") is the successor to Linde Co.

1072.   Linde Co. is and/or was engaged in the business of chemicals and polymers.

1073.   In addition to the hazardous substances associated with the business of producing chemicals and polymers, Linde Co.'s waste streams also consisted of fabrication waste and office waste, which contained the following hazardous substances: acetone, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1074.   To date, Union Carbide has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1075.   According to 68th Street Site records, Univac Div. Sperry Rand  by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1076.   Defendant Unisys Corporation ("Unisys") is the successor to Univac Div. Sperry Rand.

1077.   In or about 1979, Sperry Rand Corporation changed its name to Sperry Corporation.

1078.   In or about 1986, Sperry Corporation and Burroughs Corporation merged to form Unisys Corporation.

1079.   Univac Div. Sperry Rand is and/or was engaged in the business of information technology.

1080.   In addition to the hazardous substances associated with the business of information technology, Univac Div. Sperry Rand's waste streams also consisted of at least general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1081.   To date, Unisys has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1082.   According to 68th Street Site records, Decca Records by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1083.   Defendant Universal Music Group, Inc. ("Universal Music") is one and the same as and/or the successor to Decca Records.

1084.   Decca Records is a division of Universal Music.

1085.   Decca Records is and/or was engaged in the business of publishing music and producing related merchandise.

1086.   In addition to the producing hazardous substances associated with the business of music publication and production waste, Decca Records' waste streams also consisted of at least retail waste and/or general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1087.   By letter dated August 28, 2020, Plaintiff demanded that Universal Music reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1088.   To date, Universal Music has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1089.   According to 68th Street Site records, Lunardi Foods (shorthand for Lunardi Food Service, Inc.) by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1090.   Defendant US Foods, Inc. ("US Foods") is the successor to Lunardi Foods via a series of mergers, acquisitions, and corporate transfers.

1091.   According to the Maryland Secretary of State records, Lunardi Foods incorporated on September 16, 1959.

1092.   On or about February 11, 1985, Rykoff-Sexton Inc. acquired Continental Foods Inc.

1093.   On December 15, 1988 Lunardi Foods transferred its assets to Continental Foods, Inc.

1094.   On or about February 6, 1996 Rykoff-Secton Inc. acquired US Foodservice Inc.

1095.   According to the Maryland Secretary of State, on December 28, 2011 U.S. Foodservice, Inc. changed its name to U.S. Foods, Inc.

1096.   Lunardi Foods is and/or was engaged in the business of food and culinary equipment.

1097.   Lunardi Foods's waste streams consisted of food processing waste, metal finishing waste and/or general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1098.   By letter dated August 28, 2020, Plaintiff demanded that US Foods reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1099.   To date, US Foods has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1100.   According to 68th Street Site records, Tidewater Inland Express by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1101.   Defendant USF RedStar LLC ("USF RedStar") is the successor to Tidewater Inland Express.

1102.   According to the Maryland Secretary of State, on February 14, 2972 Tidewater Insland Express, Inc. registered as a foreign corporation in Maryland.

1103.   In or about 1986, Tidewater Inland Express, Inc. merged into USF Red Star Inc.

1104.   In or about 2007, USF Red Star Inc. merged into USF RedStar LLC.

1105.   Tidewater Inland Express is and/or was engaged in the business of shipping, transportation, and supply chain solutions.

1106.   The waste streams of Tidewater Inland Express waste streams consisted of at least transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1107.   By letter dated August 28, 2020, Plaintiff demanded that USF RedStar reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1108.   To date, USF RedStar has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1109.   According to 68th Street Site records, Towson Valley Motors and Towson Valley Volkswagon by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1110.   Defendant Valley Motors, Inc. ("Valley Motors") is the successor to Towson Valley Motors and Towson Valley Volkswagon.

1111.   According to the Maryland Secretary Valley Motors Inc. owned Towson Valley Motors TN until 1999.

1112.   In or about 1968, Towson Valley Motors, Inc. changed its name to Towson Valley Volkswagen, Inc.

1113.   In 2015 Towson Valley Volkswagen, Inc. merged into Hunt Valley Ford, Inc. and changed names to Valley Motors, Inc.

1114.   Towson Valley Motors and Towson Valley Volkswagon were engaged in the business of automobile sales and service.

1115.   Towson Valley Motors and Towson Valley Volkswagon's waste streams consisted of auto repair waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1116.   To date, Valley Motors has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1117.   According to 68th Street Site records, Westinghouse, Westinghouse Corp., Westinghouse Defense Ctr, Westinghouse Elect. Corp., Westinghouse Electric Co. and Westinghouse Industrial by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1118.   Defendant ViacomCBS, Inc. ("ViacomCBS") is the successor to and/or is formerly known as the Westinghouse, Westinghouse Corp., Westinghouse Defense Ctr, Westinghouse Elect. Corp., and Westinghouse Electric Co..

