## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>68th STREET SITE WORK GROUP,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Civil Case No.: SAG-20-3385</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>AIRGAS, INC., <em>et al.</em>,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Defendants.</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Plaintiff 68th Street Site Work Group ("Plaintiff") filed suit against 156 Defendant companies (collectively, "Defendants") under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), for the recovery of costs incurred and to be incurred in response to the release or threatened release of hazardous substances from the 68th Street Dump Superfund Alternative Site ("68th Street Site," or "Site"). ECF 1. Plaintiff also seeks a declaration of each Defendant's liability for future response costs to be incurred by Plaintiff (and its assignors) at the Site  ECF 1. As of today, forty-five Defendants are actively litigating the case, following a number of voluntary dismissals and certain entries of default. Thirty-one of those remaining Defendants have filed motions to dismiss the Complaint, with several of those motions seeking summary judgment in the alternative. ECF 163 (Armacell, LLC); ECF 174 (Truist Financial Corporation); ECF 287 (Pabst Brewing Co.); ECF 384 (C&I Leasing, Inc.); ECF 386 (Cowan Systems, Inc.); ECF 411/452 (Lifoam Industries, LLC); ECF 425 (High's of Baltimore, LLC); ECF 442 (Cloverland Dairy Limited Partnership); ECF 448 ("Certain Defendants" (American Sugar Refining, Inc.; Bob Bell Automotive Group, Inc.; Donohoe Real Estate Services; HMS Host Family Restaurants, Inc.; Len Stoler, Inc.; and Stella Maris Operating Corp.)); ECF

461 (The Rukert Terminals Corporation); ECF 478 (Alban Tractor Co., Inc.); ECF 479 (Crown Central LLC); ECF 480 (New Ridge Associates, Inc.); ECF 481 (Norris Automotive Holdings LLC); ECF 482/484 (The Victory Racing Plate Company); ECF 510 (Host Hotels and Resorts, Inc.); ECF 537 (Caraustar Industries, Inc.); ECF 539 (Greif, Inc.); ECF 549 (Heritage Chevrolet-Buick, Inc.); ECF 609 (Hilton Worldwide, Inc.); ECF 672 (Ridgeway Manor, Inc.); ECF 701 (Mattress Company of Delaware, LLC d/b/a Eclipse International); ECF 704 (Morgan Properties Management Company, LLC); ECF 767 (Airgas, Inc.); ECF 768 (Drug City Pharmacy, LLC); ECF 769 (Melibelle USA, Inc.).  Plaintiffs opposed each motion, ECF 284, ECF 285, ECF 367, ECF 521, ECF 523, ECF 529, ECF 530, ECF 538, ECF 543, ECF 547, ECF 563-566, ECF 568, ECF 569, ECF 580, ECF 581, ECF 596, ECF 677, ECF 697, ECF 728, ECF 730, ECF 775-77, and most Defendants replied, ECF 363, ECF 368, ECF 460, ECF 555, ECF 570, ECF 579, ECF 583, ECF 587, ECF 593, ECF 599, ECF 621-625, ECF 636, ECF 639-641, ECF 698, ECF 742, ECF 747.

This Court held a telephonic hearing on a representative subset of the pending motions on July 13, 2021.  Specifically, the hearing addressed ECF 163, ECF 287, ECF 384, ECF 448, and ECF 537.  No hearing is necessary as to the remaining motions to dismiss.[1]  *See* Loc. R. 105.6 (D. Md. 2021).

For the reasons stated below, Defendants' motions will be granted, with the precise disposition as to each motion detailed herein and in the accompanying order.

---

[1] This memorandum opinion will address all substantive pending motions with three exceptions: ECF 515 (Defendant Schumacher & Seiler, Inc.'s Motion for Summary Judgment); ECF 688 (Defendant American Sugar Refining, Inc.'s Motion for Sanctions); and ECF 761 (Plaintiff's Motion for Fees and Costs).  A memorandum opinion and order deciding ECF 761 will be issued along with this opinion, and ECF 515 and ECF 688 will be decided on a later date.

I. **Factual Background[2]**

Plaintiff 68th Street Site Work Group is an unincorporated association that consists of the following members: AAI Corporation; Acme Markets, Inc.; AK Steel Corporation; Browning-Ferris, Inc.; Black & Decker (U.S.) Inc.; Brunswick Corporation; ConAgra Grocery Products Company, LLC; Crown Cork & Seal Company, Inc.; CSX Realty Development, LLC; CSX Transportation, Inc.; Exxon Mobil Corporation; and Illinois Tool Works, Inc., on behalf of Signode and Vulcan-Hart. ECF 1 ¶ 27. These member entities have each assigned their claims in this case to the Work Group. ECF 1 ¶ 28. Plaintiff alleges that Defendants in this case are liable as potentially responsible parties ("PRPs") for their generation and transportation, and/or their arranging for transportation, of materials containing hazardous substances for disposal and/or treatment at the 68th Street Site. ECF 1 ¶ 1.

The 68th Street Site is a mixed industrial, commercial, and residential area, encompassing 239 acres in the Rosedale neighborhood in Baltimore County, along the eastern border of Baltimore City. ECF 1 ¶ 4. The Site is an aggregate of seven landfills, which operated within the boundaries of what the United States Environmental Protection Agency ("EPA") later designated as five Management Areas (A, B, D, E, and F). ECF 1 ¶¶ 5-11. Waste disposal activities were conducted at the Site from the 1950s through the early 1970s, and included the disposal of municipal, industrial, and commercial wastes. ECF 1 ¶ 6. Among the entities operating permitted landfills at the Site was Robb Tyler, Inc. ("Robb Tyler"). Management Area E of the 68th Street Site was the "original Robb Tyler Landfill," which was permitted in 1953 and closed by 1956. ECF 1 ¶ 10. Robb Tyler was issued a refuse disposal permit for Management Area F in 1956, and

---

[2] These facts are derived from Plaintiff's Complaint, ECF 1, and, where appropriate, from evidence attached to the motions and related filings.

it operated the Island Landfill (a six-acre landfill within Management Area F) as a permitted landfill from 1960-1969.  ECF 1 ¶ 11.

After several years of emergency response actions and site inspections, EPA proposed the 68th Street Site to the National Priorities List ("NPL") in 1999, and again in 2003.  ECF 1 ¶¶ 12-15; U.S. Env't Prot. Agency, *Proposed National Priorities List (NPL) Sites – by State*, https://www.epa.gov/superfund/proposed-national-priorities-list-npl-sites-state#MD.   The   Site has not been finalized to the NPL, instead being evaluated under the Superfund Alternative Site process.  U.S. Env't Prot. Agency, *Superfund Site: 68th Street Dump/Industrial Enterprises*, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0300 338.  In April 2006, EPA entered into an Administrative Settlement Agreement and Order for Remedial Investigation and Feasibility Study with the members of the 68th Street Site Work Group.  ECF 1 ¶ 16.  Plaintiff alleges that it commenced the Investigation and Study shortly thereafter, in June 2006.  ECF 1 ¶ 17.  Plaintiff's member entities completed the Remedial Investigation in May 2012, and the Feasibility Study in March 2013, and EPA issued its final Record of Decision for remedial actions at the Site in September 2013.  ECF 1 ¶¶ 20-21.

In November 2017, this Court entered a Consent Decree for Remedial Design/Remedial Action ("Consent Decree") between EPA and the State of Maryland, on the one hand, and a group of defendants (the "Settling Defendants") on the other hand.  *United States v. AAI Corp., et. al.*, Case No. 17-cv-2909-RDB, ECF 8 (D. Md. Nov. 29, 2017).  The Settling Defendants included Settling Performing Defendants—who are the members of the 68th Street Site Work Group—and other Settling Non-Performing Defendants.  ECF 1 ¶ 22.  All of Plaintiff's individual members are signatories to the Consent Decree.  ECF 1 ¶ 29.  Plaintiff itself (the 68th Street Site Work Group entity) is not a signatory.

Plaintiff filed its initial Complaint in November 2020, naming more than 150 Defendants (who were not Settling Defendants party to the Consent Decree) as potentially liable for more than $4.8 million in past costs incurred by Plaintiff for response activities required by the Consent Decree.  The Complaint seeks contribution, in addition to a declaration of each Defendant's liability for future response costs Plaintiff may incur.  ECF 1 ¶ 1.  Plaintiff alleges that each Defendant it named, "by contract, agreement or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of waste containing hazardous substances at the 68th Street Site."  *See, e.g.*, ECF 1 ¶ 30.  Plaintiff alleges that each Defendant's respective waste streams contained, at minimum, the following fourteen hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.  In instances where the only waste stream alleged is "general office waste"—such as with respect to Defendant Donohoe Real Estate Services—those fourteen substances make up the entirety of Plaintiff's allegations.  *See, e.g.*, ECF 1 ¶ 347.  For certain other Defendants, however, Plaintiff alleges that additional hazardous substances were disposed, including: arsenic, barium, chromium, copper, dichlorobenzene, ethyl benzene, manganese, mercury, and/or nickel.  *See, e.g.*, ECF 1 ¶¶ 217; 691.

## II.   Legal Standards Governing the Motions in General

### A.  Rule 12(b)(2) Motion to Dismiss

Three Defendants, Armacell, LLC ("Armacell"), Pabst Brewing Co. ("Pabst"), and Caraustar Industries, Inc. ("Caraustar"), have filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(2), challenging this Court's personal jurisdiction over them.  ECF 163, 287, 537.  Under Rule 12(b)(2), the burden is "on the plaintiff ultimately to prove the existence of a ground

for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *see Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014); *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citing *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993)). When "a district court decides a pretrial personal jurisdiction motion without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction." *Carefirst of Md.*, 334 F.3d at 396 (citing *Combs*, 886 F.2d at 676). To determine whether the plaintiff has met this burden, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d 676. The court need not "look solely to the plaintiff's proof in drawing" all reasonable inferences in plaintiff's favor and may also look at the defendant's proffered proof and assertions regarding defendant's lack of contacts with the forum state. *Mylan Labs., Inc.*, 2 F.3d at 62. "When the existing record is inadequate to support personal jurisdiction over a defendant, the plaintiff is entitled to jurisdictional discovery if it can demonstrate that such discovery would yield 'additional facts' that would 'assist the court in making the jurisdictional determination.'" *FrenchPorte IP, LLC v. Martin Door Mfg.*, *Inc.*, Civil Action No. TDC-14-0295, 2014 WL 4094265, at *5 (D. Md. Aug. 14, 2014) (quoting *Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1323 (Fed. Cir. 2005); and then citing *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (Fed. Cir. 2003) ("[C]ourts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is clearly frivolous.")).

To exercise personal jurisdiction over a non-resident defendant, a court must determine that (1) the exercise of jurisdiction is authorized under the state's long-arm statute, pursuant to Federal Rule of Civil Procedure 4(k)(1)(A); and (2) the exercise of jurisdiction conforms to the

Fourteenth Amendment's due process requirements. *Carefirst of Md.*, 334 F.3d at 396. When interpreting the reach of Maryland's long-arm statute, a federal district court is bound by the interpretations of the Maryland Court of Appeals. *See Carbone v. Deutsche Bank Nat'l Tr. Co.*, Civil Action No. RDB-15-1963, 2016 WL 4158354, at *5 (D. Md. Aug. 5, 2016); *Snyder v. Hampton Indus., Inc.*, 521 F. Supp. 130, 135-36 (D. Md. 1981), *aff'd*, 758 F.2d 649 (4th Cir. 1985); *see also Mylan Labs.*, 2 F.3d at 61 (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). Moreover, courts must address both prongs of the personal jurisdiction analysis, despite Maryland courts consistently holding that "the state's long-arm statute is coextensive with the limits of personal jurisdiction set out by the due process clause of the Constitution." *Carefirst of Md.*, 334 F.3d at 396; *Bond v. Messerman*, 391 Md. 706, 721, 895 A.2d 990, 999 (2006); *see CSR, Ltd. v. Taylor*, 411 Md. 457, 472, 984 A.2d 492, 501 (2009) (noting that the personal jurisdiction analysis "entails dual considerations").

Under the first prong, the plaintiff must identify a provision in the Maryland long-arm statute that authorizes jurisdiction. *Ottenheimer Publishers, Inc. v. Playmore, Inc.*, 158 F. Supp. 2d 649, 652 (D. Md. 2001). Under the second prong, "due process requires only that . . . a defendant . . . have certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). This "minimum contacts" analysis depends on the number and relationship of a defendant's contacts to the forum state, and whether the present cause of action stems from the defendant's alleged acts or omissions in the forum state. *Id.* at 316-19.

Finally, a court may exercise two types of personal jurisdiction, "general" or "specific." *Bristol-Myers Squibb Co. v. Superior Court of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1780 (2017).

