IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| AK STEEL CORPORATION; BROWNING-FERRIS, INC.; BLACK & DECKER (U.S.) INC.; BRUNSWICK CORPORATION; CONAGRA GROCERY PRODUCTS COMPANY, LLC; CROWN CORK & SEAL COMPANY, INC.; CSX REALTY DEVELOPMENT, LLC; CSX TRANSPORTATION, INC.; and EXXON MOBIL CORPORATION, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:20-cv-03385-SAG |
| ALBAN TRACTOR LLC; C&I LEASING, INC.; CITIFINANCIAL CREDIT COMPANY; THE RUKERT TERMINALS CORPORATION; SOLO CUP COMPANY; VIACOMCBS, INC.; and VORNADO REALTY TRUST, | ) ) ) ) ) ) ) | AMENDED COMPLAINT |
| Defendants. | ) | |

## AMENDED COMPLAINT

For their Amended Complaint, Plaintiffs AK Steel Corporation; Browning-Ferris, Inc.;

Black & Decker (U.S.) Inc.; Brunswick Corporation; ConAgra Grocery Products Company,

LLC; Crown Cork & Seal Company, Inc.; CSX Realty Development, LLC; CSX Transportation,

Inc.; and Exxon Mobil Corporation (hereinafter "Plaintiffs"), by and through counsel, allege as

follows:

### STATEMENT OF THE CASE

1.      This is a civil action pursuant to the provisions of the Comprehensive

Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §

9601 et seq. ("CERCLA"). Plaintiffs assert there has been a release and/or threat of release of

hazardous substances from a facility known as the 68th Street Site Superfund Alternative Site located in the Rosedale Area of Baltimore County and City of Baltimore, Maryland ("68th Street Site" or "Site"). These hazardous substances have contaminated the soil and groundwater at the 68th Street Site and have threatened public health and the environment. Each Defendant is a potentially responsible party ("PRP") that generated materials containing hazardous substances and contracted with a transporter with the intent to dispose of its waste, and such waste was disposed of at the 68th Street Site. This action seeks recovery of over $4.8 million in past response costs incurred by Plaintiffs (and their assignors) at the 68th Street Site in response to the release and threatened release of hazardous substances into the environment at and from the 68th Street Site, and a declaration of each Defendant's liability for future response costs to be incurred by Plaintiffs (and their assignors) at the 68th Street Site.

**JURISDICTION AND VENUE**

2.      This Court has exclusive jurisdiction over Count I pursuant to CERCLA Sections 107(a) and 113(b), 42 U.S.C. §§ 9607(a) and 9613(b), providing federal jurisdiction over controversies arising under CERCLA, and pursuant to 28 U.S.C. § 1331, providing federal jurisdiction over controversies involving questions of federal law. The Court also has jurisdiction over the request for declaratory relief in Count II pursuant to CERCLA Section 113, 42 U.S.C. § 9613, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202.

3.      Venue is proper in this district pursuant to 42 U.S.C. §§ 9607(a) and 9613(b), and 28 U.S.C. § 1391(b), because the release or threatened release of hazardous substances that give rise to this action occurred and/or are occurring at or from the 68th Street Site located in this judicial district.

## ALLEGATIONS COMMON TO ALL CLAIMS

4.      The 68th Street Site is an aggregate of seven landfills and encompasses approximately 239 acres, nearly 118 acres of which are streams and wetlands. The 68th Street Site is in a mixed industrial, commercial and residential area of Baltimore County, crossing the border with Baltimore City in Rosedale, Maryland. The 68th Street Site is transected near the western boundary in a north-south direction by Interstate Route 95, and is transected in an east-west direction by Moores Run. Additional waterways include Herring Run and Redhouse Run. Herring Run discharges into the Back River about 1,500 feet downstream of the 68th Street Site, which ultimately flows into the Chesapeake Bay.

5.      The 68th Street Site has been organized into five Management Areas ("MAs") identified as MA-A, MA-B, MA-D, MA-E and MA-F, with MA-C having been combined into MA-F.

6.      With the exception of MA-A, waste disposal activities occurred between the 1950s and early 1970s under various landfill operating permits. The landfill activities involved filling of low-lying and wetland areas and disposal of solid and liquid municipal, industrial and commercial wastes. Industrial wastes have been documented to include construction debris, paints, ash, sludges, and other materials from east Baltimore industrial and municipal operations. There is surface debris across much of the 68th Street Site, including metal, concrete, brick and masonry, rubber products and construction/demolition debris.

7.      MA-A comprises 11 acres on the eastern boundary of the 68th Street Site and was not used as a landfill. Instead it appears to have been used as a concrete plant in the early 1960s and was later used as a junkyard from 1966 to 1968, and includes a "tire pond."

8.     MA-B is also known as the Unclaimed Landfill and comprises 43 acres, including six lagoons for disposal of liquid waste starting in 1957 and ending in 1966.

9.     MA-D includes the 20 acre Horseshoe Landfill. Permitted disposal began in 1965 and continued until at least 1973.

10.     MA-E comprises 47 acres in the western portion of the 68th Street Site, including the original Robb Tyler Landfill permitted in 1953 and the East and West Colgate Pay Dumps which began disposal in 1956 after the Robb Tyler Landfill closed. Portions of the landfill wastes were excavated and re-deposited on either side of Interstate 95 during its construction from 1981 to 1984.

11.     MA-F is known as the Lowland Management Area and contains 118 acres of environmentally sensitive ecosystem, including the three main streams (Herring Run, Moores Run and Redhouse Run) and the six-acre Island Landfill and the nine-acre Redhouse Run Landfill. Dumping of debris along Redhouse Run began as early as 1942. In 1956, a refuse disposal permit was issued to Robb Tyler, Inc. (or affiliates), and disposal of waste material continued until at least 1969, with evidence that some other entity placed fill material along the stream in 1973. Numerous vehicles, trailers and equipment still remained along the stream by 1984. The Island Landfill was operated by Robb Tyler, Inc. (or affiliates) as a permitted landfill from 1960 to 1969.

12.     In addition to operating various portions of the 68th Street Site, Robb Tyler, Inc. was a waste hauler to the 68th Street Site. Nexus documents for the 68th Street Site identify Robb Tyler Inc.'s address as "Near Pulaski Hwy. and 66th Street, Baltimore 6, MD." According to publicly available information, this address is within two (2) city blocks of the northern border of the 68th Street Site.

13.     Three emergency removal actions were performed at the 68th Street Site in the 1980s. In 1981, there was a drum removal action in MA-B. In 1984, ten (10) 55-gallon drums protruding from the hillside of the Redhouse Run Landfill were removed from the 68th Street Site. In 1985, an emergency response removed at least forty (40) 55-gallon drums from the Island Landfill following a fire.

14.     The United States Environmental Protection Agency ("U.S. EPA") issued multiple rounds of General Notice Letters to various PRPs from 1999 through 2013.

15.     U.S. EPA proposed the 68th Street Site to the National Priorities List ("NPL") in 1999.

16.     U.S. EPA re-proposed the 68th Street Site to the NPL in 2003.

17.     On April 26, 2006, the Plaintiffs and U.S. EPA entered into an Administrative Settlement Agreement and Order for Remedial Investigation and Feasibility Study ("RI/FS AOC").

18.     Plaintiffs commenced the RI/FS work in June 2006.

19.     During a Site-wide evaluation in 2007, twenty points of interest were identified for further evaluation.

20.     Between June 26, 2008 and December 2, 2008, a Non-Time Critical Removal Action was conducted to remove surface materials and containers that had exhibited elevated chemical concentrations to reduce the risk to trespassers and on-Site workers.

21.     Plaintiffs completed a Remedial Investigation Report on or about May 14, 2012, and completed a Feasibility Study Report on or about March 18, 2013.

22.     On September 30, 2013, U.S. EPA issued its final Record of Decision ("ROD") for remedial actions at the 68th Street Site.