1119.   The original Westinghouse Electric Company was founded in or about 1886.

1120.   According to the Maryland Secretary of State, CBS Corporation registered as a foreign coporation in Maryland at least as early as 1932.

1121.   Westinghouse Electric Company filed for a name change to Westinghouse Electric Corporation in or about 1945.

1122.   The weapons and industrial electronic manufacturing Westinghouse entities, Westinghouse Electric Systems and Westinghouse Defense Center, provided research, development and manufacture of electronic equipment for the U.S. military and government agencies from 1938 until approximately 1996.

1123.   In or about November 1995 Westinghouse Electric Corporation acquired CBS, Inc., but changed the name to CBS in or about November 1997.

1124.   According to publicly available records, in or about 2000, Viacom acquired CBS Inc. via a merger, and CBS stock was transferred to Viacom stock.

1125.   In or about 2006 Viacom separated into two companies.

1126.   According to the Maryland Secretary of State, on March 23, 2007, Viacom Inc. changed its name to CBS Corporation of Delaware a/k/a CBS Corporation.

1127.   According to the Maryland Secretary of State, on December 6, 2019, CBS Corporation of Delaware a/k/a CBS Corporation changed its name to ViacomCBS Inc.

1128.   Westinghouse, Westinghouse Corp., Westinghouse Defense Ctr, Westinghouse Elect. Corp., Westinghouse Electric Co. and Westinghouse Industrial are and/or were engaged in the business of mass media and television production.

1129.   In addition to producing waste containing hazardous substances associated with the business of mass media and television production, Westinghouse, Westinghouse Corp., Westinghouse Defense Ctr, Westinghouse Elect. Corp., Westinghouse Electric Co. and Westinghouse Industrial's waste streams also consisted of at least electrical waste, fabrication waste and/or general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1130.   By letter dated August 28, 2020, Plaintiff demanded that ViacomCBS reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1131.   To date, ViacomCBS has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1132.   According to 68th Street Site records, Armour & Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1133.   Defendant Viad Corp. ("Viad") is the successor to Armour & Co.

1134.   In or about 1970, Greyhound Corp. acquired Armour & Co.

1135.   Greyhound Corp. changed its name to Greyhound Dial, then to The Dial Corp., then to Viad Corp.

1136.   Armour & Co. is and/or was engaged in the business of transportation services.

1137.   Armour & Co.'s waste streams consisted of transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, manganese, lead, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1138.   To date, Viad has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1139.   According to 68th Street Site records, Defendant The Victory Racing Plate Company ("Victory Racing") by contract, agreement or otherwise, arranged for disposal or

treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1140.   Victory Racing is and/or was engaged in the business of design and manufacture of aluminum racing plates and related products used in horse racing.

1141.   Victory Racing's waste streams consisted of metal finishing waste, fabrication waste, and/or general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1142.   By letter dated August 28, 2020, Plaintiff demanded that Victory Racing reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1143.   To date, Victory Racing has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1144.   According to 68th Street Site records, Globe Silk Screen Process by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1145.   Defendant Visual Marking Systems, Inc. ("Visual Marking ") is the successor to Globe Silk Screen Process, Inc.

1146.   In or about 1968, Globe Silk Screen Process, Inc. changed its name to Globe Screen Printing Corp.

1147.   In or about 2002, Globe Screen Printing Corp. merged into Global Transportation Graphics, Inc. which Visual Marking acquired at the same time.

1148.   Globe Silk Screen Process is and/or was engaged in the business of commercial printing, graphic design and installation of products.

1149.   Globe Silk Screen Process's waste streams consisted of printing waste, fabrication waste, electrical waste, retail waste, maintenance waste, and/or a general office waste, which contained the following hazardous substances: acetone, arsenic, barium, benzene, cadmium, chromium, copper, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1150.   By letter dated August 28, 2020, Plaintiff demanded that Visual Marking reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1151.   To date, Visual Marking has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1152.   According to 68th Street Site records, Two Guys, Two Guys Eudowood and Vornado, Inc. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1153.   Defendant Vornado Realty Trust ("Vornado Realty") is the successor to and/and or is formerly known as Two Guys, Two Guys Eudowood, and Vornado, Inc.

1154.   Vornado, Inc. operated Two Guys Department Stores.

1155.   In or about 1993, Vornado, Inc. merged into Vornado Realty.

1156.   Two Guys, Two Guys Eudowood, and Vornado, Inc. were engaged in the business of real estate investment.

1157.   In addition to producing waste containing hazardous substances associated with the business of real estate investment, the waste streams attributable to Two Guys, Two Guys Eudowood and Vornado, Inc. also consisted of at least residential and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1158.   By letter dated August 28, 2020, Plaintiff demanded that Vornado Realty reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1159.   To date, Vornado Realty has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1160.   According to 68th Street Site records, Chesapeake National Bank, Metropolis Bldg Assoc., Savings Bank of Baltimore and Union Trust Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1161.   Defendant Wells Fargo Bank, National Association ("Wells Fargo") is the successor to Chesapeake National Bank, Metropolis Bldg Assoc., Savings Bank of Baltimore and Union Trust Co.