"General" jurisdiction is a fairly limited concept, since it only arises where "the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against [defendant] on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe*, 326 U.S. at 318. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). In the context of a corporation, the paradigm bases for general jurisdiction are "the place of incorporation and principal place of business." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). The *Daimler* court clarified that while those paradigms are not necessarily the only bases for general jurisdiction, it would be "unacceptably grasping" to approve the exercise of general jurisdiction wherever a corporation, "engages in a substantial, continuous, and systematic course of business." *Id.* at 137-38 (declining to find general jurisdiction lies in every state in which a corporate defendant has "sizable" sales).

"Specific" jurisdiction arises when there is an "affiliation between the forum and the underlying controversy." *Goodyear*, 564 U.S. at 919; *Carefirst of Md.*, 334 F.3d at 397. To assess specific jurisdiction, the Fourth Circuit considers: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)).

Under Rule 12(b)(2), the court is permitted to consider evidence outside the pleadings in resolving a motion to dismiss for lack of personal jurisdiction. *Structural Preservation Sys., LLC*

*v. Andrews*, 931 F. Supp. 2d 667, 671 (D. Md. 2013); *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351, at 305 (3d ed. 2004) ("[T]he district judge has considerable procedural leeway in choosing a methodology for deciding the motion. The court may receive and weigh the contents of affidavits and any other relevant matter submitted by the parties to assist it in determining the jurisdictional facts.").

### B. Rule 12(b)(6) Motion to Dismiss

The majority of the currently pending motions cite Rule 12(b)(6), which permits a defendant to test the legal sufficiency of a complaint by way of a motion to dismiss. *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a

plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011).  But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the

legal remedy sought.  *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion.  *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).  However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint*.'"  *Goodman*, 494 F.3d at 464 (emphasis, and second alteration, in original) (quoting *Forst*, 4 F.3d at 250).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ."  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, a court may properly consider documents incorporated into the complaint or attached to the motion to dismiss, "'so long as they are integral to the complaint and authentic.'"  *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004).

Accordingly, when resolving a Rule 12(b)(6) motion, a court may consider certain exhibits, without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits[.]" *Goines*, 822 F.3d at 166 (citations omitted); *see also U.S. ex rel. Oberg*, 745 F.3d at 136; *Anand*, 754 F.3d at 198; *Am. Chiropractic Ass'n*, 367 F.3d at 234; *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (alterations omitted) (quoting *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007)).

### C. Rule 56 Summary Judgment

Several Defendants ask, in the alternative, that summary judgment be granted in their favor, and many attach exhibits to their motions to this end. ECF 448, ECF 452, ECF 464, ECF 478, ECF 479, ECF 480, ECF 481, ECF 482/484, ECF 510, ECF 549, ECF 672, ECF 701, ECF 704, ECF 767, ECF 768, ECF 769. Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears

the burden of showing that there is no genuine dispute of material fact.  *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).  If the moving party establishes that there is no evidence to support an element of the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.  *Id.*  The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).  The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor.  *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).  Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another."  *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case.  *Id.* at 352.  The non-moving party "must produce competent evidence on each element of [its] claim."  *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671).  If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial."  *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 Fed. App'x 459, 461 (4th Cir. 2010)).  In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

Relevant to this case, summary judgment typically is not granted "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont*, 637 F.3d at 448.. However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To present the issue, the nonmovant is typically required to file an affidavit pursuant to Federal Rule of Civil Procedure 56(d), explaining why "for specified reasons, it cannot present facts essential to justify its opposition," without further discovery. Fed. R. Civ. P. 56(d). In particular circumstances, the court may find that a nonmovant has effectively served the purpose of the Rule 56(d) affidavit requirement by otherwise articulating its need for discovery in briefings and hearings. *Harrods Ltd.*, 302 F.3d at 246 (electing not to penalize nonmovant for failing to file Rule 56(d) affidavit where it had "repeatedly explained to the district court both in writing and orally that more discovery was needed," and "[t]he district court was thus fully informed[.]"). However, the ultimate evaluation of the sufficiency of a nonmovant's request for discovery is made at the Court's discretion, and requirement of a Rule 56(d) affidavit remains the prevailing rule in this Circuit. *See Medlock v. Rumsfeld*, 336 F. Supp. 2d 452, 470 (D. Md. 2002) ("While the specific facts in *Harrods* led the court to conclude that the plaintiff's efforts had served the purpose of the Rule 56(f) affidavit, . . . it clearly did not eliminate the Rule 56(f) affidavit requirement discussed in *Evans*[.]").[3]

---

[3] "The language of Rule 56(d) appeared in Rule 56(f) before amendments in 2010, but these amendments made no substantial change to the rule." *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 484 n.2 (4th Cir. 2014).

III.   <u>Analysis</u>

**A. Motions to Dismiss for Lack of Personal Jurisdiction**

As noted above, three Defendants, Armacell, Pabst, and Caraustar, challenge this Court's exercise of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).   Armacell and Caraustar also seek dismissal for failure to state a claim pursuant to Rule 12(b)(6).   Each of those Defendants, through the sworn statements of their respective affiants, establish that they are neither incorporated nor do they maintain their principal place of business in Maryland.   *See* ECF 163-3 at ¶¶ 3-6 ("Ahumada Decl."); ECF 287-2 at ¶¶ 3-11 ("Urband Decl."); ECF 537-2 at ¶¶ 4-5 ("Martz Aff.").   Pabst, in addition, contends that it is not subject to general personal jurisdiction despite its registration in Maryland and the fact that its brands are distributed and sold in Maryland, along with most other states, (citing Md. Code Ann., Corps. & Ass'ns § 7-210 (West) (2021) and *Goodyear Tire & Rubber Co. v. Ruby*, 540 A.2d 482, 487 (Md. 1988)).   This Court is permitted to, and has, considered those statements in adjudicating this Rule 12(b)(2) motion.   Thus, in the absence of any exceptional circumstances to suggest otherwise, this Court lacks general jurisdiction over Defendants Armacell, Pabst, and Caraustar.

As for specific *in personam* jurisdiction, Plaintiff's claims do not arise out of any action conducted by those Defendants in Maryland.   Instead, they rest entirely on the actions of companies for which Plaintiff claims Defendants are liable as successors.   Plaintiff alleges that specific jurisdiction may be asserted against Armacell as the successor to Monarch Rubber Co., against Pabst as the successor to Carlings Brewing Company, F&M Schaefer Brewing Co., Mr. Jerold C. Hoffberger, National Brewing Company, and P. Ballantine & Sons, and against Caraustar as the successor to Chesapeake Paperboard Company, for those entities' purported arranging for disposal of waste at the 68th Street Site.   Plaintiff spends considerable time in its various responses

laying out its bases for personal jurisdiction over the purported predecessor entities.  However, this Court need not reach those issues because none of the Defendants disputes the existence of personal jurisdiction over the predecessor entities.  What is in dispute is whether Plaintiff has adequately pleaded facts or can support an inference of successorship sufficient to invoke personal jurisdiction over the alleged successors.

Plaintiff, in each Response, cites to *City of Richmond, Va. v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438 (4th Cir. 1990), for the proposition that personal jurisdiction over an alleged predecessor company is sufficient to exercise personal jurisdiction over the alleged successor.  *See, e.g.*, ECF 284 at 11-12.  However, the *City of Richmond* court conditioned such jurisdiction on the existence of "evidence supporting the imposition upon [defendant] of successor *liability*." *City of Richmond*, 918 F.2d at 454-55 (emphasis added) (citing, *inter alia*, *Simmers v. Am. Cyanamid Corp.*, 576 A.2d 376, 385 (Pa. Super. 1990) ("The great weight of persuasive authority permits imputation of a predecessor's actions upon its successor whenever forum law would hold the successor *liable* for its predecessor's actions." (emphasis added and emphasis in original omitted))).  Thus, for personal jurisdiction to be exercised over Defendants Armacell, Pabst, and Caraustar, Plaintiff must first have adequately pleaded a theory of successor liability.[4]

---

[4] With respect to successor liability, this Court believes it more appropriate to view this motion through the lens of a 12(b)(6) motion, assessing the adequacy of the Complaint's allegations.  It acknowledges that Pabst expressly disclaimed an intent to move pursuant to Rule 12(b)(6), instead insisting that its motion should be evaluated solely under Rule 12(b)(2).  However, while motions that go to the sufficiency of the claim should be asserted under Rule 12(b)(6), when presented as 12(b)(2) motions, "the district court may adjudicate the motion and ignore the way it is captioned." 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1351 (3d ed. 2021) (citing *Larson v. Port of N.Y. Auth.*, 17 F.R.D. 298, 300 (S.D.N.Y. 1955) ("Notwithstanding that movant predicates its motion upon F. R. Civ. P. 12(b)(1) and (2), the motion is deemed one to dismiss for failure to state a claim upon which relief can be granted and will be disposed of accordingly.")); *see also Energy Automation Sys., Inc. v. Xcentric Ventures, LLC*, Civ. No. 3:06-1079, 2007 WL 1557202, at *14 (M.D. Tenn. May 25, 2007) ("Generally, when a court faces questions going to the merits of a case in a Rule 12(b)(2) motion, that motion may be converted to

### 1.   Legal Standards for Successor Liability

The Fourth Circuit has recognized that a corporate successor may be held liable for its predecessor's actions under CERCLA. *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 173 (4th Cir. 2013); *United States v. Carolina Transformer Co.*, 978 F.2d 832, 837 (4th Cir. 1992). However, because CERCLA does not expressly discuss successor liability, courts apply the standard common law rule that a corporation that acquires assets of another does not also acquire its liabilities, except in four limited circumstances:

> (1) the successor expressly or impliedly agrees to assume the liabilities of the predecessor;
> (2) the transaction may be considered a de facto merger;
> (3) the successor may be considered a 'mere continuation' of the predecessor; or
> (4) the transaction is fraudulent.

*PCS Nitrogen Inc.*, 714 F.3d at 173 (citing *Carolina Transformer*, 978 F.2d at 837).[5]

---

a Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim."). Here, Pabst has effectively argued that the Complaint is deficient on its face: "Plaintiff has provided no facts, and made no allegations . . . , in its Complaint that provide a basis for the application of any exception to the general rule that Pabst, as a purchaser of a company's assets, did not acquire that company's liabilities." ECF 287 at 15. Jurisdictional issues are inextricably intertwined here with the adequacy of the factual allegations of successor liability; in other words, for purposes of these motions, if the Complaint fails to state a plausible claim for successor liability, then this Court also lacks personal jurisdiction. Thus, this Court finds it appropriate to adjudicate Pabst's motion as if it, like the motions filed by Armacell and Caraustar, was jointly brought under 12(b)(2) and 12(b)(6). The Court further notes, however, that under either a 12(b)(2) or 12(b)(6) standard, the case would be dismissed without prejudice. *See Coffin v. TGM Assoc. LP*, Civ. No.: 1:20-cv-03120-SAG, 2021 WL 1238560, at *5 (D. Md. Apr. 2, 2021) ("Because the dismissals are premised on jurisdictional defects, the claims will be dismissed without prejudice.") (citing *S. Walk at Broadlands Homeowners Ass'n, Inc. v. Openband at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013) ("[A] court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits.")); *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351 (3d ed. 2021) ("Nor does the dismissal that follows the grant of a Rule 12(b)(2) motion prejudice the plaintiff's right to file another complaint[.]").