23.     On November 28, 2017, the United States District Court for the District of Maryland entered a Consent Decree for Remedial Design/Remedial Action ("RD/RA Consent Decree") between U.S. EPA and the State of Maryland, on the one hand, and Settling Performing Defendants comprising the Plaintiffs and Non-Performing Settling Defendants, on the other hand.

24.     Hazardous substances identified at the 68th Street Site include, but are not limited to: metals, including arsenic, barium, lead, and selenium; polychlorinated biphenyls ("PCBs"); polycyclic aromatic hydrocarbons ("PAHs") including benzo(a)pyrene, benzo(a)anthracene, benzo(b)fluoranthene, dibenz(a,h)anthracene; pesticides including dieldrin and DDx, comprising isomers of dichlorodiphenyltrichloroethane ("DDT"), dichlorodiphenyldichloroethylene ("DDE") and dichlorodiphenyldichloroethane ("DDD"); dieldrin; endrin; heptachlor epoxide; thallium; and zinc.

25.     As of the filing of this Amended Complaint, Plaintiffs (and their assignors) have incurred over $4.8 million in response costs in connection with the activities and payments required by the RD/RA Consent Decree at the 68th Street Site.

26.     The response costs incurred to date by Plaintiffs (and their assignors) in connection with the RD/RA Consent Decree are necessary to address the release and/or threatened release at the 68th Street Site, and are required by U.S. EPA and the State of Maryland, and as such are consistent with the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and amendments thereto ("National Contingency Plan" or "NCP").

27.     Plaintiffs will continue to incur response costs to conduct response actions at the 68th Street Site as required by the U.S. EPA, the State of Maryland, and/or other federal or state agencies.

28.     The U.S. EPA was created on December 2, 1970 under President Richard Nixon.

29.     The Resource Conservation and Recovery Act ("RCRA") was enacted on October 21, 1976 to proactively regulate disposal of "solid waste" and "hazardous waste." *See* 42 U.S.C. §§ 6901 *et seq*. RCRA did not define the term "hazardous substance."

30.     CERCLA was not enacted until December 11, 1980 to retroactively address historic contamination, *see* 42 U.S.C. §§ 9601 *et seq*., by imposing strict, retroactive liability on PRPs identified in Section 107(a). 42 U.S.C. § 9607(a).

31.     CERCLA defined for the first time the term "hazardous substance," which is much broader than "hazardous waste" as defined by RCRA. 42 U.S.C. § 9601(14).

32.     The 68th Street Site ceased landfilling operations before U.S. EPA, RCRA or CERCLA were enacted or existed.

**THE PARTIES**

33.     Plaintiffs, in their own right and as assignees of all CERCLA claims at the 68th Street Site by other members of the 68th Street Site Work Group and those entities who have settled or will settle with the 68th Street Site Work Group, are as follows: AK Steel Corporation; Browning-Ferris, Inc.; Black & Decker (U.S.) Inc.; Brunswick Corporation; ConAgra Grocery Products Company, LLC; Crown Cork & Seal Company, Inc.; CSX Realty Development, LLC; CSX Transportation, Inc.; and Exxon Mobil Corporationt.

34.     All of the Plaintiffs are signatories to the RD/RA Consent Decree.

35.     Defendant Alban Tractor LLC ("Alban Tractor") is one in the same as the entity identified on nexus documents for the 68th Street Site as Alban Tractor Co., Inc.

36.     On or about April 13, 2020, Alban Tractor Co., Inc. filed Articles of Conversion.

37.     According to the Articles of Conversion, the Converting Corporation would be converted to and thenceforth known as Alban Tractor, LLC.

38.     According to the Articles of Conversion, Alban Tractor LLC would, for all purposes of the laws of the State of Maryland, continue as the same entity as Alban Tractor Co., Inc.

39.     According to the Articles of Convesion, each outstanding share of common stock would convert and be exchanged for one unit of membership interest in Alban Tractor, LLC.

40.     After the conversion, Alban Tractor is the sole surving entity and Alban Tractor Co., Inc. no longer exists.

41.     According to 68th Street Site records, Alban Tractor by contract, agreement or otherwise, arranged for disposal, or arranged with a transporter for transport for disposal of waste at the 68th Street Site.

42.     On or about February 12, 1998, a Robb Tyler, Inc. employee identified Alban Tractor as a generator of solid waste or chemicals that were disposed of at the 68th Street Site.

43.     On November 1, 1963, Robb Tyler, Inc. issued Service Ticket No. I-93242 to Alban Tractor for 1-30-yd. Dino.

44.     On November 11, 1963, Robb Tyler, Inc. issued Service Ticket No. I-97833 to Alban Tractor for 1-30-yd. Dino.

45.     On November 18, 1963, Robb Tyler, Inc. issued Service Ticket No. J-01313 to Alban Tractor for Dino-30yd.

46.     On November 26, 1963, Robb Tyler, Inc. issued Service Ticket No. J-04419 to Alban Tractor for 1-30-yd. Dino.

47.     On November 30, 1963, Robb Tyler, Inc. charged Alban Tractor for the collection of four Dinosaur Containers and one Dumpster Container.

48.     The Robb Tyler Accounts Receivable ledger dated March 31, 1970 identifies Alban Tractor as a customer of Robb Tyler, Inc.

49.     Alban Tractor is and/or was engaged in the business of construction equipment sales and repair.

50.     In addition to the hazardous substances associated with construction equipment sales and repair, Alban Tractor's waste streams consisted of equipment maintenance waste and general office waste, which contained the following hazardous substances: acetone, arsenic, benzene, cadmium, chromium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

51.     Alban Tractor knowingly and voluntarily contracted, agreed, or otherwise arranged with Robb Tyler, Inc. with the intent to dispose of Alban Tractor's waste during the relevant time period, and such waste contained hazardous substances.

52.     As detailed above, the waste that Robb Tyler, Inc. hauled for Alban Tractor was disposed of at the 68th Street Site.

53.     By letter dated August 28, 2020, Plaintiffs demanded that Alban Tractor reimburse Plaintiffs for a specified amount of response costs incurred and to be incurred by Plaintiffs at the 68th Street Site.

54.     To date, Alban Tractor has refused to cooperate and has not paid any response costs incurred by Plaintiffs at the 68th Street Site.

55.     Defendant C&I Leasing, Inc. ("C&I Leasing") is the successor to and/or formerly known as and/or also known as Allegheny Pepsi-Cola Bottling Company and Pepsi Cola Bottling Co.

56.     Defendant C&I Leasing, Inc. ("C&I Leasing") is the successor by merger to and/or formerly known as and/or also known as the entities identified on nexus documents for the 68th Street Site as Allegheny Pepsi-Cola Bottling Company, Pepsi Cola Co. and Pepsi Cola Bottling Co.

57.     According to publicly available information, Morton Lapides' grandfather started a soft drink business in or about 1921, which evolved into the Pepsi-Cola Bottling Company of Baltimore in the 1930s.

58.     According to publicly available information, Morton Lapides aquired Pepsi-Cola Bottling Company of Baltimore in or about 1962 and renamed it Allegheny Beverage Corporation.

59.     According to the Maryland Department of Assessments & Taxation ("MDAT"), Allegheny Beverage Corporation was formed in or about 1966.

60.     According to publicly available information from as early as 1968, Allegheny Pepsi-Cola Bottling Co. was a subsidiary of Allegheny Beverage Corporation.

61.     According to publicly available information, Morton Lapides was identified as the chairman, President and/or Vice President of "Allegheny Pepsi-Cola Bottling Co." as well as "Pepsi-Cola Bottling Co." during the 1960s, with both names associated with an address at 400 Key Hwy. in Baltimore, Maryland.

62.     According to nexus documents for the 68th Street Site, both Pepsi Cola Bottling Co. and Pepsi Cola Co. are associated with an address on Key Hwy. and 400 Key Hwy., respectively.

63.     During the relevant time period, Pepsi Cola Co. and Pepsi Cola Bottling Co. were synonymous with Allegheny Pepsi-Cola Bottling Company.