1162.   Chesapeake National Bank, Metropolis Bldg Assoc., Savings Bank of Baltimore and Union Trust Co. are and/or were engaged in the business of banking and investment.

1163.   The waste streams attributable to Chesapeake National Bank, Metropolis Bldg Assoc., Savings Bank of Baltimore and Union Trust Co. consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1164.   By letter dated August 28, 2020, Plaintiff demanded that Wells Fargo reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1165.   To date, Wells Fargo has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1166.   According to 68th Street Site records, Defendant The Whiting-Turner Contracting Company ("Whiting-Turner") by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1167.   Whiting-Turner is and/or was engaged in the business of construction management and general contracting.

1168.   Whiting-Turner's waste streams consisted of building construction waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1169.   By letter dated August 28, 2020, Plaintiff demanded that Whiting-Turner reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1170.   To date, Whiting-Turner has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1171.   According to 68th Street Site records, Yellow Transit Freight by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1172.   Defendant YRC Worldwide Inc. ("YRC Worldwide") is the successor to Yellow Transit Freight Lines.

1173.   In or about 1968, Yellow Transit Freight Lines changed its name to Yellow Freight System Inc., which changed its name to Yellow Corporation in or about 1992, creating Yellow Transportation, Inc. as its largest division at the same time.

1174.   In or about 2003, Yellow Corp. acquired Roadway Corp., forming Yellow Roadway Corporation.

1175.   In or about 2009, Yellow Transportation, Inc. and Yellow Roadway Corporation became YRC Inc. d/b/a Yellow Freight.

1176.   YRC Inc. is also known as and/or is one and the same as YRC Worldwide Inc.

1177.   YRC Worldwide Inc. currently operates as a holding company for brands including YRC Freight and holds itself out on its own website as a holding company for the same.

1178.   Yellow Transit Freight is and/or was engaged in the business of freight shipping.

1179.   Yellow Transit Freight's waste streams consisted of transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1180.   By letter dated August 28, 2020, Plaintiff demanded that YRC Worldwide reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1181.   To date, YRC Worldwide has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

1182.   According to 68th Street Site records, MD Casualty Co. by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of waste containing hazardous substances at the 68th Street Site.

1183.   Defendant Zurich American Insurance Co. ("Zurich") is the successor to MD Casualty Co. (shorthand for Maryland Casualty Company).

1184.   MD Casualty Co. was engaged in the business of insurance.

1185.   According to the Maryland Secretary of State, MD Casualty Co. incorporated on February 9, 1898.

1186.   MD Causalty Co. via a series of mergers became part of Zurich in or about the 1950's.

1187.   Zurich holds itself out on its own website as the successor to MD Casualty Co. which it admits "became part of Zurich."

1188.   MD Casualty Co.'s waste streams consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

1189.   By letter dated August 28, 2020, Plaintiff demanded that Zurich reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the 68th Street Site.

1190.   To date, Zurich has refused to cooperate and has not paid any response costs incurred by Plaintiff at the 68th Street Site.

## COUNT I – CONTRIBUTION UNDER CERCLA

1191.   Plaintiff realleges and incorporates by reference Paragraph Nos. 1 through 1190 of this Complaint as if fully restated herein.

1192.   Sections 113(f)(1) and (3)(B) of CERCLA, 42 U.S.C. §§ 9613(f)(1) and (3)(B), provide, in relevant part, that:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) . . . .

> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement . . . .

1193.   Section 107(a)(3)–(4) of CERCLA, 42 U.S.C. §§ 9607(a)(3)–(4), provides, in relevant part, that:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section --

> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at

any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for -- (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian Tribe not inconsistent with the national contingency plan; (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

1194.   "Disposal" is defined in CERCLA Section 101(29) by reference to the Solid Waste Disposal Act ("SWDA"). 42 U.S.C. § 9601(29). The SWDA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

1195.   "Facility" is defined in CERCLA Section 101(9) as "any building, structure, installation, equipment, pipe or pipeline" or "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed . . . ." 42 U.S.C. § 9601(9).

1196.   "Hazardous substance" is defined in CERCLA Section 101(14) by reference to other federal statutes and by reference to a list of substances published by EPA at 40 C.F.R. § 302.4. 42 U.S.C. § 9601(14).