[5] *Carolina Transformer* also recognized a "substantial continuity," or "continuity of enterprise" test, which used an eight-factor test analyzing successorship: (1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in

Cases considering successor liability claims under a motion to dismiss standard have generally required (1) the plaintiff to identify which of the four exceptions it is invoking for successor liability and (2) facts supporting the invocation of the chosen exception. *See, e.g.*, *Leonard v. Bed, Bath & Beyond, Inc.*, No. 5:15-CV-00284-F, 2016 WL 158587, at *3 (E.D.N.C. Jan. 8, 2016) ("[I]n order to bring a claim against a corporation based on the conduct of its predecessor, a plaintiff must allege at least one basis for successor liability."). In *Leonard*, the plaintiff had alleged that the purported successor corporation's "management [was] identical" to the predecessor, that the two entities were engaged in the "same line of business," and that the purported successor "use[d] [the predecessor's] facility, equipment, employees, name brand . . . and customers." *Id.* Even with those factual allegations, in the absence of identification of a specific basis for successor liability, the court concluded that the complaint "appear[s] to describe a run-of-the-mill sale of a business's assets—not the type of unusual transaction that would give rise to successor liability under one of the four exceptions." *Id.*

Like conclusions have been reached in CERCLA cases. For example, in *Carolina Power & Light Co. v. 3M Co.*, No. 5:08–CV–460–FL, No. 5:08–CV–463–FL, 2010 WL 11420854, at *16 (E.D.N.C. Mar. 24, 2010), the court held that a complaint's allegations were conclusory where they "state[d] only that defendants [we]re 'successors in interest to' and/or 'responsible for the

---

the same location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise. *Carolina Transformer*, 978 F.2d at 838. That test presented a more forgiving basis upon which plaintiffs may seek to assert successor liability. However, as the Fourth Circuit recognized in *United States ex rel. Bunk v. Government Logistics N.V.*, 842 F.3d 261, 274 (4th Cir. 2016), the Supreme Court's decision in *United States v. Bestfoods*, 524 U.S. 51 (1998), forecloses use of that theory in instances where the governing statute is silent. *See Bestfoods*, 524 U.S. at 63 ("[T]o abrogate a common-law principle, the statute must speak directly to the question addressed by the common law."). Thus, because CERCLA is silent on successor liability, Plaintiff's claims of successor liability must be evaluated under only the four common law exceptions outlined in *PCS Nitrogen Inc.*

environmental liabilities of' various persons who sent [contaminated] transformers to [a site]." The *Carolina Power* court noted that "[c]laimants ha[d] not alleged facts that would give notice to successor defendants as to the particular theory of successor liability that claimants seek to put forward." *Id.*

In *Metro Container Grp. v. AC & T Co., Inc.*, plaintiff did not use the term "successor" in its allegations against any defendant, instead merely saying defendant was "responsible for the waste attributable" to the predecessor. 450 F. Supp. 3d 583, 604-05 (E.D. Pa. March 30, 2020), *vacated on other grounds* No. 18-3623, 2020 WL 3060381 (E.D. Pa. June 8, 2020). The Court found those allegations "amount[ed] to conclusory finger-pointing . . . the lightest weight blanket allegations," and left defendants to "speculate as to what theory of liability attache[d] their liability." *Id.* Similarly, in *New York v. Town of Clarkstown*, 95 F. Supp. 3d 660, 682-83 (S.D.N.Y. 2015), the court held that, where plaintiff alleged defendant "is the successor to" another entity without alleging any facts in support, such an allegation amounts to a "conclusory claim," insufficient to plead an exception to the general rule of successor non-liability.

Courts have deemed even more substantial allegations insufficient to state a claim for successor liability in a CERCLA context. In *Hobart Corp. v. Dayton Power & Light Co.*, No. 3:13–cv–115, 2014 WL 631518, at *3 (S.D. Ohio Feb. 18, 2014), the plaintiff specifically alleged that the defendant was "the legal successor in interest under the theories of de facto merger and/or mere continuation and/or assumption of liabilities to [predecessor company]." Plaintiff further supported its claims with factual allegations concerning asset purchases, name changes, and continuation of manufacturing operations. *Id.* at *4. The court still held that, taken together, these "conclusory" allegations failed to plead successor liability. *Id.*

19

The allegations contained in Plaintiff's Complaint against each moving Defendant will be evaluated with the foregoing legal standards and analogical pleadings in mind.

### a.  Armacell, LLC

Paragraphs 112-114 of Plaintiff's Complaint, addressing successor liability as to Armacell, state:

112. Defendant Armacell, LLC ("Armacell") is the successor to Monarch Rubber Co.

113. In or about 2005, Armacell acquired Monarch Rubber Company.

114. Monarch Rubber Co. is and/or was engaged in the business of rubber product manufacturing and distribution.

ECF 1 ¶¶ 112-14.

Armacell argues that Plaintiff has failed to expressly identify which of the four exceptions it is invoking to assert successor liability and has failed to allege any facts to support any of the exceptions, instead merely providing conclusory statements devoid of factual support.  ECF 163 at 14.  Plaintiff, for its part, contends that the inclusion of the word "acquired" in its allegations of successorship against Armacell (". . . Armacell acquired Monarch Rubber Company") constitutes a specific factual assertion beyond mere conclusory statements.  ECF 284 at 13.  Plaintiff posits that "acquisition" can imply either an asset purchase or a statutory merger, so reasonable inferences drawn in its favor could suggest an exception to the general successor non-liability rule.  *Id.* Plaintiff concludes, then, that the inclusion of this word alone distinguishes this case from the various cases alleging only "successorship, with no facts."  *Id.*

When viewed in light of the above precedent, in which courts have dismissed similarly bare-bones pleadings as conclusory, this Court is unpersuaded by Plaintiff's contention.  The use of the conclusory word "acquired" is no more fact-specific than use of the conclusory word "successor."  A transaction described as an "acquisition" can fall anywhere along a broad spectrum

of contractual arrangements, from a run-of-the-mill asset purchase between entirely separate companies to a full merger.  Thus, use of that word does not automatically place a transaction within one of the four exceptions to the general rule of non-successor liability, and does not, absent a more specific factual assertion, provide basis for an inference that one company is a successor to another.

In an attempt to bolster the scarce allegations in its Complaint, Plaintiff makes additional arguments and supplies additional facts in its response to Armacell's motion.  ECF 284.  There, it suggests that it is invoking the "*de facto* merger" exception to non-liability.  *Id.*  Plaintiff is not permitted to amend its complaint via its opposition to a motion to dismiss.  *See Mylan Lab'ys, Inc. v. Akzo*, 770 F. Supp. 1053, 1068 (D. Md. 1991) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993); *see also Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (explaining that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).  Thus, Plaintiff's belated identification of one of the four exceptions does not render its deficient Complaint viable.  Similarly, the factual allegations Plaintiff has incorporated into its response cannot amplify the few conclusory allegations contained in its Complaint.[6]  Thus, the Complaint is properly dismissed, without prejudice, under Rule 12(b)(6) for failure to state a claim on which relief can be granted.

---

[6] In light of the patent deficiencies in the allegations presented in the Complaint, this Court need not reach the factual questions raised by the attachments to the parties' briefing.  This Court notes, however, that the February 2005 Asset Purchase Agreement ("APA") between Armacell and Monarch raises serious questions about whether Plaintiff can plausibly allege a *de facto* merger, given that the Asset Purchase agreement: (1) evidences a cash transaction and no transfer of equity; (2) expressly excludes certain Monarch assets (including the Baltimore facility in question) from the purchase; and (3) expressly excludes assumption of liabilities for disposal of hazardous

### b. Pabst

Plaintiff's Complaint includes the following successor liability allegations relevant to

Pabst:

827. Defendant Pabst Brewing Co. ("Pabst Brewing") is the successor to Carlings Brewing Company, F&M Schaefer Brewing Co., Mr. Jerold C. Hoffberger, National Brewing Company and P. Ballantine & Sons.

828. In or about 1975, Carling Brewing Company merged with the National Brewing Co. and became Carling-National Breweries.

829. In or about 1979, G. Heileman Brewing Co. acquired Carling-National Breweries.

830. In or about 1994, The Stroh Brewery Company acquired G. Heileman Brewing Co.

831. In or about 1999, Pabst Brewing acquired The Stroh Brewery Company.

832. In or about 1981, The Stroh Brewery Company acquired F&M Schaefer Brewing Co., which it also registered as a fictitious name.

833. Pabst Brewing later acquired The Stroh Brewery Company.

834. Mr. Jerold C. Hoffberger was the president of National Brewing Co.

835. In or about 1972, Falstaff Brewing Corporation acquired P. Ballantine & Sons Brewing Company.

836. In or about 1985, Pabst Brewing acquired Falstaff Brewing Corporation and/or P. Ballantine & Sons Brewing Company.

837. Carlings Brewing Company, F&M Schaefer Brewing Co., Mr. Jerold C. Hoffberger, National Brewing Company and P. Ballantine & Sons are and/or were engaged in the business of manufacture, production and distribution of alcoholic beverages.

---

materials.  ECF 163-4.  There is also evidence that Monarch continued to exist as a separate company (DJDM Investment Company) for 10 years after the 2005 sale.  ECF 163-2 at 5.  The Court does not believe, at this stage, that its consideration of the APA and other attachments would result in dismissal with prejudice pursuant to Rule 12(b)(2), given some of the factual issues Plaintiff has raised.  However, Plaintiff should carefully evaluate the evidence now in its possession when determining whether it can plausibly allege successor liability as to Armacell.

ECF 1 ¶¶ 827-37.

Plaintiff thus claims two lines of successorship leading to Pabst.  First, Plaintiff contends that Pabst is the successor to P. Ballantine & Sons Brewing Company ("Ballantine") via its transaction with Falstaff Brewing Corporation ("Falstaff").  Separately, Plaintiff contends that Pabst is the successor to Carlings Brewing Company ("Carlings"), F&M Schaefer Brewing Co. ("F&M Schaefer"), Mr. Jerold C. Hoffberger ("Mr. Hoffberger"), and National Brewing Company ("National") (collectively "Stroh Breweries") as a result of Pabst's transaction with The Stroh Brewing Company ("Stroh").  Plaintiff makes the same arguments with regard to Pabst as it did with Armacell, asserting that because it alleged that Pabst "acquired" the predecessor entities, its allegations are "robust" in contrast to cases where claims were dismissed.  ECF 367 at 16 n.9. That assertion remains unpersuasive in the context of Pabst.  In fact, given the number of "acquisitions" alleged in the years preceding Pabst's involvement, the inferences that would need to be drawn to pass successor liability through each of those transactions would be even greater. Finally, without any explanation or legal support whatsoever, Plaintiff appears also to suggest that Pabst can be the "successor" to an individual, Jerold C. Hoffberger.[7]  This Court is unaware of any precedent suggesting that companies can succeed persons.

---

[7] While not reaching the issue, this Court notes that, on the present record, Plaintiff's attempt to belatedly allege a *de facto* merger between Ballantine and Falstaff is questionable. Pabst states in its memorandum that it "acquired the stock of Pabst and Falstaff from S&P Company" in June 2010. ECF 287 at 5. Plaintiff points to this "admission" as evidence that Pabst's successorship of Falstaff is not in dispute. In its memorandum, Pabst does not challenge that it succeeded Falstaff, but does raise the nature of the March 1972 asset agreement between Ballantine and Falstaff. Pabst asserts that it is not a successor to the liabilities of Ballantine, because the March 1972 agreement did not expressly or impliedly provide for Falstaff's assumption of Ballantine's liabilities, nor did it qualify as any of the other exceptions to the general rule of successor non-liability. Ballantine's liabilities, then, were not passed to Pabst through Falstaff. Pabst concedes, however, that it "has not located a copy" of the 1972 asset agreement. In lieu of the actual document, Pabst, through the Declaration of its Chief Legal Officer Robert Urband ("Urband Decl." attached to Defendant's Motion to Dismiss), and in reference to Falstaff's 1972 Annual Report, argues that, "Based on [its]

As with Armacell, Plaintiff fails in its Complaint to allege one of the four exceptions to successor liability or to allege facts to support any exception.  Again, Plaintiff tries without success to use its Response to plug some of the holes in its Complaint.  Because that course of action is not permitted, this Court will not reach all of the factual issues presented in the briefing.  Plaintiff's claim against Pabst will be dismissed without prejudice. Again, though, Plaintiff should weigh the facts now known to the parties in considering whether amendment of the Complaint is warranted. Particularly as to Stroh, the Pabst/Stroh Asset Purchase Agreement ("APA") appears to suggest that no *de facto* merger occurred.  *See* ECF 287 at 7 (describing the APA which splits Stroh's brands and assets between Pabst and Miller Brewing Company and notes that Pabst "did not acquire the stock, equity in, or environmental liabilities of" Stroh, in particular Section 2.2(a)(ii), under which Stroh expressly retained "liabilities and obligations relating to the disposal or release of Hazardous Materials, or the violation of Environmental Requirements . . .").

---

knowledge of Falstaff's business and review of documents and records describing the 1972 Falstaff and Ballantine transaction, Falstaff did not acquire the environmental liabilities of Ballantine[,]" and only acquired Ballantine's "trade names, trademarks, brand names, vehicles, cooperage, bottles, pallets, and advertising promotional signs and materials."  Urband Decl. ¶¶ 14-15.  Pabst also uses factual findings by several courts to corroborate that the 1972 Falstaff/Ballentine transaction was an asset purchase, not an assumption of liabilities.  *See U.S. v. Falstaff Brewing Corp.*, 410 U.S. 526, 555 n.10 (1973) ("Ultimately, . . . Falstaff announced plans to acquire Ballantine's trademarks and tradename."); *see also Brewery Workers, Joint Loc. Exec. Bd. of N.J. et al. v. P. Ballantine and Sons*, No. 561-72, 1973 WL 1200, at *1 (D.N.J. Apr. 19, 1973) ("Under the terms of sale Falstaff agreed to acquire the Ballantine trademark, as well as certain retail delivery and other unfixed assets. However, Falstaff did not agree to purchase or to continue operating Ballantine's Newark brewery operations as a going concern."); *Bloor v. Falstaff Brewing Corp.*, 454 F. Supp. 258, 260 (1978) ("Falstaff Brewing Corporation bought from Investors Funding Corporation ("IFC") the Ballantine brewing labels, trademarks, accounts receivable, distribution systems and other property, excepting only the Ballantine brewery.").  As with its allegations against Armacell, Plaintiff should closely scrutinize this evidence when determining whether it can plausibly allege Pabst's successorship to Ballantine.