64.     According to publicly available information from 1985, Morton Lapides, chairman of Allegheny Beverage Corporation, was planning to sell Allegheny Pepsi-Cola Bottling Co. to PepsiCo, Inc.

65.     According to MDAT, C&I Leasing, Inc. merged into Allegheny Pepsi-Cola Bottling Co. in or about September 1988, with the surviving entity changing its name to C&I Leasing, Inc.

66.     According to the Securities and Exchange Commission, C&I Leasing is and/or was a Maryland subsidiary of PepsiCo, Inc.

67.     C&I Leasing, by virtue of its merger with nexus party Allegheny Pepsi-Cola Bottling Co., is one and the same as and formerly known as nexus parties Pepsi-Cola Bottling Co. and Pepsi Cola Co.

68.     According to 68th Street Site records, Allegheny Pepsi-Cola Bottling Company and Pepsi Cola Bottling Co. by contract, agreement or otherwise, arranged for disposal, or arranged with a transporter for transport for disposal of waste at the 68th Street Site.

69.     On October 18, 1963, Refuse Disposal, Inc., a Robb Tyler affiliated corporation, issued Service Ticket No. 3-009908 to Pepsi Cola Co.

70.     The Robb Tyler Accounts Receivable ledger dated March 31, 1970 identifies Allegheny Pepsi Cola as a customer of Robb Tyler, Inc.

71.     The Robb Tyler Accounts Receivable ledger dated March 31, 1970 identifies Pepsi Cola Bottling Co. as a customer of Robb Tyler, Inc.

72.     On or about February 12, 1998, a Robb Tyler, Inc. employee identified Pepsi Cola Co. as a generator of solid waste or chemicals that were disposed of at the 68th Street Site.

73.     According to Pepsi Cola Company's 104(e) Response to EPA's Information Request, Pepsi or its predecessor operated two facilities from which Robb Tyler, Inc. transported trash for disposal.

74.     According to Pepsi Cola Company's 104(e) Response to EPA's Information Request, Pepsi trash hauled by Robb Tyler, Inc. was collected in dumpsters approximately twenty (20) feet long, eight (8) feet wide, and six (6) feet high approximately five (5) times per week.

75.     According to Pepsi Cola Company's 104(e) Response, the waste Robb Tyler, Inc. hauled for the Pepsi Cola Company included broken wooden pallets, paper, empty drums, floor sweepings, broken glass, empty soda cans, and similar materials.

76.     According to Pepsi Cola Company's 104(e) Response, the Pepsi Cola Company estimated that Robb Tyler, Inc. hauled 250 dumpster loads per year of Pepsi Cola Company's waste.

77.     Allegheny Pepsi-Cola Bottling Company and Pepsi Cola Bottling Co. are and/or were engaged in the business of beverage manufacturing and distribution.

78.     In addition to the hazardous substances associated with beverage manufacturing and distribution, the waste streams attributable to Allegheny Pepsi-Cola Bottling Company and Pepsi Cola Bottling Co. also consisted of food processing waste, printing waste, transportation waste and general office waste, which contained the following hazardous substances: acetone,

barium, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, ethyl

benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene,

toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

79.     Additionally, 68th Street Site records describe the waste streams attributable to

Allegheny Pepsi-Cola Bottling Company and Pepsi Cola Bottling Co. as containing at least the

following: empty drums and empty soda cans.

80.     Allegheny Pepsi-Cola Bottling Company and Pepsi Cola Bottling Co. knowingly

and voluntarily contracted, agreed, or otherwise arranged with Robb Tyler, Inc., and/or a Robb

Tyler, Inc. affiliate, with the intent to dispose of their waste during the relevant time period, and

such waste contained hazardous substances.

81.     As detailed above, the waste that Robb Tyler, Inc. hauled for Allegheny Pepsi-

Cola Bottling Company and Pepsi Cola Bottling Co. was disposed of at the 68th Street Site.

82.     By letter dated August 28, 2020, Plaintiffs demanded that C&I Leasing reimburse

Plaintiffs for a specified amount of response costs incurred and to be incurred by Plaintiffs at the

68th Street Site.

83.     To date, C&I Leasing has refused to cooperate and has not paid any response

costs incurred by Plaintiffs at the 68th Street Site.

84.     Defendant CitiFinancial Credit Company ("CitiFinancial") is one and the same as

and/or formerly known as the entity identified on nexus documents for the 68th Street Site as

Commercial Credit Co.

85.     The nexus documents for the 68th Street Site identify nexus party Commercial

Credit Co.'s address as St. Paul & Saratoga Streets.

86.     According to publicly available information, 300 St. Paul Pl. and/or 300 St. Paul St. are the same address for a building at the corner of St. Paul and Saratoga Streets.

87.     According to MDAT, Commercial Credit Company was formed in or about August 1968 and with an address of 300 St. Paul Pl. and/or 300 St. Paul St., Baltimore, MD 21202.

88.     However, according to historic newspapers, Commercial Credit Co. is associated with the 300 St. Paul Place address at least as early as September 1957.

89.     According to MDAT, Commercial Credit Company changed its name to CitiFinancial Credit Company on or about June 14, 1999.

90.     According to MDAT, CitiFinancial Credit Company changed its name to Commercial Credit Company on or about June 30, 1999.

91.     According to MDAT, Commercial Credit Company changed its name back to CitiFinancial Credit Company on or about August 26, 1999.

92.     Additionally, Commercial Credit Company was one and the same as and/or formerly known as and/or an alter ego of the entity identified on nexus documents for the 68th Street Site as C C Supply Co.

93.     On information and belief, C C Supply Co. is shorthand for C C Supply Corporation.

94.     According to MDAT, C C Supply Corporation was formed in or about 1953, with a principal office at 300 St. Paul St.

95.     According to MDAT, in or about 1974, C C Supply Corporation changed its name to Commercial Credit Supply Corporation.

96.     According to historic newspapers from the early 1970s, Commercial Credit Supply Corporation handled all mail for Commercial Credit Company and Commercial Credit Corporation.

97.     According to historic newspapers from at least as early as 1955, Commercial Credit Company and Commercial Credit Corporation shared the same founder, A. E. Duncan, and the same president E. L. Grimes, and from at least as early as in or about January 1959 shared Charles C. Greene as president.

98.     According to historic newspapers from the 1960s, Commercial Credit Company operated Commercial Credit Corporation as a subsidiary and/or division.

99.     According to historic newspapers, Commercial Credit Company and Commercial Credit Corporation were both located at the 300 St. Paul Pl. address, the same address as C C Supply Corporation.

100.    According to MDAT, Commercial Credit Supply Corporation merged into Commercial Credit Corporation in or about 1988.

101.    On information and belief, during the relevant time period, Commercial Credit Company operated both C C Supply Co. and Commercial Credit Corporation as divisions and/or subsidiaries at Commercial Credit Company's address at 300 St. Paul and controlled the operations of C C Supply Co. and Commercial Credit Corporation before they divested and/or spun off as separate entities.

102.    According to 68th Street Site records, Commercial Credit Co. and C C Supply Co. by contract, agreement or otherwise, arranged for disposal, or arranged with a transporter for transport for disposal of waste at the 68th Street Site.