1197.   "Owner" or "operator" is defined in CERCLA Section 101(20) as ". . . in the case of an onshore facility or an offshore facility, any person owning or operating such facility . . . ." 42 U.S.C. § 9601(20).

1198.   "Person" is defined in CERCLA Section 101(21) as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(20).

1199.   "Release" is defined in CERCLA Section 101(22) as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . ." 42 U.S.C. § 9601(22).

1200.   "Response" is defined in CERCLA Section 101(25), and includes "removal" actions, "remedial" actions, and enforcement activities related thereto. 42 U.S.C. § 9601(25).

1201.   The 68th Street Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

1202.   There has been a "release" and/or a threatened "release" of "hazardous substances" at the 68th Street Site which has caused the incurrence of "response costs" by the 68th Street Site Work Group, within the meaning of Sections 101(22), 101(14) and 107 of CERCLA, 42 U.S.C. §§ 9601(22), 9601(14) and 9607.

1203.   Plaintiff is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

1204.   Each of the Defendants is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

1205.   Pursuant to CERCLA, 42 U.S.C. §§ 9607(a)(3) and/or 9607(a)(4), each Defendant is liable as an arranger or generator of materials containing hazardous substances,

which materials were treated and/or disposed at the 68th Street Site; and/or a transporter of hazardous substances who selected the 68th Street Site for the treatment and/or disposal of such hazardous substances, and who transported such hazardous substances to the Site.

1206.   As a result of the release and threatened release of hazardous substances at or from the 68th Street Site, the 68th Street Site Work Group has incurred response costs and will continue to incur costs of "response," as that term is defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

1207.   Plaintiff has resolved its liability to EPA for matters covered in the RI/FS AOC and RD/RA Consent Decree.

1208.   Pursuant to CERCLA Sections 107 and 113, 42 U.S.C. §§ 9607 and 9613, each Defendant is strictly liable for its respective equitable share of the past and future response costs incurred and to be incurred by Plaintiff in response to the release or threatened release of hazardous substances at and from the 68th Street Site.

1209.   No Defendant has resolved its liability to Plaintiff or EPA.

1210.   To date, Plaintiff has incurred over $4.8 million in response costs and natural resource damages, including reimbursement of response costs incurred by the United States and the State of Maryland, at the 68th Street Site under the RD/RA Consent Decree.

1211.   The response costs incurred by Plaintiff in connection with the 68th Street Site are consistent with the NCP.

1212.   Plaintiff is entitled to contribution from all Defendants under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for Defendants' respective equitable shares of all costs and damages incurred by Plaintiff, including applicable interest as provided for in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

WHEREFORE, Plaintiff respectfully requests that this Court enter a declaratory judgment against all Defendants finding that they are each liable under CERCLA and are obligated to pay for their respective equitable shares of all past and future response costs, including appropriate pre-judgment interest, associated with the 68th Street Site. Plaintiff further requests that this Court award interest and costs of suit, including reasonable attorney's fees and consultant fees as permitted by law; and order any such other relief as the Court may deem just and appropriate under the circumstances.

## COUNT II – DECLARATORY RELIEF

1213.   Plaintiff alleges and incorporates by reference Paragraph Nos. 1 through 1212 of this Complaint as if fully restated herein.

1214.   There is a present and actual controversy between Plaintiff and all Defendants concerning their respective rights and obligations with respect to the response costs associated with 68th Street Site.

1215.   Plaintiff seeks a declaratory judgment under CERCLA Section 113, 42 U.S.C. § 9613, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202, against all Defendants holding them liable for their respective equitable shares of response costs, that will be binding in any subsequent action to recover further response costs.

1216.   Plaintiff is entitled to judgment against all Defendants for past and future response costs incurred in connection with the 68th Street Site.

WHEREFORE, Plaintiff respectfully prays that this Court enter a declaratory judgment against all Defendants finding that they are each liable under CERCLA and are obligated to pay for their equitable shares of all past and future response costs associated with the 68th Street Site. Plaintiff further requests that this Court award interest and costs of suit, including reasonable

attorney's fees and consultant fees as permitted by law; and order any such relief as the Court

may deem just and appropriate under the circumstances.

Dated: November 20, 2020                    Respectfully submitted,

                                            _____/s/_____
                                            James Kelly-Lieb, Esquire
                                            Bar number 20420
                                            (signed by Stuart Kaplow with permission of James
                                            Kelly-Lieb)


                                            _____/s/_____
                                            Stuart Kaplow, Esquire
                                            Bar number 05282

                                            Stuart D. Kaplow, P.A.
                                            11426 York Road, Floor 1
                                            Cockeysville, MD 21030
                                            (410) 339-3910 Telephone
                                            (410) 415-7161 Facsimile
                                            Email: skaplow@stuartkaplow.com
                                                   jkellylieb@kenny-law.com

                                            Attorneys for Plaintiff 68th Street Site Work Group