### c. Caraustar

Paragraphs 227-232 of Plaintiff's Complaint, addressing Defendant Caraustar, state:

> 227. Defendant Caraustar Industries, Inc. ("Caraustar Industries") is the successor to and/or is formerly known as Chesapeake Paperboard Company.

> 228. In or about 2001, Caraustar Custom Packaging Group (Maryland), Inc. merged into The Chesapeake Paperboard Company as the surviving corporation, which changed its name to Caraustar Custom Packaging Group (Maryland), Inc.

> 229. In or about 2009, Caraustar Custom Packaging Group (Maryland), Inc. merged into Caraustar Custom Packaging Group, Inc., a Delaware corporation.

> 230. Caraustar Custom Packaging Group (Maryland), Inc. is owned by and/or was acquired by and/or is one and the same as Caraustar Industries.

> 231. Publicly available information shows both at 5000 Austell-Powder Springs Road in Austell, GA and directs to the same website. Publicly available information also identifies Caraustar Industries' four business lines as Recycling Services, Mill Group, Industrial Products Group and Consumer Packaging.

> 232. Chesapeake Paperboard Company is and/or was engaged in the business of industrial packaging for distribution.

ECF 1 ¶¶ 227-32.

Caraustar presents a slightly different question of successor liability from the Pabst and Armacell analyses, but this Court nonetheless reaches the same result.  Plaintiff alleges that "Caraustar Custom Packaging Group (Maryland), Inc. is owned by and/or was acquired by and/or is one and the same as Caraustar Industries." *Id.* ¶ 230.  That imprecise and conclusory statement is insufficient to plead either successor liability or a parent corporation's liability for its subsidiary. By adopting this "throw spaghetti at the wall and see what sticks" approach to its allegations against Caraustar, Plaintiff fails to give Caraustar sufficient notice of a plausible successor liability theory against which it can defend. *Carolina Power & Light Co.*, 2010 WL 11420854, at *16.

This Court notes that Caraustar has adduced evidence that, on February 27, 2020, it, through a subsidiary, "entered into an agreement to sell all of the stock of Caraustar Custom Packaging Group, Inc., a Delaware corporation, to Graphic Packaging International, LLC, a Delaware limited liability company."  ECF 537 at 3; Martz Aff. ¶ 3.  Subsequently, Caraustar Custom Packaging Group, Inc. was converted to an LLC and had its name changed to GPI Converting, LLC, which "still exists, is in good standing with the State of Delaware under its new name."  ECF 537 at 6; ECF 639 at 7.  Plaintiff, in its Response, cites no evidence to contradict Caraustar's evidence that successor liability is not a viable theory because Caraustar Industries is not a successor to Chesapeake Paperboard Company.  Instead, Plaintiff attempts to shift gears to assert other theories of "indirect corporate liability" as well, providing a laundry list including "agency relationships" and liability that attaches when one company is the "alter ego" or "mere instrumentality" of another.  ECF 580 at 11.  While Plaintiff is correct that indirect corporate liability is not limited only to instances of successor liability, it is still "a general principle of corporate law that a parent corporation . . . is not liable for the acts of its subsidiaries[,]" and "CERCLA does not purport to reject this bedrock principle."  *See Bestfoods*, 524 U.S. at 61-62. There is no mention of any other theory of indirect corporate liability in Plaintiff's Complaint and no facts to allege that any such theory would be plausible vis-à-vis Caraustar.  Plaintiff's claim will therefore be dismissed without prejudice.

### 2.  Nationwide Jurisdiction and Service of Process

Plaintiff's briefing includes an additional unpersuasive argument regarding the existence of nationwide personal jurisdiction and service of process under CERCLA.  ECF 284.  Section 113(b) of CERCLA, concerning jurisdiction and venue for civil proceedings under the statute, states:

> Except as provided in subsections (a) and (h) of this section, the United States
> district courts shall have exclusive original jurisdiction over all controversies
> arising under this chapter, without regard to the citizenship of the parties or the
> amount in controversy. Venue shall lie in any district in which the release or
> damages occurred, or in which the defendant resides, may be found, or has his
> principal office.

42 U.S.C. § 9613(b).  In its Responses to all three Defendants' motions, while acknowledging that

§ 113(b) "establishes subject matter jurisdiction, not personal jurisdiction," Plaintiff suggests it is

"illustrative of Congressional intent" to also allow for nationwide jurisdiction and service of

process.  *See, e.g.*, ECF 284 at 6.  This Court agrees with Defendants that the plain language of

CERCLA refutes that contention.  CERCLA expressly addresses nationwide service of process in

§ 113(e), and provides for such process only in actions brought by the federal government:

> (e) Nationwide service of process- In any action by the United States under this
> chapter, process may be served in any district where the defendant is found, resides,
> transacts business, or has appointed an agent for the service of process. (emphasis
> added)

42 U.S.C. § 9613(e) (emphasis added).  *See also American Tel. & Tel. Co. v. Compagnie Bruxelles*

*Lambert*, 94 F.3d 586, 589 (9th Cir. 1996) ("[Section] 9613(e) authorizes nationwide service of

process only in actions by the United States; it does not apply in private actions.").

Plaintiff notes that, in *O'Neil v. Picillo*, 682 F. Supp. 706, 709-19 & n.1 (D. R.I. 1988), the

Court suggested that allowing nationwide jurisdiction under CERCLA for claims brought by

private litigants would better serve CERCLA's goal of prompt remedial response to environmental

contamination.  *Id.*  Notwithstanding the *O'Neil* court's policy views, even it recognized that "the

decision whether to allow extraterritorial process is for the Congress, and not the courts to make,"

and continued:

> [T]his is not simply a case of statutory construction where it falls to a court to
> interpret statutory ambiguity, or silence, in the manner suggested by the statute's
> legislative history and its purpose. . . . [T]his is an instance where congressional
> silence is assigned a presumptive meaning – namely, that the federal district courts

> will observe the territorial limits of the respective states in which they sit. . . .
> Congress has not authorized nationwide service of process in CERCLA actions.

*Id.* at 714 n.1.  Congress has taken no further steps towards such authorization since *O'Neil* was

decided in 1988.  This Court must therefore adhere to the plain language of CERCLA, and to

constitutional due process requirements, and decline Plaintiff's invitation to broaden CERCLA's

reach.

### 3. Jurisdictional Discovery

Finally, Plaintiff suggests that dismissal would be inappropriate without permitting it to

conduct limited jurisdictional discovery.  *See* ECF 284 at 17-19.  Certainly, this Court has authority

to order such discovery.  *See Mylan Labs., Inc.*, 2 F.3d at 64.  In fact, the decision whether to

permit jurisdictional discovery lies entirely within this Court's discretion.  *See e.g.*, *Base Metal*

*Trading. Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 216 n.3 (4th Cir. 2002).

However, a plaintiff is not entitled to jurisdictional discovery in every case.  Instead, there

is a threshold requirement that the Plaintiff make assertions regarding the existence of jurisdiction

that are more than speculative or conclusory.  *See Carefirst of Md.*, 334 F.3d at 402-03 ("When a

plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court

is within its discretion in denying jurisdictional discovery."); *see also ALS Scan, Inc.*, 293 F.3d at

716 n.3.  Additionally, Plaintiff is required to proffer the facts it needs discovery to ascertain and

a showing of how those facts would establish personal jurisdiction.  *See ALS Scan, Inc.*, 293 F.3d

at 716 n. 3 (upholding denial of jurisdictional discovery where "ALS Scan has failed . . . to proffer

any further facts that it could demonstrate that would be material to the limited jurisdictional

ruling").  Plaintiff has not met that standard.  Further, Plaintiff has not identified any discovery

that might possibly be helpful, such as former employees of the entities who remain available for

deposition or to answer pertinent questions about successorship.  Additionally, Plaintiff has not

asserted any non-speculative theories of jurisdiction premised on plausible facts.  Thus, on the

present record, Plaintiff is not entitled to conduct jurisdictional discovery as a fishing expedition,

hoping to uncover some viable basis for successor liability.

### B.  Motions to Dismiss Contesting Successor Liability

In addition to the three Defendants challenging personal jurisdiction, which required a

successor liability analysis, fourteen other Defendants directly contest the adequacy of the

allegations of successor liability as to their entities via their Rule 12(b)(6) motions to dismiss.  ECF

174, 384, 386, 425, 442, 481, 510, 539, 549, 701, 704, 767, 768, 769.[8]  The allegations pertaining

to those Defendants are equally paltry, and sometimes even more so, than those summarized for

the three defendants above.  For example, as to Defendant Truist Financial Corporation ("Truist"),

there is a single allegation:

> 1056. Defendant Truist Financial Corporation ("Truist Financial") is, via a series
> of mergers and acquisitions and name changes, the liable corporate successor to
> American National Building & Loan, Clifton Savings Bank and Loyola Fed Save
> and Loan.

ECF 1 ¶ 1056.  In no way does that assertion contain sufficient facts to establish the transference

of successor liability throughout the unspecified "series" of unspecified transactions, to include

"mergers and acquisitions and name changes."  The allegations as to the remaining Defendants

who challenge successor liability are similarly deficient.

---

[8] Plaintiff attempts to allege successorship for many more of the remaining Defendants than these
fourteen, but not all those defendants fully address the successor liability issue in their briefings.
"Certain Defendants," for example, do not raise successor liability in their Motion to Dismiss (ECF
448) but state in their reply that they "do not agree with, and will dispute at the appropriate time if
necessary, Plaintiff's aggregation of alleged predecessor entities whose waste is attributed to
Certain Defendants based on alleged successor liability."  ECF 579 at 4 n.3.  As the number of
Defendants contesting this issue will likely grow as the litigation proceeds, any attempt by Plaintiff
to amend the Complaint should look to address successor liability concerns as to each of the
remaining Defendants.

Notably, in its Responses to Airgas and Melibelle (ECF 767 at 10, ECF 769 at 10), Plaintiff expressly states, "Plaintiff used the word 'successor' in a general way" so as to give rise to multiple possible inferences of indirect corporate liability, including the exceptions to the general rule of successor non-liability.  Plaintiff's express concession that it intended for its successorship allegations to be couched in such general language is surprising, given the Third Circuit's previous dismissal of similar claims for lack of specificity, where "purported successor defendants [were] left to speculate as to what theory of liability attaches their liability." *Metro Container Grp.*, 450 F.Supp.3d at 604. In that case, the court chided the plaintiff (who was represented by the same counsel representing Plaintiff in this case) for failure to even use the term "successor" in its allegations.  While counsel rectified that error here, , the Third Circuit raised that point not to establish an acceptable pleading threshold, but rather to illustrate the egregiously deficient nature of the successorship allegations in *Metro Container Grp*.  Mere use of the word "successor," in a general sense without any factual support, does not create a viable claim.

Although Plaintiff's claims of successor liability against the seventeen defendants who have raised the issue will be dismissed without prejudice, it bears repeating that, prior to seeking leave to amend, Plaintiff should seriously scrutinize whether the claims against particular Defendants can or should be amended in light of the information that has been presented to this Court to date.  For example, Plaintiff first names Defendant High's of Baltimore, LLC ("High's LLC") as the successor to High's Ice Cream House and High's Store, and, alternatively, names Defendant New Ridge Associates ("New Ridge") as successor to those same entities.  ECF 1 ¶¶ 522, 530.  High's LLC argues that, under a January 2012 Amended Asset and Real Estate Purchase Agreement, ECF 425-3, it purchased numerous store properties from High's of Baltimore, Inc. ("High's Inc.")—which subsequently changed its name to New Ridge Associates—but did not

assume High's Inc.'s liabilities.  ECF 425 at 9-10.  Defendant New Ridge's Motion to Dismiss, as well as the attached affidavit of its Vice President and Chief Financial Officer, affirm that no liabilities transferred to High's LLC under the 2012 transaction, and both the transfer and the subsequent name change are corroborated by public records with the Maryland State Department of Assessments and Taxation.  ECF 480 at 1; ECF 480-2 ¶¶ 4-5; ECF 425 at 10.

Given the Court's determination that the "broad-brush" approach Plaintiff has employed in its original Complaint is legally insufficient, an attempt to reassert claims against any particular Defendant without articulable facts plausibly suggesting the existence of one of the four exceptions to successor non-liability will be viewed with disfavor.