103.    On November 1, 1963, Robb Tyler, Inc. issued Service Ticket No. I-93588 to Commercial Credit Co.

104.    On November 4, 1963, Robb Tyler, Inc. issued Service Ticket No. I-94261 to Commercial Credit Co.

105.    On November 5, 1963, Robb Tyler, Inc. issued Service Ticket No. I-95763 to Commercial Credit Co.

106.    On November 6, 1963, Robb Tyler, Inc. issued Service Ticket No. I-96053 to Commercial Credit Co.

107.    On November 7, 1963, Robb Tyler, Inc. issued Service Ticket No. I-96528 to Commercial Credit Co.

108.    On November 8, 1963, Robb Tyler, Inc. issued Service Ticket No. I-97057 to Commercial Credit Co.

109.    On November 11, 1963, Robb Tyler, Inc. issued Service Ticket No. I-97825 to Commercial Credit Co.

110.    On November 12, 1963, Robb Tyler, Inc. issued Service Ticket No. I-97956 to Commercial Credit Co.

111.    On November 13, 1963, Robb Tyler, Inc. issued Service Ticket No. I-98476 to Commercial Credit Co.

112.    On November 14, 1963, Robb Tyler, Inc. issued Service Ticket No. I-99024 to Commercial Credit Co.

113.    On November 15, 1963, Robb Tyler, Inc. issued Service Ticket No. I-99567 to Commercial Credit Co.

114.    On November 16, 1963, Robb Tyler, Inc. issued Service Ticket No. J-01632 to Commercial Credit Co.

115.    On November 19, 1963, Robb Tyler, Inc. issued Service Ticket No. J-02287 to Commercial Credit Co.

116.    On November 20, 1963, Robb Tyler, Inc. issued Service Ticket No. J-02578 to Commercial Credit Co.

117.    On November 21, 1963, Robb Tyler, Inc. issued Service Ticket No. J-02898 to Commercial Credit Co.

118.    On November 22, 1963, Robb Tyler, Inc. issued Service Ticket No. J-03155 to Commercial Credit Co.

119.    On November 25, 1963, Robb Tyler, Inc. issued Service Ticket No. J-22768 to Commercial Credit Co.

120.    On November 26, 1963, Robb Tyler, Inc. issued Service Ticket No. J-23049 to Commercial Credit Co.

121.    On November 27, 1963, Robb Tyler, Inc. issued Service Ticket No. J-04132 to Commercial Credit Co.

122.    On November 28, 1963, Robb Tyler, Inc. issued Service Ticket No. J-04734 to Commercial Credit Co.

123.    On November 29, 1963, Robb Tyler, Inc. issued Service Ticket No. J-05160 to Commercial Credit Co.

124.    The 1970 Robb Tyler Accounts Receivable ledger dated March 31, 1970 identifies C C Supply Co. as a customer of Robb Tyler, Inc.

125.    Commercial Credit Co. and C C Supply Co. were and/or are engaged in the business of financial services.

126.    The waste streams attributable to Commercial Credit Co. and C C Supply Co. consisted of general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

127.    Commercial Credit Co. and C C Supply Co. knowingly and voluntarily contracted, agreed, or otherwise arranged with Robb Tyler, Inc. with the intent to dispose of their waste during the relevant time period, and such waste contained hazardous substances.

128.    By letter dated August 28, 2020, Plaintiffs demanded that CitiFinancial reimburse Plaintiffs for a specified amount of response costs incurred and to be incurred by Plaintiffs at the 68th Street Site.

129.    CitiFinancial was formally served with the original Complaint in this case, but failed to time file a responsive pleading to such original Complaint.

130.    On May 7, 2021, Plaintiff filed a Motion for Clerk's Entry of Default against CitiFinancial (Dkt. No. 630), and the Court's clerk entered the Notice of Default on May 14, 2021 (Dkt. Nos. 649 and 650).

131.    To date, CitiFinancial has refused to cooperate and has not paid any response costs incurred by Plaintiffs at the 68th Street Site.

132.    Defendant The Rukert Terminals Corporation ("Rukert Terminals") is one and the same as the entities identified on nexus documents for the 68th Street Site as Ruckert Terminal and Ruckerts Terminal.

133.     According to 68th Street Site records, Rukert Terminals by contract, agreement or otherwise, arranged for disposal, or arranged with a transporter for transport for disposal of waste at the 68th Street Site.

134.     On or about March 9, 2004, a Robb Tyler, Inc. employee identified Rukert Terminals as a customer of Robb Tyler, Inc. whose waste was disposed of at the 68th Street Site during the time that the 68th Street Site was in operation.

135.     The Robb Tyler Accounts Receivable ledger dated March 31, 1970 identifies Rukert Terminals as a customer of Robb Tyler, Inc.

136.     Rukert Terminals is and/or was located at 2021 S. Clinton Street, Baltimore, MD 21224.

137.     On or about June 15, 2005, the U.S. EPA issued a 104(e) Request for Information to Rukert Terminals seeking information concerning the transportation, storage, treatment or disposal of hazardous substances, pollutants or contaminants by Rukert Terminals at the 68th Street Site.

138.     Rukert Terminals is and/or was engaged in the business of terminal operations and stevedore services.

139.     In addition to the hazardous substances associated with terminal operations and stevedore services waste, Rukert Terminals' waste streams also consisted of transportation waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, chromium, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

140.    Rukert Terminals knowingly and voluntarily contracted, agreed, or otherwise arranged with Robb Tyler, Inc. with the intent to dispose of Rukert Terminals waste during the relevant time period, and such waste contained hazardous substances.

141.    As detailed above, the waste that Robb Tyler, Inc. hauled for Rukert Terminals was disposed of at the 68th Street Site.

142.    By letter dated August 28, 2020, Plaintiffs demanded that Rukert Terminals reimburse Plaintiffs for a specified amount of response costs incurred and to be incurred by Plaintiffs at the 68th Street Site.

143.    To date, Rukert Terminals has refused to cooperate and has not paid any response costs incurred by Plaintiffs at the 68th Street Site.

144.    Defendant Solo Cup Company ("Solo Cup") is one and the same as and/or the successor to Maryland Cup Corp., MD Cupcorp, MD Cup Corp., Solo Cup Co. and Sweetheart Cup. In its February 9, 2021 Answer to the Complaint, Solo Cup admitted this same allegation in part, stating "Solo Cup admits that Maryland Cup Corporation and Sweetheart Cup Company, Inc. are predecessors to Solo Cup Company. . ." Solo Cup's Ans., at 281, ¶ 1005(Dkt. No. 188).

145.    Maryland Cup Corp., MD Cupcorp and MD Cup Corp. are one in the same and are abbreviations or references to The Maryland Cup Corporation.

146.    According to publicly available records, the Maryland Cup Corporation operated in Owings Mills, Maryland and was founded as the Maryland Baking Company by Mr. Henry Shapiro in or about 1926.

147.    Maryland Baking Company manufactured ice cream cones, and then expanded into manufacturing matches, straws, and cups at its Owings Mills plant.

148.    Maryland Baking Company changed its name to Maryland Cup Corporation when it began concentrating on manufacturing disposable consumer products including plastic cups in or around 1957, and formally registered Maryland Cup Corporation with the MDAT on or about 1969.

149.    According to publicly available records, Mr. Shapiro sold Maryland Cup Corporation on or about 1983. In its February 9, 2021 Answer to the Complaint, Solo Cup admitted this same allegation in part, stating "Solo Cup admits that Maryland Cup Corporation was sold on or about 1983. . ." Solo Cup's Ans., at 282, ¶ 1010 (Dkt. No. 188).

150.    According to MDAT, in or about 1946, Sweetheart Cup Corp. was incorporated in Maryland with its most recent principal address at 326 St. Paul Pl. Baltimore, MD 21202.

151.    According to historic newspapers from the 1960s, Sweetheart Cup (and variations) was located in Owings Mills, Maryland.

152.    According to MDAT, on or about February 18, 1969, Sweetheart Properties, Inc. was incorporated in Maryland at an address at 10100 Reisterstown Rd., Owings Mills, MD 21117.

153.    According to historic newspapers from at least as early as January 1962 to at least as late as June 1983, Sweetheart Cup was identified as a division of Maryland Cup Corp.

154.    According to MDAT, on or about August 31, 1983, MC Acquisition Corp. and Maryland Cup Corporation merged, with the surviving entity retaining the name Maryland Cup Corporation.

155.    According to MDAT, through multiple mergers all occuring on December 31, 1984, Sweetheart Cup Corp. merged into Sweetheart Properties, Inc., which changed its name to

Maryland Cup Corporation, and Maryland Cup Corporation changed its name to Sweetheart Holding Corp.