### C. Summary Judgment Motions Contesting Successor Liability

Two entities, Heritage Chevrolet-Buick and Mattress Development Company of Delaware, LLC d/b/a Eclipse International, seek summary judgment on the issue of successor liability and have filed evidence suggesting that such liability may not exist.  Additionally, Morgan Properties Management Company, LLC, seeks summary judgment on the same issue, though with a leaner evidentiary record in support.  Finally, Norris Automotive Holdings LLC; Host Hotels and Resorts, Inc.; Airgas, Inc.; Melibelle USA, Inc.; and Drug City Pharmacy, LLC, while raising the issue in their motions seeking summary judgment, attach little to no evidence pertaining to successor liability, and appear to seek summary judgment primarily on other grounds. Each will be addressed below.

### 1. Heritage Chevrolet-Buick ("Heritage")

Plaintiff, in its Complaint, alleges that Heritage, through a series of name changes, transfers, and mergers, is the successor to Brooks-Price Co. and Schmidt Ford Tractor Inc.  ECF 1 ¶ 505-516.  Defendant Heritage, while not required to do so under the post-*Celotex* summary

judgment standard, attaches to its motion affirmative evidence to demonstrate that no genuine dispute of material fact exists with regards to Plaintiff's successor liability claim. These attachments include an affidavit of its Chief Executive Officer, attesting to the fact that Heritage did not assume any liabilities—environmental or otherwise—through Articles of Transfer or Asset Purchase Agreements with any of the "nexus" parties through which Plaintiff attempts to allege successor liability, as well as relevant portions of those transactions as exhibits. ECF 549-2 ¶¶ 7, 11-12, 14; *see also, e.g.*, ECF 549-4 at 3 (APA between Bud Schmidt Buick, Inc. and Atlantic Automotive Corp. (Section 1.3 "Exclusion of Liabilities.")).

By contrast, Plaintiff, who bears the burden of proof for its successor liability claim, attaches no admissible evidence or affidavits at all pertaining to the question of successor liability to its memorandum. ECF 596. Instead, it proffers just two pages (with a single ledger line referring to Brooks-Price and two ledger lines referring to Schmidt Ford Tractor Inc.) from Robb Tyler's 1970 Accounts Receivable Ledger. ECF 596-1. It is unclear what possible dispute of material fact the three ledger lines, with no accompanying affidavit to provide explanation or elaboration, could speak to on the issue of successor liability. Those ledger pages do not connect Heritage to Schmidt Ford Tractor, Brooks-Price, or any of the other numerous entities in the ledger's roster. Summary judgment is often referred to as the "put up or shut up" moment in litigation. *Konover Const. Corp. v. ATC Assoc., Inc.*, Civil Action No. MJG–10–2801, 2012 WL 1552432 at *7 (D. Md. April 27, 2012). Here, Plaintiff failed to proffer any evidence or material that could establish that material facts relating to its successor liability claim are in dispute,

particularly given Heritage's affirmative evidence to the contrary.  Thus, Plaintiff has failed to satisfy its burden under Rule 56(c).[9]

In addition, Plaintiff has failed to file the requisite Rule 56(d) affidavit seeking further discovery.  In its memorandum, it argues with some specificity the reasons for which it seeks discovery, but this attempt at constructive satisfaction, through briefing, of the Rule 56(d) affidavit requirement remains "insufficient to compel denial" of a summary judgment motion.  *Evans*, 80 F.3d at 961.  Considering Heritage's assertions, in the affidavit of its CEO, that it possesses no records pertaining to the waste of its purported predecessors, ECF 549-2, this Court is not persuaded that discovery would bear fruit even had it been properly sought.  For the above reasons, Defendant Heritage Chevrolet-Buick's motion for summary judgment, ECF 549, will be granted.

### 2. Mattress Development Company of Delaware, LLC d/b/a Eclipse International ("Mattress Development")

The entirety of Plaintiff's successorship allegations as to Mattress Development (d/b/a Eclipse International) are found in a conclusory statement in a single paragraph of its Complaint:

> 374. Defendant Eclipse International, Inc. ("Eclipse International") is the successor to and/or formerly known as American Bedding of Baltimore and/or Eclipse Sleep Products.

ECF 1 ¶ 374.  Defendant Mattress Development posits that Plaintiff misnamed it as a Defendant in this case, and that Plaintiff served it as "Eclipse International, Inc." because Mattress

---

[9] In its memorandum, while making a handful of references to what it says are deficiencies in evidence put forward by Heritage (ignoring the fact that Heritage had no obligation to provide *any* evidence with its motion), the only affirmative "evidence" Plaintiff cites (but does not attach) in order to counter Heritage's arguments is a single newspaper obituary for Frank "Bud" Schmidt, stating that "[h]e retired in 2004 and sold his franchise to the Heritage Group."  Putting aside the question of whether the Court should take notice of the obituary, there is nothing in that statement—which is devoid of any details of or context regarding the apparent transaction—from which this Court could reasonably infer a basis of successor liability.  ECF 596 at 21.

Development "markets certain sleep products under the brand name 'Eclipse' or 'Eclipse International.'" [10]   ECF 701 at 3.   Defendant states that it acquired those trademarks through an April 2000 Asset Purchase Agreement with NAMACO Industries, Inc. ("NAMACO"), under which it assumed none of NAMACO's liabilities.  *Id.*

Mattress Development attaches two affidavits to its filing, one (ECF 701-2) from its own president and CEO, and another (ECF 701-3) from the former Vice President of NAMACO.  Read together, the affidavits, along with excerpts from the 2000 Asset Purchase Agreement (attached as exhibits to the affidavits), affirm that the transaction was one only for "specified intellectual property and marketing and packaging materials and supplies," ECF 701-2 ¶ 6; *see also* ECF 701-3 ¶¶ 3-5, and "certain trademarks including the name Eclipse," ECF 701-2 ¶ 9; *see also* ECF 701-3 ¶ 3.   Mattress Development "expressly disclaimed" any of NAMACO's liabilities.  ECF 701-2 ¶ 7; ECF 701-2 at 4-5 (Exhibit A) ("Purchaser is not assuming nor shall Purchaser be liable for any liabilities or obligations of Seller . . . of any kind or nature whatsoever . . . ."); *see also* ECF 701-3 ¶ 4.   In addition, both affiants state that they have never heard of any entity named "American Bedding of Baltimore," and that neither Mattress Development nor NAMACO has ever been affiliated with such an entity.  ECF 701-2 ¶ 10; ECF 701-3 ¶ 9.

Plaintiff attaches no counter-affidavits or evidence concerning successor liability to its Response.  ECF 728.  Of the material it does attach, Exhibits A-E pertain to Defendant's alternative

---

[10] Mattress Development is one of three Defendants–along with Airgas, Inc. and Drug City Pharmacy LLC–that raise the issue of improper service in their motions. See ECF 767 at 2-4; ECF 768 at 2-4; ECF 701 at 8.  However, this Court, finding other grounds for dismissal of the claims against them, will not address the issue in this opinion.  Relatedly, Defendant Alban Tractor Co., Inc. ("Alban") argues that "Alban Tractor Co., is not a proper person that can . . . be sued[,]" because it had ceased to exist under that name as of April 2020—when it converted to Alban Tractor LLC—and that dismissal "is warranted on this basis alone."  ECF 478 at 1; ECF 621 at 1. This Court, again, finding other grounds for dismissal of the claims against Alban, will not take up the issue, though it does note that Alban waived service as "Alban Tractor Co., Inc."  ECF 238.

argument of insufficiency of service, and Exhibit F is just the "Historic Records" showing waste disposal activities by the predecessor entities (consisting of six waste disposal tickets for American Bedding, and two ledger lines in the 1970 Accounts Receivable Ledger for Eclipse Sleep Products).  Again, Plaintiff has failed to supply any evidence to satisfy its Rule 56(c) burden relative to its successor liability claim.

Perhaps implicitly acknowledging these deficiencies, Plaintiff uses its Response to attempt to pivot away from its allegation of successor liability, instead presenting multiple additional theories of indirect corporate liability, including successorship by merger, "mere continuation," or alter ego theories.  Plaintiff argues that these theories could be construed from Plaintiff's allegations in the Complaint.  ECF 1 ¶¶ 373-78.  As previously discussed, however, the single sentence referencing Mattress Development in the Complaint is paltry and conclusory, to say the least, and it fails to support an expansive reading encompassing any of these alternative theories. Plaintiff also seeks to supplement its successor liability allegation with a handful of additional facts, drawn largely from newspaper and magazine articles, advertisements, and web pages. ECF 728 at 22-23.  For reasons already outlined at length in several preceding sections of this opinion, this Court will not consider new facts raised exclusively in the Response.  Moreover, even if the Court were to consider these newfound evidentiary tidbits, they do not present any substantive basis from which it could reasonably infer a theory of successor liability.

Lastly, as in the case of Heritage, Plaintiff here also failed to file the requisite Rule 56(d) affidavit to articulate its reasons for seeking additional discovery, and its plea for discovery on the successor liability issue within its briefing is too generalized to compel denial of Mattress Development's summary judgment motion.  *See* ECF 728 at 27-28.  For the above reasons, Plaintiff has failed to demonstrate the existence of a genuine dispute with regards to its successor

liability claim, and, thus, Defendant Mattress Development's motion for summary judgment, ECF 701, will be granted.

### 3. Morgan Properties Management Company, LLC ("MPMC")

Plaintiff, in its Complaint, alleges that MPMC is the "successor to and/or also known as Forest Height Apts., Marylander Apts., University Associates, Westerly Apts and The Westridge Apts [collectively "The Apartments"]."  ECF 1 ¶ 776.  In its motion and the attached affidavit of its Area Vice President, ECF 704-2, Defendant MPMC categorically states that it "does not now nor has it ever owned any properties, including any of the properties at issue in this litigation." ECF 704-2 ¶ 4.  MPMC further argues, and attaches the affidavit and its LLC registration, ECF 704-3, to demonstrate that MPMC was not formed until January 2013, and that it was formed only for the specific purpose of "manag[ing], operat[ing], and leas[ing] rental properties."  ECF 704-2 ¶¶ 2-3.

In its Response, Plaintiff first attempts to introduce alternate theories of indirect corporate liability, including an "agency relationship" or an "alter ego"/"mere instrumentality" relationship, ECF 730 at 6-9, a maneuver which this Court has already labeled inappropriate in its discussion of Defendant Caraustar in Section III(a)(1)(c), *supra*.  However, Plaintiff does  fare better in this instance in terms of fulfilling its evidentiary burden.  Plaintiff attaches eighteen exhibits to its Response, including property records, records from the Maryland Department of Assessments & Taxation, and webpages.  ECF 730.  Within these records, Plaintiff draws attention to, for example, the fact that the "Owners" listed for the respective Apartments share the same mailing address as MPMC (160 Clubhouse Rd. Ste 9004, King of Prussia, PA 19406).  ECF 730 at 10-12.  Plaintiff also provides evidence referencing "assumption of certain indebtedness by Morgan" in a purchase from Pennsylvania Real Estate Investment Trust.  ECF 730-11 (PREIT 2003 SEC Form 8-K/A

Report).  Given these apparent factual issues, it is premature at this early stage to grant summary judgment.

Nonetheless, the claims against MPMC must still be dismissed because Plaintiff has failed to adequately state a claim for successor liability against MPMC.  Its sole allegation is found in a conclusory statement in a single paragraph of its Complaint.  ECF 1 ¶ 776 ("Defendant Morgan Properties Management Company, LLC . . . is the successor to and/or also known as Forest Height Apts., Marylander Apts., University Associates, Westerly Apts and The Westbridge Apts.").  As the Court has outlined repeatedly throughout this opinion, such a statement is insufficient to state a claim for successor liability upon which relief can be granted.  Thus, while MPMC's motion for summary judgment will not be granted, its Rule 12(b)(6) motion to dismiss will be.