156.    According to MDAT records, on or about December 31, 1996, both Sweetheart Holding Corp. f/k/a Maryland Cup Corporation and Maryland Cup Corporation f/k/a Sweetheart Properties, Inc. merged into Lily-Tulip, Inc., a Delaware corporation.

157.    According to MDAT records, on or about January 24, 1990, Lily-Tulip, Inc. changed its name to Sweetheart Cup Company Inc., the entity which Solo Cup admits is its predecessor.

158.    As detailed above, Solo Cup is the successor by merger to the nexus parties identified as variations of Maryland Cup and Sweetheart Cup.

159.    Additionally, as alleged in Paragraph No. 135, *supra*, Solo Cup is one and the same as, the successor by merger or *de facto* merger to, or the mere continuation or alter ego of, or otherwise assumed the liabilities of, the entity identified on the nexus records for the Metro Container Site as Solo Cup Co.

160.    According to MDAT, Solo Cup Company ("Solo Cup I") was a Delaware corporation first qualified to do business in Maryland in or about 1955 with a mailing address of 1700 Old Deerfield Rd., Highland Park, IL 60035.

161.    Historic newspapers identify Solo Cup Co. at an address on Constance Avenue in Arbutus, Maryland from at least as early as 1959 to at least as late as 1972.

162.    According to MDAT, Solo Cup I merged into SCC Holding Company, a Delaware entity not qualified to do business in Maryland, on or about July 31, 1991, and thereafter ceased to exist.

163.     According to the Illinois Secretary of State ("ILSOS"), SCC Holding Company was a Delaware corporation qualified to do business in Illinois on or about September 30, 1980 which merged or consolidated out of existence on or about March 29, 1991, with an address at 1700 Old Deerfield Rd., Highland Park, IL 60035, the same address associated with Solo Cup I and Defendant Solo Cup. Its president is identified as R L Hulseman.

164.     According to ILSOS, Solo Cup I was also qualified to do business in Illinois in or about 1955, which merged or consolidated out of existence on or about March 28, 1991, and its president is also identified as RL Hulseman.

165.     According to MDAT, a second Solo Cup Company ("Solo Cup II"), an Illinois corporation, was qualified to do business in Maryland on or about July 31, 1991, the same date that Solo Cup I merged out of existence. Solo Cup II's principal office was 1700 Old Deerfield Rd., Highland Park, IL 60035, the same address as Solo Cup I. Solo Cup II's mailing address was 150 S. Sanders Rd., Lake Forest IL 60045.

166.     According to MDAT, Solo Cup II merged out of existence on or about October 14, 2005.

167.     Upon information and belief, Solo Cup II merged into Solo Cup or a predecessor and/or affiliate.

168.     According to MDAT, Defendant Solo Cup is the third Solo Cup entity. Solo Cup was qualified to do business in Maryland on or about October 14, 2005, the same date that Solo Cup II merged out of existence. Solo Cup has a principal office at 150 S. Sanders, Lake Forest, IL 60045, the same as the mailing address for Solo Cup II, and the original qualification to do business from 2005 identifies Solo Cup's mailing address as 1700 Old Deerfield Rd., Highland

Park IL 60035, the address also associated with both Solo Cup I, Solo Cup II and SCC Holding Company.

169.    Additionally, Solo Cup's qualification to do business from 2005 identified Solo Cup's principal office in Maryland as 10100 Reistertown Road, Owings Mills, MD 21117, an address also associated with Maryland Cup and Sweetheart Cup entities.

170.    On information and belief and as detailed above, Solo Cup II continued the uninterrupted business of Solo Cup I and/or SCC Holdings Company which were affiliates and/or predecessors to Solo Cup, and Solo Cup continued the uninterrupted business of Solo Cup II.

171.    According to 68th Street Site records, Maryland Cup Corp., MD Cupcorp, MD Cup Corp., Solo Cup Co. and Sweetheart Cup by contract, agreement or otherwise, arranged for disposal, or arranged with a transporter for transport for disposal of waste at the 68th Street Site.

172.    According to a U.S. EPA interview dated May 24, 1999, a witness identified The Maryland Cup Corporation as a waste generator whose waste was brought to the 68th Street Site.

173.    On or about May 2, 2005, a former independent contractor for Robb Tyler, Inc. stated that he picked up Solo Cup Company's 10-yard container approximately three times per week and disposed of the waste at the 68th Street Site.

174.    The former independent contractor for Robb Tyler, Inc. described Solo Cup Company's waste as paper and plastic.

175.    On or about August 24, 2005, a former truck driver for Robb Tyler, Inc. identified Maryland Cup Corporation as a generator of waste that was sent to the 68th Street Site approximately three times per week.

176.    On or about August 24, 2005, a former truck driver for Robb Tyler, Inc. identified Solo Cup Company as a generator of waste that was sent to the 68th Street Site approximately three times per week.

177.    On or about April 25, 2006, a former truck driver for Modern Trash Moval, Inc. identified The Maryland Cup Corporation as a generator of waste that was sent to the 68th Street Site.

178.    On or about May 8, 2006, a former truck driver for Modern Trash Moval, Inc. identified The Maryland Cup Corporation as a generator of waste that was sent to the 68th Street Site approximately twice per week, which waste was contained in a 4-cubic yard container and consisted of paper.

179.    On or about February 12, 1998, a Robb Tyler, Inc. employee identified Solo Cup Company as a generator of solid waste or chemicals that were disposed of at the 68th Street Site.

180.    On or about February 12, 1998, a Robb Tyler, Inc. employee identified The Maryland Cup Corporation as a generator of mixed, waste paper/cardboard that was disposed of at the 68th Street Site.

181.    According to Early Chandler, a Robb Tyler, Inc. driver, he made roll-off pick-ups of The Maryland Cup Corporation waste for transport to the 68th Street Site.

182.    According to Early Chandler, a Robb Tyler, Inc. driver, The Maryland Cup Corporations's waste consisted of mixed loads that sometimes emitted a chemical-like odor.

183.    According to Early Chandler, a Robb Tyler, Inc. driver, The Maryland Cup Corporations's waste consisted of paper, rags, cans and floor sweepings.

184.    According to Early Chandler, a Robb Tyler, Inc. driver, he made roll-off pick-ups of the Solo Cup plant's waste, located near Rome Road, for transport to the 68th Street Site.

185.     According to Early Chandler, a Robb Tyler, Inc. driver, Solo Cup's waste consisted of mixed loads that included rags, cans and floor sweepings.

186.     According to Sinclair Doggett, a Robb Tyler, Inc. driver, he made roll-off pick-ups at The Maryland Cup Corporation plant on Reistertown Road for transport to the 68th Street Site.

187.     According to Sinclair Doggett, a Robb Tyler, Inc. driver, The Maryland Cup Corp's waste that went to the 68th Street Site included mixed loads of paper, rags, cans and floor sweepings.

188.     According to Wilbert Savage, a Robb Tyler, Inc. driver, he hauled waste from the Maryland Cup plant, located on Reisertown Road, to the 68th Street Site.

189.     According to Wilbert Savage, a Robb Tyler, Inc. driver, The Maryland Cup Corporation's waste that went to the 68th Street Site consisted of assorted plant trash including rags and floor sweepings.

190.     According to Orlando Michael Cefaloni, a Robb Tyler, Inc. driver, he would pick up approximately 28 drums four (4) times per year from The Maryland Cup Corporation and haul the drums to the 68th Street Site.

191.     According to Orlando Michael Cefaloni, a Robb Tyler, Inc. driver, The Maryland Cup Corporation drums that were hauled to the 68th Street Site were emptied and burned at the Site.

192.     According to Orlando Michael Cefaloni, a Robb Tyler, Inc. driver, The Maryland Cup Corporation drums contained different wastes including inks and varnalene.

193.    According to Andrew Lee Ragsdale, Sr., a Robb Tyler, Inc. driver, he would pick up waste from The Maryland Cup Corporation, also known as Sweetheart Cup, and haul the waste to the 68th Street Site.