### 4. Norris Automotive Holdings LLC ("Norris"); Melibelle USA, Inc. ("Melibelle"); Host Hotels and Resorts, Inc. ("Host Hotels"); Airgas, Inc. ("Airgas"); and Drug City Pharmacy, LLC ("Drug City")

Other Defendants who raise the successor liability issue in their motions to dismiss also move for summary judgment in the alternative; however, unlike Heritage, Mattress Development, and MPMC, they appear to seek summary judgment primarily on other grounds unrelated to successor liability.  Norris and Melibelle nominally ask for summary judgment in the alternative, but in their respective discussions of successor liability  express that "the court must dismiss the Complaint against Norris Holdings[,]" with no mention of summary judgment.  ECF 481 at 3; ECF 769 at 4.  In fact, when Norris and Melibelle refer to "publicly available records" in the Maryland Department of Assessments & Taxation (none of which is attached to their filings), each specifically notes, in a footnote, that its "reference to publicly available records does not convert its Motion to Dismiss into a Motion for Summary Judgment."  *Id.*  Thus, this Court will not read a summary judgment request into a motion which more accurately reflects one for Rule 12(b)(6) dismissal.  Host Hotels similarly argues successor liability as a basis for dismissal, not summary

judgment. It bases its summary judgment request primarily on its argument that Plaintiff's allegations fail to overcome the waivers in the Consent Decree, which this Court will address later in this opinion. Further, all the evidence attached to its motion pertains to the waiver issue—none speaks to successor liability. ECF 510. Airgas, as well, while arguing that Plaintiff has failed to adequately state a claim for corporate parent liability, only nominally seeks summary judgment, and its attached affidavit speaks only to the issue of improper service. ECF 767. Finally, Drug City, with its motion, *does* proffer a copy of the 2016 Articles of Sale and Transfer between Drug City Pharmacy Company and itself, which states that the transfer is one of "furniture, fixtures, equipment, records, stock in trade inventory, supplies, goodwill . . . [,]" with no mention of any assumption of liability. ECF 768-3. However, Drug City concludes its discussion of the successor liability issue in its memorandum by stating only that the court must dismiss the Complaint. In fact, in a later section titled "Alternatively, Summary Judgment is Appropriate," Drug City makes no mention of the attached copy of the Articles of Sale and Transfer. It refers only to an attached affidavit from its Owner, George Fotis (ECF 768-2), which speaks to issues of service and statutory waiver (addressed later in this opinion), not to successor liability. Thus, while Drug City has provided some evidence to demonstrate that it is not liable as a successor, it does not appear to this Court that it seeks summary judgment, rather than merely dismissal, on that basis.

In light of the only passing invocations of summary judgment on this issue, and the sparse accompanying records, summary judgment is premature with respect to Norris, Melibelle, Host Hotels, Airgas, and Drug City, and the claims against these Defendants will be dismissed pursuant to Rule 12(b)(6).

### D.  Motions to Dismiss for Lack of Arranger Liability

Nearly all Defendants, apart from those challenging this Court's jurisdiction, seek dismissal on the grounds that the Complaint does not adequately allege arranger liability.  ECF 174, 384, 386, 411/452, 425, 442, 448, 461, 478, 479, 480, 481, 482/484, 510, 539, 549, 609, 672, 701, 704, 767, 768, 769.  Of course, in weighing a motion to dismiss, the Court takes all of Plaintiff's allegations to be true.  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Here, Plaintiff merely pleaded a "threadbare recital[] of the elements" of § 107(a)(3) arranger liability under CERCLA.  A comparison of the statutory language and the language that begins each of Plaintiff's claims shows an almost verbatim recitation:

CERCLA (42 U.S.C. § 9607(a)(3)):

"any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . . shall be liable . . ."

Plaintiff's Complaint:

"According to 68th Street Site records, [Defendant] by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of waste containing hazardous substances at the 68th Street Site."

ECF 1 ¶ 30.  Plaintiff adds no additional facts about what any Defendant did, save for a general description of the type of business and a recitation of various (generally boilerplate) substances that can be found in the waste generated by like businesses.  In multiple instances, Plaintiff alleges that certain Defendants' waste contained "hazardous substances associated with" their particular business type but provides no more specifics.  *See, e.g.*, ECF 1 ¶¶ 534-35 (alleging that Defendant

Hilton Worldwide, Inc.'s purported predecessor "is and/or was engaged in the business of hospitality services and lodging[,]" with waste streams consisting of "hazardous substances associated with hospitality services, and lodging waste, . . . general office waste," but alleging no substances beyond the fourteen commonly alleged for each Defendant, which appear to be attributable to "general office waste"); ¶¶ 689-91 (alleging that Lifelike Products (alleged to be the former name of Defendant Lifoam Industries, LLC) "is and/or was engaged in the business of model train retail[,]" with waste streams consisting of "hazardous substances associated with model train retail waste, . . . retail waste and general office waste," but alleging only one substance–mercury–beyond the fourteen common substances); ¶¶ 777-78 (alleging that Defendant Morgan Properties Management Company, LLC's purported predecessors "are and/or were engaged in the business of residential services[,]" with waste streams consisting of "hazardous substances associate with residential services waste, . . . general office waste," but alleging no substances beyond the fourteen common substances).  There are, for example, no allegations about the specific arrangements any Defendant made with Robb Tyler or any other transporter, nor are there any allegations about the amount of or nature of the waste attributable to any Defendant.

The sole deviation from the statutory language in Plaintiff's recitation is a significant one. CERCLA requires that an arranger have "arranged with a transporter for transport for disposal or treatment, of hazardous substances."  42 U.S.C. § 9607(a)(3).  The Complaint, in contrast, alleges that each Defendant "arranged with a transporter for transport for disposal or treatment of *waste containing* hazardous substances[.]"  *See, e.g.*, ECF 1 ¶ 30 (emphasis added).  That distinction is significant in light of courts' evolving interpretation of CERCLA's arranger liability provisions.

A brief review of the history of the CERCLA statute is useful in this context.  Congress enacted CERCLA as a strict liability statute in 1980, in response to the need to remediate hazardous

waste sites.  CERCLA created a trust fund known as the "Superfund" to finance prompt removal of environmental hazards and permitted (1) the government to recover the remedial costs from potentially responsible parties (PRPs) and (2) those PRPs to sue other parties they believe to bear responsibility for contribution.  To be considered a PRP, a business must fit within one of four categories:

> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a).

While CERCLA was enacted as a strict liability statute, its scope has subsequently been narrowed in several pertinent ways.  Congress has amended the statute (for example, under the Small Business Liability Relief and Brownfields Revitalization Act of 2002) to incorporate certain statutory exemptions, including qualified exemptions from liability for the smallest volume waste contributors at Superfund sites ("*de micromis*" entities) under 42 U.S.C. § 9607(o), and for small businesses (those with less than 100 employees) under § 9607(p).

Courts have also shifted their interpretation of CERCLA to now require some showing of a defendant's intent to demonstrate "arranger liability."  The intent requirement began with *Amcast Indus. Corp. v. Detrex Corp.,* 2 F.3d 746, 751 (7th Cir. 1993), which held that"[a]lthough the

statute defines disposal to include spilling, the critical words for present purposes are "arranged

for.' The words imply intentional action."  In *Burlington Northern & Santa Fe Ry. Co. v. United

States*,  the Supreme Court indicated that it interpreted § 9607 similarly when  it stated that "under

the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it

takes intentional steps to dispose of a hazardous substance."  556 U.S. 599, 611 (2009) (emphasis

added).  "[K]nowledge alone is insufficient to prove that an entity 'planned for' the disposal."  *Id.*

at 612.  The Court, thus, gave considerable weight to the mental state of the entity during its

handling of the substance.  *Id*. at 611 (citing to *United States v. Cello–Foil Prods., Inc.*, 100 F.3d

1227, 1231 (6th Cir. 1996) ("[I]t would be error for us not to recognize the indispensable role that

state of mind must play in determining whether a party has 'otherwise arranged for disposal . . . of

hazardous substances.'")).

In line with *Burlington Northern*, and the Sixth and Seventh Circuits' holdings in *Amcast* and

*Cello-Foil* respectively, the Fourth Circuit has held that "intent to sell a product that happens to

contain a hazardous substance is not equivalent to intent to dispose of a hazardous substance under

CERCLA. For arranger liability to attach, there must be something more."  *Consolidation Coal

Co. v. Ga. Power Co.*, 781 F.3d 129, 149 (4th Cir. 2015).

Plaintiff, in response, attempts to distinguish *Consolidation Coal* and *Burlington Northern*

as dealing solely with the sale of otherwise useful items containing a hazardous substance. Tr.

Mot. Hr'g 44:4-7, July 13, 2021, ECF 760.  Plaintiff posits that because this case, without question,

involved disposal of waste and not the sale of a useful product, no intent is required.  *Id.*  That

contention disregards the Supreme Court's "plain language" interpretation of CERCLA, which

applies on its face to all § 107(a)(3) claims. That plain language requires an entity to take

42

intentional steps with the specific intent to dispose of hazardous waste and not just waste that, to its knowledge, may or may not contain hazardous substances.

Few courts have addressed the issue presented by the allegations in this case: whether an arranger defendant must know that the material it disposed of is hazardous. In *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2012 WL 2704920 (E.D. Wis. July 3, 2012), *aff'd sub nom. NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682 (7th Cir. 2014), the plaintiff paper company sold its "broke," or the scraps created during the process of making or coating paper, to nearby recycling mills who converted the broke into usable paper. *Id.* at *1. The broke contained PCBs, but at the time, PCBs were not recognized to pose an environmental hazard. Nonetheless, the recycling mills' conversion of the broke discharged PCBs into a river, which resulted in extensive environmental contamination. In considering whether plaintiff could be subject to arranger liability for its recycling efforts, the Court acknowledged that the plaintiff "lacked knowledge that broke . . . could be hazardous." *Id.* at *12. Based on *Burlington Northern*'s indication that "an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance," the court reasoned that "[i]t seems doubtful that a defendant can ever be found to be an arranger if he did not know the substance in question is hazardous." *Id.* at *11 (quoting *Burlington Northern*, 556 U.S. at 611). It also highlighted additional language from *Burlington Northern* to support its conclusion:

> [W]hen the *Burlington Northern* court notes that "if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance," it is implicit or assumed in such a statement that the entity knew or at least suspected that the substance was harmful.

*Id.* (quoting *Burlington Northern*, 556 U.S. at 610). The *Appleton Papers* court also cited "the underlying purpose of arranger liability under CERCLA," which it defined as "to deter and, if necessary, to sanction parties seeking to evade liability by 'contracting away' responsibility." *Id.*

(quoting *United States v. Gen. Elec. Co.*, 670 F.3d 377, 382 (1st Cir. 2012)).  It noted that "it is difficult to find that the disposer was trying to evade liability where "the dangerousness of the product is unknown to the would-be arranger." *Id.*  Imposing liability on those with no knowledge, the *Appleton Papers* court reasoned, would not result in deterrence because "people who do not even suspect that their product is harmful are not in a position to be deterred." *Id.*

The court in *Town of Islip v. Datre,* 245 F. Supp. 3d 397 (E.D.N.Y. 2017), reached the same conclusion in granting a motion to dismiss filed by a defendant with no knowledge that the construction and demolition debris it brokered had contained hazardous substances.  The court agreed that *Burlington Northern* "suggests that the alleged arranger must know the substance in question was hazardous." *Id.* at 423.  It reasoned:

> Indeed, if, as the Town argues, knowledge of the hazardous nature of the material were irrelevant—and the only inquiry was whether the alleged arranger intended for the disposal of some material—the Supreme Court could have omitted the term "hazardous" from its holding, in which case the holding would have read, "[U]nder the plain language of the statute, an entity may qualify as an arranger ... when it takes intentional steps to dispose of a ... substance." Instead, the Court required "intentional steps to dispose of a *hazardous* substance."

*Id.* (emphasis added) (internal citation omitted).  The *Datre* court also noted the anomalous result that would occur if a party with no knowledge that its discarded material posed a risk of contamination were to be liable where a party who arranges for the sale of a useful product is not, even if the seller knows the product contains hazardous substances that "will be leaked, spilled, dumped, or otherwise discarded." *Burlington Northern*, 556 U.S. at 510 (holding that such knowledge "may provide evidence of the entity's intent to dispose of its hazardous wastes" but "alone is insufficient to prove that an entity 'planned for' the disposal").  The *Datre* court reasoned, "the seller's knowledge of the pollution that will result from the sale renders the seller more culpable for the resulting contamination than an entity who arranges for the disposal of a product

it does not even realize poses a risk of contamination. It would be anomalous, therefore, to hold the less culpable entity liable while permitting the more culpable seller to escape liability." *Id.* at 423.

The Third Circuit employed similar reasoning in *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669 (3d Cir. 2003). The court held that "ownership or possession [of a hazardous substance] alone [was not] a sufficient basis upon which to ground 'arranger liability'" because such a rule "could broaden the sweep of Section 107(a)(3) beyond the bounds of fairness." *Id.* at 678. For example, the Court noted "it would be unfair to require [a] defendant to contribute to the cost of cleanup" if that defendant merely "arranges for a plant to treat a hazardous substance that [the defendant] owns or possesses, but [had] . . . no knowledge (or even reason to know) that the processing will result in the release of hazardous waste." *Id.* In other words, the Third Circuit indicated that arranger liability should not apply where an entity was unaware that environmental pollution could result from its arrangement to dispose of a substance. *See id.*

This case, as pled, seeks an extraordinarily broad interpretation of arranger liability that conceptually tests those same bounds of fairness contemplated in *Morton*, *Datre*, and other cases. The long list of Defendants Plaintiff has sued consists of business entities that allegedly engaged in a standard business practice—waste disposal using a local trash collection service. There are no particularized allegations in the Complaint suggesting that any of the Defendants arranged for any hazardous substance per se to be transported for disposal, or knowingly incorporated hazardous substances into their general business trash.[11] Under the logical extension of Plaintiff's

---

[11] In a small handful of instances, Plaintiff does allege with minimal specificity certain *items* that may have been in Defendants' waste streams: "drums, rubber dust, and rubber scrap" with regards to Defendant Armacell, ECF 1 ¶ 116); "empty drums and empty soda cans" with regards to Defendant C&I Leasing, *id.* ¶ 218; "steel wire known as 'snake' which contained some of the hazardous substances listed above" with regards to Defendant Caraustar, *id.* ¶ 234; "milk buckets

theory, given its broad identification of the hazardous substances each Defendant is alleged to have disposed of and its failure to allege the requisite intent, virtually every business engaging in waste disposal, regardless of the amount or content of its trash, could properly be held liable.  Even assuming Plaintiff's allegations to be true, then, they do not comport with *Consolidation Coal* or the other cases described above*,* because the allegations involve the regular disposition of waste that happens to contain one or more hazardous substances, not the required arrangement intentionally to dispose of a hazardous substance itself.