194.    According to Andrew Lee Ragsdale, Sr., a Robb Tyler, Inc. driver, The Maryland Cup Corporation, also known as Sweetheart Cup, wastes that went to the 68th Street Site included 5-gallon buckets of paint like material, colored ink and other liquid waste.

195.    The Robb Tyler Accounts Receivable ledger dated March 31, 1970 identifies The Maryland Cup Corporation and Solo Cup Company as customers of Robb Tyler, Inc.

196.    Maryland Cup Corp., MD Cupcorp, MD Cup Corp., Solo Cup Co. and Sweetheart Cup are and/or were engaged in the business of manufacture, sales, and distribution of disposable consumer products particularly for food and beverage-related products. In its February 9, 2021 Answer to the Complaint, Solo Cup admitted this same allegation in part, stating "Solo Cup admits that Solo Cup Company was generally engaged in the business of manufacturing, sales, and distribution of disposalbe consumer products, including food and beverage-related products. Solo Cup's Ans., Dkt. No. 188, at 283, ¶ 1012.

197.    In addition to the hazardous substances associated with the manufacture and distribution of disposable consumer products, Maryland Cup Corp., MD Cupcorp, MD Cup Corp., Solo Cup Co. and Sweetheart Cup's waste streams consisted of fabrication waste, retail waste and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, copper, dichloroethylene, lead, mercury, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

198.     The Maryland Cup Corporation and Solo Cup Company knowingly and voluntarily contracted, agreed, or otherwise arranged with Robb Tyler, Inc. and the other waste haulers identified above with the intent to dispose of their waste during the relevant time period, and such waste contained hazardous substances.

199.     As detailed above, the waste that Robb Tyler, Inc. and the other waste haulers identified above hauled for The Maryland Cup Corporation and Solo Cup Company was disposed of at the 68th Street Site.

200.     By letter dated August 28, 2020, Plaintiffs demanded that Solo Cup reimburse Plaintiffs for a specified amount of response costs incurred and to be incurred by Plaintiffs at the 68th Street Site.

201.     In its February 9, 2021 Answer to the original Complaint in this case, Solo Cup admitted this same allegation in part, stating "Solo Cup admits that it received a letter from Plaintiff on or around August 28, 2020 demanding reimbursement for a specified amoutn of response costs, but lacks knowledge or information sufficient to admit or deny whether those response costs were incurred or will be incurred by Plaintiff, and therefore denies the same . . ." Solo Cup's Ans., at 283, ¶ 1014 (Dkt. No. 188).

202.     To date, Solo Cup has refused to cooperate and has not paid any response costs incurred by Plaintiffs at the 68th Street Site.

203.     In its February 9, 2021 Answer to the original Complaint in this case, Solo Cup admitted this same allegation in part, stating "Solo Cup admits that it has not paid response costs purportedly incurred by Plaintiff . . ." Solo Cup's Ans., at 284, ¶ 1015 (Dkt. No. 188).

204.     Defendant ViacomCBS, Inc. ("ViacomCBS") is the successor to and/or is formerly known as the entities identified on nexus documents for the 68th Street Site as

Westinghouse, Westinghouse Corp., Westinghouse Defense Ctr, Westinghouse Industrial, Westinghouse Elect. Corp., and Westinghouse Electric Co. In its February 9, 2021 Answer to the Complaint, ViacomCBS admitted this same allegation in part, stating "ViacomCBS admits that ViacomCBS Inc. is the successor to Westinghouse Electric Corporation." ViacomCBS's Ans., at 2, ¶ 1118 (Dkt. No. 172).

205.    On information and belief, Westinghouse, Westinghouse Corp., Westinghouse Defense Ctr, Westinghouse Industrial, Westinghouse Elect. Corp., and Westinghouse Electric Co. are all shorthand for and/or synonymous with ViacomCBS's predecessor, Westinghouse Electric Corporation.

206.    The original Westinghouse Electric Company was founded in or about 1886.

207.    In its February 9, 2021 Answer to the original Complaint in this case, ViacomCBS admitted this same allegation in part, stating "ViacomCBS admits that Westinghouse Electric & Manufacturing Corporation was incorporated in the State of Pennsylvania in 1886." ViacomCBS's Ans., at 2, ¶ 1119 (Dkt. No. 172).

208.    According to MDAT, CBS Corporation registered as a foreign coporation in Maryland at least as early as 1932.

209.    In its February 9, 2021 Answer to the original Complaint in this case, ViacomCBS admitted this same allegation in part, stating "ViacomCBS admits that according to records filed with the Maryland Secretary of State, CBS Corporation, a Pennsylvania corporation formerly known as Westinghouse Electric Corporation, was registered as a foreign corporation in 1932 . . ." ViacomCBS's Ans., at 2, ¶ 1120 (Dkt. No. 172).

210.    Westinghouse Electric Company filed for a name change to Westinghouse Electric Corporation in or about 1945.

211.     In its February 9, 2021 Answer to the original Complaint in this case, ViacomCBS admitted this same allegation in part, stating "ViacomCBS admits that in 1945, the Westinghouse Electric Manufacturing Corporation was changed to Westinghouse Electric Corporation . . . ." ViacomCBS's Ans., at 3, ¶ 1121 (Dkt. No. 172).

212.     The weapons and industrial electronic manufacturing Westinghouse entities, Westinghouse Electric Systems and Westinghouse Defense Center, provided research, development and manufacture of electronic equipment for the U.S. military and government agencies from 1938 until approximately 1996.

213.     In its February 9, 2021 Answer to the original Complaint in this case, ViacomCBS admitted this same allegation in part, stating "Westinghouse Electric Corporation manufactured and sold some products to the U.S. military and government agencies . . . ." ViacomCBS's Ans., at 3, ¶ 1122 (Dkt. No. 172).

214.     In or about November 1995 Westinghouse Electric Corporation acquired CBS, Inc., but changed the name to CBS in or about November 1997.

215.     In its February 9, 2021 Answer to the original Complaint in this case, ViacomCBS admitted this same allegation in part, stating "ViacomCBS admits that in 1995, Westinghouse Electric Corporation acquired CBS Inc. In 1997, the name Westinghouse Electric Corporation was changed to CBS Corporation. . . ." ViacomCBS's Ans., at 3, ¶ 1123 (Dkt. No. 172).

216.     According to publicly available records, in or about 2000, Viacom acquired CBS Inc. via a merger, and CBS stock was transferred to Viacom stock.

217.     In its February 9, 2021 Answer to the original Complaint in this case, ViacomCBS admitted this same allegation in part, stating "ViacomCBS admits that in 2000,

CBS Corporation, a Pennsylvania corporation, became the non-survivor of a merger with and into Viacom Inc., a Delaware corporation . . . ." ViacomCBS's Ans., at 3, ¶ 1124 (Dkt. No. 172).

218.    In or about 2006, Viacom separated into two companies.

219.    In its February 9, 2021 Answer to the original Complaint in this case, ViacomCBS admitted this same allegation in part, stating "ViacomCBS admits that the name Viacom Inc. was changed to CBS Corporation on December 31, 2005, and a separate Viacom Inc. was incorporated in Delaware . . . ." ViacomCBS's Ans., at 3, ¶ 1125 (Dkt. No. 172).

220.    According to MDAT, on March 23, 2007, Viacom Inc. changed its name to CBS Corporation of Delaware a/k/a CBS Corporation.

221.    In its February 9, 2021 Answer to the original Complaint in this case, ViacomCBS admitted this same allegation in part, stating "ViacomCBS admits that according to records filed with the Maryland Secretary of State, on March 23, 2007, CBS Corporation registered under the DBA name CBS Corporation of Delaware a/k/a CBS Corporation . . . ." ViacomCBS's Ans., at 3, ¶ 1126 (Dkt. No. 172).

222.    According to MDAT, on December 6, 2019, CBS Corporation of Delaware a/k/a CBS Corporation changed its name to ViacomCBS Inc.