Ultimately, not only does Plaintiff's Complaint lack specific factual allegations as to each Defendant, but its deviation from the express language of the statute, requiring that the defendant arrange for disposal of hazardous substances, means that it does not plausibly plead arranger liability.  The claims against the moving Defendants– ECF 174, 384, 386, 411/452, 425, 442, 448, 461, 478, 479, 480, 481, 482/484, 510, 539, 609, 672, 704, 767, 768, 769–will be dismissed without prejudice, allowing Plaintiff to seek leave to amend to state fact-based claims against those Defendants as to whom Plaintiff has reason to believe intentionally arranged to dispose of hazardous substances.[12]

---

and cans" with regards to Defendant Cloverland Dairy, *id.* ¶ 289); and "cans, filters, and oil cans" with regards to Defendant Crown Central, *id.* ¶ 322).  Apart from its allegation regarding Caraustar, which references only "hazardous substances listed above" in the Complaint with no more specificity, Plaintiff alleges nothing to indicate that these items are inherently hazardous, let alone that Defendants knew they were hazardous and intended to dispose of them for that reason.

[12] Many moving Defendants argue, in the alternative, that this Court should find that Plaintiff waived its right to sue them in two distinct provisions of the Consent Decree: the provision creating an exemption for defendants contributing only municipal solid waste, only in amounts not exceeding 0.2% of the total volume of waste at the Site (Paragraph 106), and the provision creating an exemption for defendants contributing only a *de micromis* amount of waste containing hazardous substances, not exceeding 110 gallons or 200 pounds, at the Site (Paragraph 108).  ECF 448-1 (Consent Decree, *United States v. AAI Corp., et. al.*, Case No. 17-cv-2909-RDB (D. Md. Nov. 29, 2017) ("Consent Decree")) ¶¶ 106, 108. However, the waiver argument falls within the Fourth Circuit's definition of an affirmative defense.  *See Emergency One, Inc. v. Am. Fire Eagle*

### E.  Alternative Motions for Summary Judgment

### i.  The Consent Decree Waivers

Although the Consent Decree waivers, as discussed in footnote 13, *supra*—which create

exemptions for defendants contributing relatively small amounts of municipal solid waste and *de*

*micromis* amounts of waste containing hazardous substances—constitute affirmative defenses

inappropriate to consider with respect to the pending 12(b)(6) motions, several Defendants have

raised them in the context of summary judgment motions. These Defendants argue that Plaintiff,

an unincorporated association comprised of a number of the Settling Defendants who were

signatories to the Consent Decree, has failed to adequately plead sufficient volumetric information

to overcome these waivers of claims. ECF 448, 464, 478, 479, 480, 481, 484, 510, 549, 672, 701,

704, 767, 768, 769.  Such affirmative defenses may be considered as bases for summary judgment.

*See Forst*, 4 F.3d at 250 ("These defenses are more properly reserved for consideration on a motion

for summary judgment."); *see also* 10B Charles Alan Wright & Arthur R. Miller, Federal Practice

and Procedure § 2734 (4th ed. 2021) ("It is fairly well settled that an affirmative defense may be

---

*Engine Co.*, 332 F.3d 264, 271 (4th Cir. 2003) ("An affirmative defense is the "'defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all allegations in the complaint are true.'") (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d. Cir. 2003)).  In the July 13, 2021 motions hearing, Defendants cited to a Fourth Circuit case, *Ballard v. Bank of America*, 734 F.3d 308, 313 (4th Cir. 2013), for the proposition that a waiver is an appropriate basis for dismissal of a claim.  However, the waiver in *Ballard* was unqualified, requiring Plaintiff to waive "'any and all' claims – past, present, or future" against the Defendant, with no fact-specific conditions to the waiver. *Id.* at 309.  Here, the fact-specific nature of the Consent Decree's conditional waivers, in this Court's view, renders them an affirmative defense ill-suited to disposition at the motion to dismiss stage of the case. *See, e.g.*, ECF 521 at 17.  That said, the Court need not, and does not, definitively reach the waiver issues in the context of Defendants' motions to dismiss.  Plaintiff's sparse allegations related to Defendants' waste are otherwise addressed by this Court as a basis for dismissal for failure to state a claim for arranger liability, independent of the terms of the Consent Decree.  Defendants of course are free to re-raise the Consent Decree waivers at an appropriate time, if Plaintiff seeks leave to amend.

asserted by a motion under Rule 56 made prior to the answer even though the facts supporting the defense do not appear on the face of the complaint.").

However, Defendants bear the burden of proof for this affirmative defense.  *See Bengston v. Gibbs*, Nos. 88–3824, 88–3831; 1989 WL 100677, at *1 (4th Cir. Aug. 15, 1989) ("The burden of proving modification or waiver is on the party asserting it.") (quoting *Lambe-Young, Inc. v. Cook*, 320 S.E.2d 699, 702 (N.C. App. 1984)); *see also Turner Const. Co. v. BFPE Int'l, Inc.*, Civ. No. JKB-15-368, 2016 WL 1169938, at *15 n.32 (D. Md. Mar. 25, 2016) ("Because waiver is an affirmative defense, the burden rests on [defendant] to prove that the Waiver . . . is effective and controlling here.") (citing *Bengston*, 1989 WL 100677, at *1).  The only evidence Defendants proffer to prove this defense is an exchange between EPA and Plaintiff's counsel, contained in a September 17, 2020 Information Request from EPA, *see, e.g.*, ECF 448-2, and Plaintiff's counsel's response on October 2, 2020, *see, e.g.*, ECF 448-3, as well as a Declaration of an EPA Civil Investigator affirming that those two exhibits are "true and correct cop[ies]" of those documents, which were "made and kept in the course of EPA's regularly conducted activities[,]" *see, e.g.*, ECF 448-4 ("Martin-Banks Declaration").  Defendants attach these documents primarily for what they contend to be Plaintiff's counsel's "admission" that Plaintiff's members "do not have information regarding the volume of [municipal solid waste] sent to the Site by any Recipients[,]" and that "[t]he only historical records that still exist are sparse Robb Tyler, Inc. accounting records."  *See* ECF 448 at 12-13 (citing ECF 448-3 at 4-6).  Thus, the only "evidence" through which Defendants attempt to prove that the Consent Decree waivers bar Plaintiff's claims is a statement by Plaintiff's counsel regarding a current lack of evidence.

Even if this Court were to consider the statements of Plaintiff's counsel in the response letter as strongly indicative of Plaintiff's lack of evidence and the unlikelihood of its obtaining

further evidence, this Court is not convinced that Defendants, who bear the burden of proof for their affirmative defense, may be granted summary judgment on what amounts to a "no-evidence" motion.  To obtain summary judgment, particularly in a pre-discovery posture, Defendants must, themselves, present undisputed facts that affirmatively demonstrate the Consent Decree waiver, rather than merely pointing out the absence of evidence on the other side.  *See Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012) ("Where, as here, the movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense.").  In addition, while the Martin-Banks Declaration speaks to the authenticity of Plaintiff's correspondence with the EPA, it is not a conclusive determination of the merits or legitimacy of the contentions contained in the correspondence.  While this Court acknowledges the potential difficulty for Defendants to assemble the factual records—containing more than half-a-century-old volumetric information about their garbage—necessary to prove or disprove the applicability of the Consent Decree waivers and satisfy their burden of proof, it would be premature to grant summary judgment on that basis at this early stage of litigation.

  **ii.**  **CERCLA's Statutory Exemptions**

  A number of Defendants, in addition to invoking the Consent Decree waivers, seek summary judgment on the basis of CERCLA's two statutory exemptions, found in 42 U.S.C. §§ 107(o) and 107(p), noting that, where a plaintiff is a private party, the statute places the burden of proof on that private plaintiff to demonstrate that defendant entities do *not* qualify for CERCLA's statutory exemptions.  ECF 478-82, 767-69..

  Section 107(o) is the codified version of the *de micromis* exemption found in Paragraph 108 of the Consent Decree, meant to protect those entities who may have contributed miniscule amounts (less than 110 gallons or 200 pounds) of material containing hazardous waste to a site.

Section 107(p), the statutory Municipal Solid Waste exemption, is specifically invoked by these Defendants for its small business exemption, which provides that business entities with less than 100 employees in the three years preceding notice of potential liability from the President (through EPA) are protected from suit.  42 U.S.C. § 107(p)(1)(B).  This Court notes that there are certain ambiguities present in the exemption which may require clarification in the future, including from what point the three-year period should run in cases, such as this, where defendants' notice of potential liability came not from EPA, but only from Plaintiff, a private party.  However, this Court need not reach these issues, because the plain language of the exemptions makes clear that those exemptions apply only "with respect to response costs at a facility *on the National Priorities List*."  *See* 42 U.S.C. § 107(o)(1); § 107(p)(1) (emphasis added).  Here, while EPA proposed the 68th Street Site for the National Priorities List ("NPL") in 1999, and re-proposed in 2003 (ECF 1 ¶¶ 14-15), the Site has not been finalized to the NPL, as confirmed in EPA's Superfund Site database, where the Site remains listed under "Proposed National Priorities List (NPL) Sites."[13]  Instead, EPA decided to assess the Site under the Superfund Alternative Site process—now known as the Superfund Alternative Approach (SAA).[14]  Only EPA, in its discretion, may seek to enforce the same exemptions with respect to SAA sites.  Thus, while the 68th Street Site may be *eligible* for NPL finalization, at this point it remains a non-NPL site, rendering the statutory exemptions, by their plain language, inapplicable.  To the extent the parties have evidence suggesting otherwise, they are free to re-raise the issue later in the proceedings, if the Complaint is amended.

---

[13] U.S. Env't Prot. Agency, *Proposed National Priorities List (NPL) Sites – by State*, https://www.epa.gov/superfund/proposed-national-priorities-list-npl-sites-state#MD.

[14] U.S. Env't Prot. Agency, *Superfund Site: 68th Street Dump/Industrial Enterprises*, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0300 338.

For the above reasons, this Court will deny the following motions for summary judgment: ECF 448 (American Sugar Refining, Inc.; Bob Bell Automotive Group, Inc.; Donohoe Real Estate Services; HMS Host Family Restaurants, Inc.; Len Stoler, Inc.; and Stella Maris Operating Corp); ECF 464 (The Rukert Terminals Corporation); ECF 478 (Alban Tractor Co., Inc.); ECF 479 (Crown Central LLC); ECF 480 (New Ridge Associates, Inc.); ECF 481 (Norris Automotive Holdings LLC); ECF 482/484 (The Victory Racing Plate Company); ECF 510 (Host Hotels and Resorts, Inc.); ECF 672 (Ridgeqay Manor, Inc.); ECF 704 (Morgan Properties Management Company, LLC); ECF 767 (Airgas, Inc.); ECF 768 (Drug City Pharmacy, LLC); ECF 769 (Melibelle USA, Inc.).

## F. Real Party in Interest

Under Rule 17 of the Federal Rules of Civil Procedure, "an action must be prosecuted in the name of the real party in interest." Fed R. Civ. P. 17(a). The function of the "real party in interest" doctrine is "to enable a defendant to present defenses he has against the real party in interest, to protect the defendant against a subsequent action by the party actually entitled to relief, and to ensure that the judgment will have proper res judicata effect." *Va. Elec. & Power Co. v. Westinghouse Elec. Corp.*, 485 F.2d 78, 84 (4th Cir. 1973). "To determine whether the requirement that the action be brought by the real party in interest has been satisfied, the court must look to the substantive law creating the right being sued upon to see if the action has been instituted by the party possessing the substantive right to relief." 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1544 (3d ed. 2021).