223.    In its February 9, 2021 Answer to the original Complaint in this case, ViacomCBS admitted this same allegation in part, stating "ViacomCBS admits that according to records filed with the Maryland Secretary of State, on December 6, 2019, CBS Corporation changed its name to ViacomCBS Inc. . . . ." ViacomCBS's Ans., at 4, ¶ 1127 (Dkt. No. 172).

224.    According to 68th Street Site records, Westinghouse, Westinghouse Corp., Westinghouse Defense Ctr, Westinghouse Elect. Corp., Westinghouse Electric Co. and

Westinghouse Industrial by contract, agreement or otherwise, arranged for disposal, or arranged with a transporter for transport for disposal of waste at the 68th Street Site.

225.    On or about March 9, 2004, a former Robb Tyler, Inc. employee identified Westinghouse Electric Corporation as a Robb Tyler customer whose waste was disposed at the 68th Street Site.

226.    The former Robb Tyler, Inc. employee identified Westinghouse Electric Corporation's waste that went to the 68th Street Site as consisting of wood, plastic, metal boxes, and plastic boxes.

227.    The former Robb Tyler, Inc. employee stated that Westinghouse Electric's waste was picked up daily for transport to the 68th Street Site.

228.    On or about May 18, 2000, a former Robb Tyler, Inc. employee identified Westinghouse Electric Corp. at 4015 Foster Avenue and 2519 Wilkens Avenue as generating waste including airplane and air conditioning parts that were tranported for disposal to the 68th Street Site.

229.    On or about September 30, 2002, a former Bohager employee identified Westinghouse at 4015 Foster Avenue as a potential 68th Street Site generator whose waste consisted of metal and wire.

230.    According to Early Chandler, a Robb Tyler, Inc. driver, Westinghouse waste consisting of rags, cans, oil, grease, paint, drums and floor sweepings were transported and disposed of at the 68th Street Site.

231.    According to Sinclair Doggett, a Robb Tyler, Inc. driver, Westinghouse waste consisting of rags, cans, oil and floor sweepings were transported and disposed of at the 68th Street Site.

232.    According to Wilbert Savage, a Robb Tyler, Inc. driver, Westinghouse waste consisting of trash, floor sweepings, rags, cans, drums and possibly some oil were transported and disposed of at the 68th Street Site.

233.    The Robb Tyler Accounts Receivable ledger dated March 31, 1970 identifies Westinghouse, Westinghouse Corp., Westinghouse Defense Ctr, Westinghouse Elect. Corp., Westinghouse Electric Co. and Westinghouse Industrial as customers of Robb Tyler, Inc.

234.    Westinghouse, Westinghouse Corp., Westinghouse Defense Ctr, Westinghouse Elect. Corp., Westinghouse Electric Co. and Westinghouse Industrial are and/or were engaged in the business of mass media and television production.

235.    In addition to the hazardous substances associated with the business of mass media and television production, Westinghouse, Westinghouse Corp., Westinghouse Defense Ctr, Westinghouse Elect. Corp., Westinghouse Electric Co. and Westinghouse Industrial's waste streams also consisted of at least electrical waste, fabrication waste and/or general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

236.    Westinghouse, Westinghouse Corp., Westinghouse Defense Ctr, Westinghouse Elect. Corp., Westinghouse Electric Co. and Westinghouse Industrial knowingly and voluntarily contracted, agreed, or otherwise arranged with Robb Tyler, Inc. and other waste haulers identified above with the intent to dispose of their waste during the relevant time period, and such waste contained hazardous substances.

237.    As detailed above, the waste Robb Tyler, Inc. and other waste haulers identified above hauled for Westinghouse, Westinghouse Corp., Westinghouse Defense Ctr, Westinghouse

Elect. Corp., Westinghouse Electric Co. and Westinghouse Industrial was disposed of at the 68th Street Site.

238.    By letter dated August 28, 2020, Plaintiffs demanded that ViacomCBS reimburse Plaintiffs for a specified amount of response costs incurred and to be incurred by Plaintiffs at the 68th Street Site.

239.    In its February 9, 2021 Answer to the original Complaint in this case, ViacomCBS admitted this same allegation in part, stating "ViacomCBS admits that Plaintiff, via Plaintiff's counsel, sent a letter to ViacomCBS dated August 28, 2020 . . . ." ViacomCBS's Ans., at 4, ¶ 1130 (Dkt. No. 172).

240.    To date, ViacomCBS has refused to cooperate and has not paid any response costs incurred by Plaintiffs at the 68th Street Site.

241.    In its February 9, 2021 Answer to the original Complaint in this case, ViacomCBS admitted this same allegation in part, stating "ViacomCBS admits that it has not paid any response costs incurred by Plaintiff at the 68th Street Site . . . ." ViacomCBS's Ans., at 4, ¶ 1131 (Dkt. No. 172).

242.    Defendant Vornado Realty Trust ("Vornado Realty") is the successor to and/or is formerly known as the entities identified on nexus documents for the 68th Street Site as Vornado, Inc., Two Guys and Two Guys Eudowood.

243.    In its November 20, 2020 Answer to the original Complaint in this case, Vornado Realty admitted this same allegation, stating "Admitted that Vornado Realty is the successor to the interests of Two Guys from Harrison, Inc. and Vornado Inc." Def.'s Ans. & Counterclaim, at 2, ¶ 1153 (Dkt. No. 185).

244.     In 1959, a company named Two Guys from Harrison, Inc. and O.A. Stutton Co. merged to form Vornado, Inc.

245.     Vornado, Inc. operated Two Guys Department Stores.

246.     In its November 20, 2020 Answer to the original Complaint in this case, Vornado Realty admitted this same allegation, stating "Admitted." Def.'s Ans. & Counterclaim, at 2, ¶ 1154 (Dkt. No. 185).

247.     Two Guys and Two Guys Eudowood, as identified on the nexus documents for the 68th Street Site, are shorthand for Two Guys Department Stores and one and the same as Vornado, Inc.

248.     In or about 1993, Vornado, Inc. merged into Vornado Realty.

249.     In its November 20, 2020 Answer to the orginal Complaint in this case, Vornado Realty admitted this same allegation, stating "Admitted that in or about 1993 Vornado Inc. was merged into Vornado Realty, a Maryland Estate Investment Trust." Def.'s Ans. & Counterclaim, at 2, ¶ 1155 (Dkt. No. 185).

250.     According to 68th Street Site records, Two Guys, Two Guys Eudowood and Vornado, Inc. by contract, agreement or otherwise, arranged for disposal, or arranged with a transporter for transport for disposal of waste at the 68th Street Site.

251.     On or about March 8, 2005, a Robb Tyler, Inc. employee identified Two Guys as a generator of waste from an industrial location whose waste was hauled by Robb Tyler, Inc. to the 68th Street Site approximately three times per week, and which waste included paper and cardboard.

252.     The Robb Tyler Accounts Receivable ledger dated March 31, 1970 identifies Vornado Inc., Two Guys and Two Guys Eudowood as customers of Robb Tyler, Inc.

253.    Two Guys, Two Guys Eudowood, and Vornado, Inc. were engaged in the business of retail sales and appliance manufacturing and sales.

254.    In addition to the hazardous substances associated with the business of retail sales and appliance manufacturing and sales, the waste streams attributable to Two Guys, Two Guys Eudowood and Vornado, Inc. also consisted of at least residential and general office waste, which contained the following hazardous substances: acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

255.    Vornado Inc., Two Guys, and Two Guys Eudowood knowingly and voluntarily contracted, agreed, or otherwise arranged with Robb Tyler, Inc. with the intent to dispose of their waste, and such waste contained hazardous substances.

256.    As detailed above, the waste that Robb Tyler, Inc. hauled for Vornado Inc., Two Guys and Two Guys Eudowood was disposed of at the 68th Street Site.

257.    By letter dated August 28, 2020, Plaintiffs demanded that Vornado Realty reimburse Plaintiffs for a specified amount of response costs incurred and to be incurred by Plaintiffs at the 68th Street Site.