The question presented here, whether unincorporated associations that are not, themselves, party to an administrative agreement (such as a Consent Decree) may qualify as the real party in interest on behalf of their member PRPs in CERCLA contribution litigation, has not been widely

raised. Specifically, in the context of this case, the Plaintiff, 68th Street Site Work Group, is not itself party to the Consent Decree, but is instead made up of member PRPs that are parties to it. In support of its view that such representative litigation capacity is appropriate, Plaintiff cites a slew of cases in which the status of such an unincorporated association of PRPs was left unchallenged, thus allowing the association to seek contribution from other PRPs. *See, e.g.*, ECF 521 at 21 n.15; ECF 580 at 20 n.8. However, Defendants counter that, in the few cases where the issue has been raised and considered, courts have rejected plaintiff unincorporated associations as real parties in interest, irrespective of the many cases in which their status was not challenged. ECF 570 at 2; *see, e.g.*, *Pasco Sanitary Landfill NPL Site Indus. Waste Area Generator Grp. III v. Basin Disposal, Inc.*, No. 4:15-cv-5022, 2015 WL 12516735, at *2 (E.D. Wash. Nov. 16, 2015)) ("*IWAG III*") ("[Plaintiff]'s assertion that other district courts have allowed other such associations to proceed as parties is not germane to the issue before the Court. To support their argument, [Plaintiff] only sites [sic] cases where the associations' statues [sic] as parties went unchallenged."). Indeed, Defendants cite the holdings in *IWAG III* and *Boarhead Farm Agreement v. Advanced Envtl. Tech. Corp.*, 381 F. Supp. 2d 427 (E.D. Pa. 2005), for the proposition that CERCLA contribution may only be sought by PRPs, and that Plaintiff's individual member corporations, as recognized PRPs and original signatories to the Consent Decree with EPA and the State of Maryland, are the real parties in interest.

A brief review of both *IWAG III* and *Boarhead Farm* is warranted here. First, in *IWAG III*, the plaintiff was an unincorporated association of PRPs "created to facilitate clean-up and cost recovery efforts of the 16 member PRPs[,]" but was not itself a PRP. 2015 WL 12516735, at *1. The court held that § 113(f) of CERCLA only confers upon PRPs the right to sue other PRPs for contribution, and, thus, that the sixteen member PRPs of the group, not the group itself, were the

real parties in interest.  *Id.* at *2 (citing *Boarhead Farm*, 381 F. Supp. at 432-33); 42 U.S.C. § 9613(f).  The plaintiff group's counsel in *IWAG III* serves as counsel to Plaintiff in this case.

Plaintiff attempts to distinguish *IWAG III* via that court's statement that "Plaintiff is a group of PRPs that was formed for the purpose of bringing this action."  *IWAG III* at *2.  Plaintiff asserts that here, by contrast, it was "formed in 2006 to cooperate with EPA and perform responses [sic] cost activities . . . ."  ECF 580 at 24-25.  However, the Complaint contains no allegations regarding the circumstances of Plaintiff's formation, other than noting that it "commenced the RI/FS [Remedial Investigation and Feasibility Study] work in June 2006."  ECF 1 ¶ 17.  Even taking that allegation as true, however, it does not transform Plaintiff into a PRP or render it eligible to bring a § 113(f) contribution claim.  That conclusion is burnished by *Boarhead Farm* and the plain language of the statute.

In *Boarhead Farm*, the "Boarhead Farms Agreement Group," an unincorporated association, brought a CERCLA contribution claim on behalf of six member companies who were PRPs.  The district court ruled that the individual PRPs were the real parties in interest.  *Boarhead Farm*, 381 F. Supp. at 432 ("[U]nder [CERCLA], the PRPs are the real parties in interest, despite the fact that here, the PRPs paid for remediation by contributing to the Agreement Group which, acting as an intermediary, then pooled the funds and paid the contractors conducting the remediation.").  Plaintiff notes that, in *Boarhead Farm*, the defendants had already stipulated that the plaintiff unincorporated association had stated a viable § 113(f) contribution claim, in return for the agreement of the plaintiff's members to act as parties to the case for discovery purposes.  It was, then, the plaintiff association who subsequently sought leave to amend in order to substitute its member parties as the named plaintiffs.  The district court agreed that the individual PRPs were the real parties in interest and allowed plaintiff to amend its complaint.

Plaintiff suggests that the distinction of which party raised the issue is notable, because the *Boarhead Farm* ruling was meant to "preserve[] the parties' prior stipulation on discovery[,]" in the interest of "fundamental fairness and judicial economy[,]" and that a similar ruling would not serve those interests here, where the real party in interest issue is being raised by defendants as a basis for dismissal. ECF 580 at 24. It is difficult to understand, however, how proper adjudication of the real party in interest issue, the function of which, as noted, is to protect defendants against duplicative litigation, would not also serve the interests of "fundamental fairness and judicial economy."

With that summary of relevant case law in mind, this Court finds the plain language of the statute to be dispositive. CERCLA specifies that "a person who has resolved *its* liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement" can seek contributions from persons not party to a settlement. 42 U.S.C. § 9613(f)(3)(B) (emphasis added). Thus, for Plaintiff to be the real party in interest, it must (1) qualify as a "person" and (2) have resolved *its* liability to a governmental entity.

CERCLA defines "person" as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21). While it is unsettled whether Plaintiff, as an *unincorporated* association, would fall within the definition of "person," it nevertheless fails to meet the second prong to entitle it to seek contribution, because it never had or resolved any liability to the United States or the State of Maryland. The only liability it purportedly participated in resolving rested with its member entities. The fact that Plaintiff voluntarily assumed (apparently via contract) some responsibility

for performing work and making payments, without ever formally substituting itself as party to the Consent Decree, does not render it liable to the governmental entities. The government's recourse is against Plaintiff's members, not Plaintiff. Thus, Plaintiff fails to satisfy CERCLA's plain requirements regarding eligibility to seek contribution.

In light of that statutory interpretation, Plaintiff's attempt to rely on Federal Rule of Civil Procedure 17(a)(1)(G)'s definition of "real party in interest" is unsuccessful. That subsection provides, in relevant part: "The following may sue in their own names without joining the person for whose benefit the action is brought . . . a party authorized by statute." *Id.* Plaintiff suggests that because "association" is within CERCLA's definition of "person," it is authorized by statute to sue without joining its members. As noted above, however, only an association itself having liability to a governmental entity would be authorized by CERCLA to sue. Plaintiff's argument is therefore unavailing.

Further, contrary to Plaintiff's urging, *Karras v. Teledyne Indus., Inc.*, 191 F. Supp. 2d 1162 (S.D. Cal. 2002), is inapposite. The *Karras* court stated, "Plaintiff associations are permitted under CERCLA to sue for contribution despite the fact that they are creatures of contract, created to facilitate cleanup and cost recovery efforts of the PRPs." *Id.* at 1167. However, the *Karras* plaintiff was not an association, but a trustee to a group of PRPs who had entered into a Consent Order and Consent Decree with the California Department of Toxic Substances Control. Trustees are expressly permitted by another exception to Rule 17(a) as a real party in interest when bringing an action for another's benefit. Fed. R. Civ. P. 17(a)(1)(E). In addition, the *Karras* court gave considerable weight to the fact that the plaintiff trusts "elected their PRP status by contract," noting that "[CERCLA] does not foreclose entities from attaining PRP status by contract." *Id.* at 1169.

In the instant case, Plaintiff is an unincorporated association, not a trustee, rendering Rule 17(a)(1)(E), and thus *Karras*, inapplicable.

In its briefing and at the hearing, Plaintiff suggested the existence of "unequivocal" assignments of CERCLA claims from its members to Plaintiff itself.  *See, e.g.*, ECF 521 at 23.  It is true that, in some instances, the assignment of claims can assuage the concerns underlying the real party in interest doctrine—if the real parties in interest are bound to a judgment, there will be no concerns about subsequent actions or res judicata.  *Metro Container Grp. v. AC&T Co., Inc*., 450 F. Supp. 3d 583, 605 (E.D. Pa. 2020) ("'Plaintiff associations are permitted under CERCLA to sue for contribution despite the fact that they are creatures of contract, created to facilitate cleanup and cost recovery efforts of the PRPs[,]' *so long as they bind the members* of the association to the ruling of the suit.") (emphasis added) (quoting *Karras*, 191 F. Supp. 2d at 1167-68).  Here, however, Plaintiff has not alleged or established that its members would be bound to the rulings in this suit if they are not joined as parties.  Its repeated invocation of "unequivocal" assignments does not indicate that those assignments bind its members in this matter.  The absence of evidence of binding assignments leaves the Defendants potentially subject to a second suit by the member entities, a result contravening the purpose of the real party in interest doctrine.  Such concerns are compounded by the prayer for relief in the Complaint, which requests "a declaration of each Defendant's liability for future response costs to be incurred by Plaintiff (and its assignors) at the 68th Street Site."  ECF 1 ¶ 1.  The inclusion of the parenthetical could be interpreted as an indication that Plaintiff's assignors may have future claims of their own and are not strictly bound to rulings against them.  The exception described in *Metro Container Group,* then, is inapplicable here.

Despite reaching the conclusion that Plaintiff is not the real party in interest in this case, this Court is unpersuaded by some Defendants' contention that dismissal on this basis is independently warranted.  Rule 17(a)(3) clearly states, "The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Plaintiff has mounted non-frivolous legal arguments supporting its contention that it is a real party in interest.  While this Court ultimately disagrees, it declines to conclude that the time it spent addressing the parties' opposing viewpoints consumed Plaintiff's "reasonable time" to correct the issue, and it would ordinarily afford Plaintiff an opportunity to join or substitute the real parties in interest.  However, because Plaintiff's Complaint as to the moving Defendants is being dismissed without prejudice on the other grounds described herein, Plaintiff and its members can correct the real party in interest issue if leave to amend is sought.[15]

## IV.   **Conclusion**

For the reasons set forth above, the following Motions to Dismiss are GRANTED:  ECF 163 (Armacell, LLC); ECF 174 (Truist Financial Corporation); ECF 287 (Pabst Brewing Co.); ECF 384 (C&I Leasing, Inc.); ECF 386 (Cowan Systems, Inc.); ECF 411/452 (Lifoam Industries, LLC); ECF 425 (High's of Baltimore, LLC); ECF 442 (Cloverland Dairy Limited Partnership); ECF 448 ("Certain Defendants" (American Sugar Refining, Inc.; Bob Bell Automotive Group, Inc.; Donohoe Real Estate Services; HMS Host Family Restaurants, Inc.; Len Stoler, Inc.; and Stella Maris Operating Corp.)); ECF 461 (The Rukert Terminals Corporation); ECF 478 (Alban

---

[15] At the hearing, defense counsel argued that because Plaintiff lacked standing to sue at the inception of the case, any proposed amended complaint would be fatally flawed because standing would not have existed throughout the entire duration of the litigation.  This Court declines to anticipate the issue and will address the argument if it is raised in a motion opposing leave to file an amended complaint.

Tractor Co., Inc.); ECF 479 (Crown Central LLC); ECF 480 (New Ridge Associates, Inc.); ECF 481 (Norris Automotive Holdings LLC); ECF 482/484 (The Victory Racing Plate Company); ECF 510 (Host Hotels and Resorts, Inc.); ECF 537 (Caraustar Industries, Inc.); ECF 539 (Greif, Inc.); ECF 609 (Hilton Worldwide, Inc.); ECF 672 (Ridgeway Manor, Inc.); ECF 704 (Morgan Properties Management Company, LLC); ECF 767 (Airgas, Inc.); ECF 768 (Drug City Pharmacy, LLC); ECF 769 (Melibelle USA, Inc.). The following Motions for Summary Judgment are, similarly, GRANTED: ECF 549 (Heritage Chevrolet-Buick); ECF 701 (Mattress Company of Delaware, LLC d/b/a Eclipse International). The remaining alternative motions for summary judgment will be denied, and all dismissed claims will be dismissed without prejudice.[16] A separate Order follows.

Dated: September 16, 2021

                                             /s/

                                       Stephanie A. Gallagher
                                       United States District Judge

---

[16] Plaintiff, in the second count of its Complaint, sought a declaration of liability against all Defendants for any future response costs. The Court's adjudication of Defendants' motions renders this count futile; however, the Court makes mention of it only to address a related argument raised by a small number of Defendants. Defendants C&I Leasing (ECF 384 at 13), Heritage Chevrolet-Buick (ECF 549 at 18), and Morgan Properties Management Company (ECF 704 at 18), as part of their requested relief, argue that if the CERCLA claim fails, they are entitled to a declaration that they are *not* liable for any future response costs. These Defendants cite to a single case from this Court, *PRSC, LLC v. Admiral, Inc.*, No. 8:08-cv-1379, 2009 WL 10685578, at *6-7 (D. Md. Mar. 10, 2009), where the court, even after deciding to dismiss the complaint, elected to "declare the rights of the parties as requested." (citing to a line of state cases from the Court of Appeals of Maryland.) However, a similar declaration at this point in litigation, where dismissal is *without* prejudice, would be premature.