258.    In its November 20, 2020 Answer to the original Complaint in this case, Vornado Realty admitted this same allegation in part, stating "Admitted that said letter was delivered . . ." Def.'s Ans. & Counterclaim, at 3, ¶ 1158 (Dkt. No. 185).

259.    To date, Vornado Realty has refused to cooperate and has not paid any response costs incurred by Plaintiffs at the 68th Street Site.

260.     In its November 20, 2020 Answer to the original Complaint in this case, Vornado

Realty admitted this same allegation in part, stating "Admitted that Vornado Realty has not paid

response costs in this matter . . ." Def.'s Ans. & Counterclaim, at 3, ¶ 1159 (Dkt. No. 185).

## COUNT I – CONTRIBUTION UNDER CERCLA

261.     Plaintiffs reallege and incorporate by reference Paragraph Nos. 1 through 260 of

this Amended Complaint as if fully restated herein.

262.     Sections 113(f)(1) and (3)(B) of CERCLA, 42 U.S.C. §§ 9613(f)(1) and (3)(B),

provide, in relevant part, that:

> Any person may seek contribution from any other person who is liable or potentially
> liable under section 9607(a) . . . .
>
> A person who has resolved its liability to the United States or a State for some or all of a
> response action or for some or all of the costs of such action in an administrative or
> judicially approved settlement may seek contribution from any person who is not party to
> a settlement . . . .

263.     Section 107(a)(3)–(4) of CERCLA, 42 U.S.C. §§ 9607(a)(3)–(4), provides, in

relevant part, that:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set
> forth in subsection (b) of this section --
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or
> treatment, or arranged with a transporter for transport for disposal or treatment, of
> hazardous substances owned or possessed by such person, by any other party or entity, at
> any facility or incineration vessel owned or operated by another party or entity and
> containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to
> disposal or treatment facilities, incineration vessels or sites selected by such person, from
> which there is a release, or threatened release which causes the incurrence of response
> costs, of a hazardous substance, shall be liable for -- (A) all costs of removal or remedial
> action incurred by the United States Government or a State or an Indian Tribe not
> inconsistent with the national contingency plan; (B) any other necessary costs of response
> incurred by any other person consistent with the national contingency plan; (C) damages
> for injury to, destruction of, or loss of natural resources, including the reasonable costs of
> assessing such injury, destruction, or loss resulting from such a release; and (D) the costs

of any health assessment or health effects study carried out under section 9604(i) of this title.

264.    "Disposal" is defined in CERCLA Section 101(29) by reference to the Solid Waste Disposal Act ("SWDA"). 42 U.S.C. § 9601(29). The SWDA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

265.    "Facility" is defined in CERCLA Section 101(9) as "any building, structure, installation, equipment, pipe or pipeline" or "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed . . . ." 42 U.S.C. § 9601(9).

266.    "Hazardous substance" is defined in CERCLA Section 101(14) by reference to other federal statutes and by reference to a list of substances published by EPA at 40 C.F.R. § 302.4. 42 U.S.C. § 9601(14).

267.    "Owner" or "operator" is defined in CERCLA Section 101(20) as ". . . in the case of an onshore facility or an offshore facility, any person owning or operating such facility . . . ." 42 U.S.C. § 9601(20).

268.    "Person" is defined in CERCLA Section 101(21) as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(20).

269.    "Release" is defined in CERCLA Section 101(22) as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment (including the abandonment or discarding of barrels, containers,

and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . ." 42 U.S.C. § 9601(22).

270.    "Response" is defined in CERCLA Section 101(25), and includes "removal" actions, "remedial" actions, and enforcement activities related thereto. 42 U.S.C. § 9601(25).

271.    The 68th Street Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

272.    There has been a "release" and/or a threatened "release" of "hazardous substances" at the 68th Street Site which has caused the incurrence of "response costs" by the 68th Street Site Work Group, within the meaning of Sections 101(22), 101(14) and 107 of CERCLA, 42 U.S.C. §§ 9601(22), 9601(14) and 9607.

273.    Plaintiffs is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

274.    Each of the Defendants is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

275.    Pursuant to CERCLA, 42 U.S.C. §§ 9607(a)(3) and/or 9607(a)(4), each Defendant is liable as an arranger or generator of materials containing hazardous substances, which materials were treated and/or disposed at the 68th Street Site; and/or a transporter of hazardous substances who selected the 68th Street Site for the treatment and/or disposal of such hazardous substances, and who transported such hazardous substances to the Site.

276.    As a result of the release and threatened release of hazardous substances at or from the 68th Street Site, the Plaintiffs incurred response costs and will continue to incur costs of "response," as that term is defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

277.     Plaintiffs resolved their liability to EPA for matters covered in the RI/FS AOC and RD/RA Consent Decree.

278.     Pursuant to CERCLA Sections 107 and 113, 42 U.S.C. §§ 9607 and 9613, each Defendant is strictly liable for its respective equitable share of the past and future response costs incurred and to be incurred by Plaintiffs in response to the release or threatened release of hazardous substances at and from the 68th Street Site.

279.     No Defendant has resolved its liability to Plaintiffs or EPA.

280.     To date, Plaintiffs incurred over $4.8 million in response costs and natural resource damages, including reimbursement of response costs incurred by the United States and the State of Maryland, at the 68th Street Site under the RD/RA Consent Decree.

281.     The response costs incurred by Plaintiffs in connection with the 68th Street Site are consistent with the NCP.

282.     Plaintiffs are entitled to contribution from all Defendants under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for Defendants' respective equitable shares of all costs and damages incurred by Plaintiffs, including applicable interest as provided for in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

WHEREFORE, Plaintiffs respectfully requests that this Court enter a declaratory judgment against all Defendants finding that they are each liable under CERCLA and are obligated to pay for their respective equitable shares of all past and future response costs, including appropriate pre-judgment interest, associated with the 68th Street Site. Plaintiffs further requests that this Court award interest and costs of suit, including reasonable attorney's fees and consultant fees as permitted by law; and order any such other relief as the Court may deem just and appropriate under the circumstances.

## COUNT II – DECLARATORY RELIEF

283.    Plaintiffs allege and incorporate by reference Paragraph Nos. 1 through 282 of this Amended Complaint as if fully restated herein.

284.    There is a present and actual controversy between Plaintiffs and all Defendants concerning their respective rights and obligations with respect to the response costs associated with 68th Street Site.

285.    Plaintiffs seeks a declaratory judgment under CERCLA Section 113, 42 U.S.C. § 9613, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202, against all Defendants holding them liable for their respective equitable shares of response costs, that will be binding in any subsequent action to recover further response costs.

286.    Plaintiffs are entitled to judgment against all Defendants for past and future response costs incurred in connection with the 68th Street Site.

WHEREFORE, Plaintiffs respectfully pray that this Court enter a declaratory judgment against all Defendants finding that they are each liable under CERCLA and are obligated to pay for their equitable shares of all past and future response costs associated with the 68th Street Site. Plaintiffs further requests that this Court award interest and costs of suit, including reasonable attorney's fees and consultant fees as permitted by law; and order any such relief as the Court may deem just and appropriate under the circumstances.

Dated: November 1, 2021

Respectfully submitted,

THE JUSTIS LAW FIRM LLC

*/s/ Rachel D. Guthrie*

Rachel D. Guthrie    admitted *pro hac vice*
Matthew T. Merryman  admitted *pro hac vice*
4100 Terrace St.
Kansas City, MO  64111
Telephone: (816) 608-2760
Facsimile:  (816) 683-1743
Email: rguthrie@justislawfirm.com
      mmerryman@justislawfirm.com

Stuart D. Kaplow
Bar Number 05282
James Kelly-Lieb
Bar Number 20420
Stuart D. Kaplow, P.A.
11426 York Road, 1st Floor
Cockeysville, MD 21030
(410) 339-3910 Telephone
(410) 415-7161 Facsimile
Email: skaplow@stuartkaplow.com
      jkellylieb@kenny-law.com

ATTORNEYS FOR PLAINTIFFS